**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| CALVIN DUNCAN, in his official capacity as Clerk-Elect of Orleans Parish Criminal District Court, and in his personal capacity as an Orleans Parish voter,<br><br>*Plaintiff*,<br><br>v.<br><br>JEFFREY LANDRY, in his official capacity as Governor of the State of Louisiana, NANCY LANDRY, in her official capacity as Louisiana Secretary of State, and ELIZABETH MURRILL, in her official capacity as Attorney General for the State of Louisiana,<br><br>*Defendants*. | Case No. 3:26-cv-00460<br><br><br>*Jury Trial Demanded* |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. High-powered officials in Louisiana state government are engaged in an unconstitutional campaign to prevent Plaintiff Calvin Duncan, Clerk-Elect of Orleans Parish Criminal District Court and an Orleans Parish voter, from taking the office to which he was duly elected by a landslide on November 15, 2025. He received his Commission Certificate (signed by Defendants Jeffrey and Nancy Landry) for this office on April 20, 2026, alongside his Criminal District Clerk of Court identification badge, and Oath of Office forms. *See* Exh. A.

2. Mr. Duncan was sworn into office on April 21, 2026, as permitted by La. R.S. 42:141(B), and is currently scheduled, in accordance with La. R.S. 13§1371.2.A, to assume office and his duties on May 4, 2026.

3. Defendants, however, have a different plan. They aim to illegally obstruct Mr. Duncan's assumption of office by retroactively redefining the meaning of "clerk of court" that existed on November 15, 2025—the date of Mr. Duncan's election. So too are they working in coordination to retaliate against Mr. Duncan—an exoneree who was wrongfully imprisoned for 28 years—for his outspoken claims that the criminal legal system in Orleans is unjust and frequently discriminatory against Black people. They are targeting Mr. Duncan in order to prevent him from undertaking reforms he believes are necessary to protect criminal defendants, particularly those who are Black.

4. In fact, Defendant Attorney General Liz Murrill, Defendant Jeff Landry's legal emissary, threatened Mr. Duncan's protected speech during his campaign—vowing to take concrete retaliatory action against him if he refused to chill his own speech concerning his status as a nationally recognized exoneree.

5. But Mr. Duncan, in line with his constitutionally protected right under the First Amendment, refused to honor Defendants' threat and self-censor his political speech on the campaign trail—speech that ultimately garnered him an electoral triumph. In doing so, Mr. Duncan not only had the audacity to flout the Governor's and Attorney General's wills, both he and his message of reform won the election.

6. In response, the Governor (as the Attorney General had forewarned) retaliated against Mr. Duncan for the protected speech that had secured him the election. The Governor also entered into a conspiracy with other named Defendants to deprive Mr. Duncan of his free speech rights and assumption of the position to which he was elected.

7. In his pursuit to punish Mr. Duncan for his racial-justice advocacy on behalf of criminal defendants and to silence that constitutionally protected advocacy, the Governor

pressured members of the legislature to pass Senate Bill 256 ("SB 256" or the "Landry Bill") and to include two amendments together (the "Landry Amendments") that he claims bar Mr. Duncan outright from assuming the office to which he was duly elected. The first amendment ("the First Landry Amendment"),[1] added on April 8, 2026, would make the Bill effective upon gubernatorial signature, and was passed with the explicit intent of barring Mr. Duncan from taking office by ensuring the Landry Bill passes prior to Mr. Duncan's first day in office as Clerk of Orleans Parish Criminal Court. The second amendment ("the Second Landry Amendment"),[2] added on April 23, 2026, eliminates the position of Clerk of Orleans Parish Criminal Court the day before Mr. Duncan is scheduled to assume the role, and redefines the meaning of "clerk of court" for Orleans Parish to purportedly install the Clerk of Orleans Parish *Civil* Court into the new office of Clerk of Court for the Parish of Orleans.

8.      Together, the two Landry Amendments, introduced at the Governor's behest by Senator John C. "Jay" Morris III (the Bill's author) and House Representative Dixon McMakin, run headlong into the law. Absent a legally-required election, Defendants seek to appoint the sitting Civil District Court Clerk into the new "Orleans Clerk of Court" position on May 4, 2026.

---

[1]    The text of the First Landry Amendment reads: "Section 3. This Act shall become effective upon signature by the governor or, if not 27 signed by the governor, upon expiration of the time for bills to become law without signature 28 by the governor, as provided by Article III, Section 18 of the Constitution of Louisiana. If 29 vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval."

[2]    The text of the Second Landry Amendment reads: "Section 4. The provisions of this Act shall not reduce the current term of office of 34 the clerk of criminal district court for the Parish of Orleans on the effective date of this Act. 35 The office of clerk of criminal district court for the Parish of Orleans shall be abolished at 36 the end of May 3, 2026 and before the term of any other criminal clerk of court begins. 37 Immediately thereafter, the authority, functions, duties, and responsibilities of the office of 38 clerk of criminal district court for the Parish of Orleans, and all of the books, papers, records, 39 monies, actions, and other property of every kind and description, movable and immovable, 40 real and personal, possessed, controlled, or used by the office of the clerk of criminal district 41 court for the Parish of Orleans shall be transferred and owned, possessed, controlled, and 42 used by the clerk of the civil district court for the Parish of Orleans, who shall thereafter be 43 referred to as the clerk of court for the Parish of Orleans."

9. This legislative action targets Mr. Duncan specifically for punishment, violating the constitutional prohibition on enacting bills of attainder.

10. To date, Mr. Duncan has been barred by his predecessor from touring the Criminal District Court Clerk's Office. Meanwhile, the Civil District Court Clerk was invited to and did tour the Office, prior to the introduction of the Second Landry Amendment, which explicitly appoints her to this new position, foretelling Defendants' plan laid bare by the Second Landry Amendment.

11. But the current Clerk of *Civil* District Court, who the Governor instructed the legislature to install, envisions stepping into this newly-created office, cannot do so without an election—in part because the duties of the new Clerk of Court are significantly different from the Civil District Court Clerk's prior duties. By way of example, the Civil District Court Clerk has never served as the Chief Elections Officer for Orleans Parish. That duty has previously strictly fallen within the purview of the Criminal District Court Clerk—the office to which Mr. Duncan was elected.

12. Most importantly, the legislature does not have the power to create new offices and appoint their preferred candidate to bypass elections required by state law.

13. The undemocratic Landry Amendments will certainly chill Mr. Duncan from using his voice as a citizen, candidate for office, or elected official, not to mention the voice of any future candidate running for office who seeks to engage in protected speech with which the Governor disagrees. The messaging surrounding SB 256 is clear: if the wrong candidate with the wrong platform wins the election, expect that office to be abolished, and for the Governor's preferred candidate to be appointed.

4

14. The Landry Bill cannot operate to sanction illegal bypass of an election. This is particularly so where, as here, such a maneuver is designed to punish Mr. Duncan's speech and voting rights, and if left to stand, would carry out an unlawful conspiracy to single him out and deprive him of the seat to which he was duly elected.

15. Against this backdrop, Mr. Duncan asks this Court to maintain the status quo by allowing him to take his seat as Criminal District Court Clerk on May 4, 2026.

16. Ruling to the contrary would deny Mr. Duncan, in his personal capacity, his right to vote for the newly-created Orleans Clerk of Court position and unlawfully nullify his vote for the Orleans Parish Criminal District Court position. It would further bless Defendants' violation of the Bill of Attainder Clause, their retaliatory attack on Mr. Duncan for his speech, and the conspiracy intended to deprive him of his civil rights.

## JURISDICTION

17. Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983, 52 U.S.C. § 10101(a)(2)(A), Art. 1, § 10 of the U.S. Constitution, 42 U.S.C. § 1985, and La. Civ. Code Ann. Art. 2324.

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights cases), and 28 U.S.C. § 1367 (supplemental jurisdiction).

19. Declaratory and injunctive relief are authorized by Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## VENUE

20.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district, specifically East Baton Rouge Parish, and Defendants conduct business in this district. 28 U.S.C. § 98.

## PARTIES

21.     Plaintiff Calvin Duncan is a Black 63-year-old lawyer, prisoners' rights activist, racial justice advocate, author, researcher, and exoneree. He is domiciled in the State of Louisiana, is a resident of New Orleans, Louisiana, and is a registered and eligible voter in Orleans Parish. He was elected to the position of Clerk of Criminal District Court in Orleans Parish on November 15, 2025. As such, he is currently the Clerk-Elect of Criminal District Court in Orleans Parish. He brings this action in both his personal capacity as an Orleans parish voter, as well as his official capacity as Clerk-Elect of Orleans Parish Criminal District Court.

22.     Defendant Jeffrey Landry is the Governor of the State of Louisiana. As Governor, Defendant Landry is the State's chief executive. He is legally responsible for submitting the state's operating and capital budgets, signing or vetoing legislation, and executing all state laws in accordance with the Constitution of the United States and the Louisiana Constitution. He is sued in his official capacity.

23.     Defendant Nancy Landry is the Secretary of State for the State of Louisiana. As Secretary of State, Defendant Landry oversees the state's election process, including qualifying candidates, issuing commissions, and overseeing the administration of elections, including tabulating, verifying, and certifying election results. She is legally responsible for administering all elections in Orleans Parish involving Plaintiff in his personal capacity as a registered voter and in his official capacity as Clerk-Elect of Criminal District Court in Orleans Parish. She is sued in her official capacity.

6

24.     Liz Murrill is the Attorney General of the State of Louisiana. As Attorney General, she is the Chief Legal Officer for the State of Louisiana and represents the legal interests of the Governor of Louisiana. She is legally responsible for protecting and upholding the Constitutional rights of every Louisianian, enforcing the laws of Louisiana as they are written, and ensuring compliance with the Constitution of the United States and the Louisiana Constitution.

## STATEMENT OF FACTS

*Mr. Duncan Spent 28 Years in Prison for a Crime He Did Not Commit.*

25.     In 1982, Mr. Duncan was wrongly accused of first-degree murder.[3]

26.     In 1985, an Orleans Parish jury issued a unanimous jury verdict wrongly convicting him of that crime.[4]

27.     He was sentenced to life in prison at the Louisiana State Penitentiary, where he remained for more than 28 years.[5]

28.     Innocent of the crime for which he was convicted, Mr. Duncan fought to prove his innocence throughout his time in prison.[6]

29.     Albeit confined behind the iron bars of the largest maximum-security prison in the country, Mr. Duncan's quest to prove his innocence never wavered.

30.     Undeterred by the weight of his sentence, he became a self-taught jailhouse lawyer and spent years writing letters to the Orleans Parish Clerk of Criminal District Court, desperate to secure access to his own case files—the very files he knew contained evidence of his innocence.[7]

---

[3]   The National Registry of Exonerations, *Calvin Duncan* (Jan. 31, 2023), https://exonerationregistry.org/cases/13478; Innocence & Justice Louisiana, *Calvin Duncan: Profile*, https://justicelouisiana.org/clients/calvin-duncan/ (last visited Apr. 13, 2026).

[4]   *Id.*

[5]   *Id.*; Exh. B, Exoneration Documents for Calvin Duncan.

[6]   SB 256 Senate Hearing: Judiciary A, 52nd Reg. Sess. (March 31, 2026) (Testimony of Calvin Duncan), at 5:04:01-5:06:48, https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2026/03/0331_26_juda2.

[7]   *Id.* at 5:04:01-5:06:48, 5:15:05-5:16:20.

31.     Unfortunately for Mr. Duncan, his decades-long attempts to secure access to his own case files fell flat due to the mismanagement of files at the Criminal Court Clerk's Office.[8]

32.     In 2004, the Innocence Project of New Orleans ("IPNO") (now known as Innocence and Justice Louisiana) agreed to take on Mr. Duncan's case.[9]

33.     IPNO's nearly seven years of tireless work not only called Mr. Duncan's conviction into question, it unequivocally proved his innocence.[10]

34.     Consequently, in 2011, confronted with evidence they could not overcome, prosecutors presented Mr. Duncan with a coercive, Hobson's Choice—either plead guilty to murder and accept a time-served sentence, by which he could secure his immediate freedom, or decline the offer and remain behind bars during the course of all future attempts to prove his innocence.[11]

35.     Unsurprisingly, faced with the option of obtaining his immediate freedom or a continued, uncertain fight for his innocence from behind bars, Mr. Duncan accepted the deal.[12]

***Once Free, Mr. Duncan Became a Vocal Advocate and an Outspoken Critic of Louisiana's Deeply Flawed Criminal Legal System, and Eventually Secured His Status as an Exoneree.***

36.     Having secured his liberty, Mr. Duncan did not fade into the background quietly.

37.     Instead, Mr. Duncan spoke out repeatedly against Louisiana's deeply flawed criminal legal system that repeatedly and disproportionately placed innocent people and Black people behind bars at the behest of non-unanimous juries.[13]

---

[8]     *Id.*; The National Registry of Exonerations, *supra* note 3.
[9]     Innocence & Justice Louisiana, *supra* note 3.
[10]    *Id.*
[11]    *Id.*
[12]    *Id.*
[13]    SB 256 Senate Hearing: Judiciary A, *supra* note 6, at 5:04:01-5:16:20.

38.     In 2013, following Mr. Duncan's release from prison, he founded a nonprofit, The Light of Justice Program (now affiliated with Loyola University New Orleans School of Law), that provides legal assistance to incarcerated people.[14]

39.     Mr. Duncan was also the driving force behind *Ramos v. Louisiana*, 590 U.S. 83 (2020), the United States Supreme Court decision that struck down non-unanimous jury convictions, a practice widely understood as a legacy of slavery and Jim Crow segregation.[15]

40.     Mr. Duncan's advocacy played a significant part in ending the illegal and racist practice of using non-unanimous juries to secure criminal convictions in Louisiana and across the country.[16]

41.     Mr. Duncan nonetheless knew that, without access to their criminal records, incarcerated people would not be able to benefit from the *Ramos* decision, make their appeals, and meet other legal deadlines. Because New Orleans only recently began digitizing records, Mr. Duncan started bringing his scanner to the District Attorney's office to scan records for people who were incarcerated, in order for them to meet their filing deadlines.[17]

---

[14]   *Light of Justice*, Loyola University New Orleans Jesuit Research Institute, https://jsri.loyno.edu/programs/light-justice (last visited Apr. 14, 2026); Lily Bordelon, *The Light of Justice Program Shines Bright with New JSRI Grant*, Loyola New Orleans The Maroon (Sep. 5, 2025), https://loyolamaroon.com/10045309/news/campus/the-light-of-justice-program-shines-bright-with-new-jsri-grant/; Open Society Foundations, *Foundations Announce 2013 Soros Justice Fellow* (May 14, 2013), https://www.opensocietyfoundations.org/newsroom/foundations-announce-2013-soros-justice-fellows.

[15]   Adam Liptak, *A Relentless Jailhouse Lawyer Propels a Case to the Supreme Court*, NY Times (Aug. 5, 2019), https://www.nytimes.com/2019/08/05/us/politics/supreme-court-nonunanimous-juries.html.

[16]   *Id.*; Nick Chrastil, *DA's office agrees to vacate 22 non-unanimous jury convictions*, The Lens Nola (Feb. 26, 2021), https://thelensnola.org/2021/02/26/das-office-agrees-to-vacate-22-non-unanimous-jury-conviction; Mark Sherman, *Supreme Court: Criminal juries must be unanimous to convict*, Associated Press (Apr. 20, 2020), https://apnews.com/article/a4f065037299491913827b7d8eda9023.

[17]   Eve Abrams, *He spent decades in prison for a crime he didn't commit. Now he's an elected official* (Nov. 19, 2025), https://www.npr.org/2025/11/19/nx-s1-5611459/he-spent-decades-in-prison-for-a-crime-he-didnt-commit-now-hes-an-elected-official.

42.     In 2019, Mr. Duncan enrolled at Tulane University, earning a bachelor's degree in paralegal studies.[18]

43.     Separately, Mr. Duncan continued to fight for his formal exoneration, which he secured in 2021,[19] when an Orleans Parish criminal court judge ruled that Mr. Duncan had been unjustly convicted.[20] The judge's ruling was clear: Calvin presented evidence of his innocence, pursuant to La. C. Cr. P. art. 926.2, and his conviction was vacated.[21]

44.     Then, in 2023, he earned his law degree from Lewis and Clark Law School.[22]

45.     As an exoneree whose name now appeared in the National Registry of Exonerations, Mr. Duncan never ceased speaking out about his years in prison when the Criminal District Court Clerk's office in Orleans Parish failed him.[23] He repeatedly underscored that improper recordkeeping at the Criminal District Court Clerk's office leads to wrongful convictions, and wrongful convictions disproportionately impact Black people.[24]

46.     In 2023, Mr. Duncan sought to obtain $330,000 in state compensation for his wrongful conviction.[25] Defendant Murrill, who took over the Attorney General's office from

---

[18]  Tulane University School of Professional Advancement, *Calvin Duncan: Adjunct Lecturer*, https://sopa.tulane.edu/about-sopa/advisors-faculty-staff/calvin-duncan (last visited Apr. 13, 2026); Alicia Jasmin, *Tulane SoPA plays vital role in alum's journey from prison to JD*, Tulane University (June 1, 2023), https://sopa.tulane.edu/news/tulane_sopa_alum_calvin_duncan_earns_jd.

[19]  The National Registry of Exonerations, *supra* note 3. In 2021, the Louisiana Legislature passed a law allowing defendants (who had previously pled guilty to crimes they did not commit) to challenge their convictions in circumstances where evidence of their innocence was wrongfully withheld by the prosecution.

[20]  *Id.*

[21]  Exh. B, Exoneration Documents for Calvin Duncan.

[22]  Lewis & Clark Law School, *Incoming Student Profile: Jailhouse Lawyer Who Brought Case to Supreme Court* (May 12, 2020), https://law.lclark.edu/live/news/43521-incoming-student-profile-jailhouse-lawyer-who.

[23]  Abrams, *supra* note 17; *Man who had murder conviction tossed wins election as New Orleans chief criminal court record keeper*, CBS News (Nov. 17, 2025), https://www.cbsnews.com/news/calvin-duncan-murder-conviction-tossed-wins-new-orleans-chief-record-keeper.

[24]  *Id*.

[25]  Jack Brook, *A New Orleans candidate's murder conviction was tossed but the state still challenges his past*, Associated Press (Oct. 8, 2025), https://apnews.com/article/new-orleans-election-calvin-duncan-exonerated-murder-73d617069d9d66daffc7576bdb2b6350.

Governor Landry, threatened to contest Mr. Duncan's ability to practice law if he did not drop his claim for damages.[26] Weighing the significance of the threat, and fearful of its very likely ability to prevent him from practicing law, Mr. Duncan reluctantly withdrew his damages claim so that his ability to practice law would not be imperiled.[27]

47.    In 2025, Loyola University School of Law awarded Mr. Duncan an honorary degree and invited him to deliver the commencement address to its law school class.[28]

***In 2025, Mr. Duncan Ran for and, in a Landslide Victory, Won the Very Office That Failed Him More Than a Decade Prior.***

48.    On October 11, 2025, the Orleans Parish Clerk of Criminal District Court appeared on the ballot.[29]

49.    Mr. Duncan decided he was the best positioned candidate to run for that office.

50.    Indeed, there was no question that he knew better than any other potential candidate what was at stake when criminal court records are mismanaged.[30]

51.    On September 23, 2025, during a debate against then-incumbent Darren Lombard, Mr. Duncan told voters directly: "I stayed in prison 28 and a half years trying to get my records. I've never wanted that to happen to nobody else."[31] He continued: "I know the consequences of

---

[26]    *Id.*

[27]    *Id.*

[28]    Loyola University New Orleans, *Tech Entrepreneur Tom Gruber, Major General Angela Salinas, and Justice Advocate Calvin Duncan to Speak, Receive Honorary Degrees at 2025 Loyola University Commencement Ceremonies* (Apr. 9, 2025), https://www.loyno.edu/news/apr-09-2025_tech-entrepreneur-tom-gruber-major-general-angela-salinas-justice-advocate-calvin.

[29]    Erin Lowrey, *Orleans Parish Oct. 11 Open Primary Election results*, WDSU (Oct. 11, 2025), https://www.wdsu.com/article/new-orleans-oct-11-election-results/67963033; SB 256 Senate Hearing: Judiciary A, *supra* note 6, at 5:06:51-5:07:10.

[30]    Calvin for Clerk, https://calvinforclerk.com/ (last visited Apr. 14, 2026); SB 256 Senate Hearing: Judiciary A, *supra* note 6, at 5:04:01-5:06:48, 5:15:05-5:16:20.

[31]    Sula Kim, *Orleans Parish clerk of criminal court race heats up ahead of runoff* (Video), at 0:36-0:46, WDSU (Nov. 11, 2025), https://www.wdsu.com/article/orleans-parish-clerk-of-criminal-court-race-heats-up-runoff/69384944#:~:text=%2C%22%20said%20Lombard.-,Duncan%20highlighted%20the%20importance%20of%20proper%20record%20storage%2C%20stating%2C%20%22,get%20the%20justice%20they%20deserve.

getting it wrong. I know the consequences of why when records are not properly stored, and evidence are not properly stored and secured, victims cannot get the justice they deserve."[32]

52.    New Orleans voters responded to Mr. Duncan's message, earning him 47 percent of the votes across all precincts in Orleans Parish during the October election.[33]

53.    Because no candidate earned over 50% of the October vote, a November run-off was scheduled.

54.    In the November 2025 runoff election, Mr. Duncan triumphed with 68 percent of the vote—approximately 38,681 New Orleans residents decided they wanted Mr. Duncan to represent them as their Clerk of Criminal District Court.[34]

55.    Mr. Duncan's defeat of an incumbent has since been hailed as one of the most decisive electoral victories in recent Orleans Parish history.[35]

56.    On April 20, 2026, Mr. Duncan received his Commission Certificate, Criminal District Clerk of Court identification badge, and Oath of Office forms. He was sworn into office the following day, and is currently scheduled to take office on May 4, 2026.[36]

---

%22; WDSU, *Hot Seat: Orleans Clerk of Criminal Court*, at 1:02–2:05 (September 23, 2025), https://www.youtube.com/watch?v=JWcZL7o42rg.

[32]    Kim, *supra* note 31.

[33]    Robert Stewart, *'Jailhouse lawyer' Calvin Duncan leads clerk vote as 'Fair Chance' amendment passes*, WWNO (Oct. 11, 2025), https://www.wwno.org/politics/2025-10-11/jailhouse-lawyer-calvin-duncan-leads-clerk-vote-as-fair-chance-amendment-passes.

[34]    Greg LaRose, *Former 'prison lawyer' wins Orleans clerk of court election*, La. Illuminator (Nov. 15, 2025), https://lailluminator.com/2025/11/15/duncan-clerk.

[35]    *Id.*

[36]    Alyssa Curtiz, '*A slap in the face': Proposed New Orleans court overhaul could eliminate incoming Clerk Calvin Duncan*, WWL (Mar. 30, 2026), https://www.wwltv.com/article/news/local/local-politics/a-slap-in-the-face-proposed-court-overhaul-in-new-orleans-could-eliminate-incoming-clerk-calvin-duncan/289-431070fb-36e0-49ee-8883-09e70eb50ea7.

***Mr. Duncan's Success Was Thwarted at Nearly Every Turn by the State's Highest-Ranking Attorney Who Threatened to Retaliate Against Mr. Duncan on Behalf of Her Clients for Using His Protected Speech to Emphasize His Exoneree Status.***

57.    Defendants have engaged in a coordinated conspiracy to prevent Mr. Duncan from taking office as the Criminal District Clerk of Court of Orleans Parish.

58.    In the lead up to the October 2025 primary, Defendant Murrill, the highest-ranking attorney in the State who represents all state actors in their line of duty, including Defendants Landry and Landry, took the extraordinary and unprecedented step of using her official office to publicly attack and threaten retaliation against Mr. Duncan if he continued to promote his exonerated status during the course of his campaign, in an attempt to prevent him from taking office.

59.    On September 30, 2025, Defendant Murrill sent Mr. Duncan a letter demanding that he "cease representing to the public that you were 'exonerated' to avoid further action from this office." *See* Exh. C.

60.    The Attorney General shockingly claimed that Mr. Duncan's exoneration—already documented in court records, the National Register, recognized by a sitting judge of the state, and acknowledged by the Orleans District Attorney's Office—was improper.[37]

61.    She wrote that the circumstances surrounding the vacatur of his conviction caused her "grave concern about abuse and manipulation of the justice system," even though she acknowledged that "criminal court records confirmed that Mr. Duncan's conviction was vacated in 2021."[38]

---

[37]    Travers Mackel, *AG Liz Murrill questions the past of New Orleans political candidate*, WDSU (Oct. 2, 2025), https://www.wdsu.com/article/calvin-duncan-murrill-williams-letter/68162121.

[38]    *Id*.; Sophie Kasakove & James Finn, *Liz Murrill accuses New Orleans criminal clerk candidate of misrepresenting his case*, Times Picayune (Oct. 2, 2025), https://www.nola.com/news/politics/liz-murrill-calvin-duncan/article_3025f33e-fd02-4a2d-b287-7f35f5b9fcbd.html; John Simerman, *AG Murrill stands by criticism of criminal clerk candidate, who fires back*, Times Picayune (Oct. 2, 2025), https://www.nola.com/news/new-

62.     There is no question that, in an attempt to discourage voters from electing Mr. Duncan into office, her letter sought to interfere with an election, not only by publicly casting doubt on the legitimacy of Mr. Duncan's innocence during the course of his campaign, but by also threatening retaliation by the arm of the State if he managed to secure the office for which he was running.[39]

63.     Days later, then-incumbent Lombard's campaign took on the mantle by pursuing a temporary restraining order against Mr. Duncan seeking to prevent him from using the word "exonerated."[40] The request for a temporary restraining order was built on the Attorney General's public statements and directly challenged Mr. Duncan's innocence.[41]

64.     Mr. Lombard later withdrew the petition, having secured the media attention he had hoped for with his filing.

65.     On Wednesday, October 1, 2025, mere days after she sent her initial letter, Defendant Murrill doubled down on the State's quest to retaliate against Mr. Duncan if he continued to tout his status as an exonerated person: "Lombard can do whatever he wants with my letter because it's a public record. I sent the letter to Duncan because Duncan is improperly representing that he was 'exonerated,' when he was not."[42] Defendant Murrill vowed to take "further action" against Mr. Duncan if he did not stop calling himself exonerated.[43]

---

orleans-criminal-clerk-candidate-defends-exoneration-claim/article_65f7f444-9405-49cc-b0d9-42faf1867169.html; James Finn, *New Orleans criminal clerk race gets heated as incumbent attacks challenger's record*, Times Picayune (Sep. 26, 2025), https://www.nola.com/news/politics/clerk-calvin-duncan-darren-lombard/article_3fea6199-7ea9-4e53-a85e-45791a16592e.html.

[39]    *Id*.

[40]    Katy Reckdahl, *'I'll fight for your rights like I fought for my own freedom'*, The Lens Nola (Oct. 10, 2025), https://thelensnola.org/2025/10/10/ill-fight-for-your-rights-like-i-fought-for-my-own-freedom.

[41]    *Id.*

[42]    Mackel, *supra* note 37.

[43]    *Id.*; Simerman, *supra* note 38.

14

66.    In response to Defendant Murrill's threats, more than 100 attorneys issued a widely disseminated statement defending Mr. Duncan, writing that the facts, the law, and the procedural history were clear: "Calvin Duncan was wrongly convicted, he proved his innocence, and he is fully exonerated."[44]

67.    Despite Defendant Murrill's attempt to implement the first step of the conspiracy to prevent Mr. Duncan from taking office, Mr. Duncan won the election.

***After Mr. Duncan's Election, the Governor Followed Through With His Retaliatory Agenda Against Mr. Duncan, by Directing Introduction of the Landry Bill and the First and Second Landry Amendments.***

68.    As the 2026 Spring legislative session opened, Governor Landry, who sets the priorities for the legislature, gave clear direction to legislators that they should act swiftly to implement his agenda.[45] Attempting to do what Defendant Murrill could not, he took up the cause of trying to unseat Mr. Duncan after he was duly elected.

69.    Senator Morris, a Republican who represents Monroe, over 200 miles away from New Orleans in the northeast corner of Louisiana, has no constituent interest in the administration of Orleans Parish criminal courts.[46] And yet, during a committee hearing on March 31, 2026, Representative Morris introduced SB 256 at the Governor's behest.[47]  He admitted that the Landry Bill lacked any supportive studies or data to back it, but introduced it nonetheless.[48]

---

[44]    Legal Professionals' Statement on Calvin Duncan's Innocence and Exoneration, https://docs.google.com/document/d/1wJive9dA-PRgRXDERE4PvrOfBz3zN9yC59hHP_0v9j4 (last visited Apr. 15, 2026); Reckdahl, *supra* note 40; Jack Brook & Sarah Cline, *Louisiana GOP races to eliminate an elected office won by an exonerated man*, Associated Press (Apr. 9, 2026), https://apnews.com/article/new-orleans-election-calvin-duncan-exonerated-murder-73d617069d9d66daffc7576bdb2b6350.

[45]    La. Office of the Governor, *Governor Jeff Landry Opens Third Regular Session* (Mar. 9, 2026), https://gov.louisiana.gov/news/governor-jeff-landry-opens-third-regular-session; Daniel Miller, *Louisiana Republicans push to eliminate an elected office won by exonerated man*, Live Now Fox (Apr. 10, 2026), https://www.livenowfox.com/news/louisiana-gop-eliminate-elected-office-exonerated-man.

[46]    La. Senate, *Senator John C. "Jay" Morris III, District 35*, https://senate.la.gov/smembers?ID=35 (last visited Apr. 19, 2026).

[47]    S.B. 256, 52d Reg. Sess. (La. 2026), https://legis.la.gov/legis/BillInfo.aspx?i=250431 (last visited Apr. 19, 2026).

[48]    *Id.*

70.     SB 256 stands to merge the Orleans Parish Clerk of Criminal District Court with the Orleans Parish Clerk of Civil District Court, eliminating those positions entirely and creating a new position: Orleans Clerk of Court.[49]

71.     The position of Civil District Court Clerk is currently held by Ms. Chelsey Richard Napoleon, who ran unopposed and in the absence of any election.[50] Ms. Napoleon never appeared on the October or November ballots.

72.     After an amendment brought by House Representative McMakin on April 23, 2026, SB 256 now shockingly indicates that, despite the position being one that requires an election, the sitting Civil District Court Clerk will assume by legislative appointment control of the authority and resources of the Criminal District Court Clerk.[51] In fact, as described *infra* at ¶¶ 121–131, in the absence of an election to fill the vacancy created by SB 256, it should be Mr. Duncan, not Ms. Napoleon, who assumes the role.

73.     The expressed intent of the Bill's proponents, in line with Governor Landry's direction, is unmistakably to prevent Mr. Duncan specifically from taking office on May 4, 2026.

74.     Senator Morris has stated publicly that, when the Bill passes, Ms. Napoleon will become the new Clerk of Court—the ultimate desired outcome of Defendants' conspiratorial plan.[52] The McMakin amendment (the "Second Landry Amendment")—which followed Morris' amendment (the "First Landry Amendment") on April 8, 2026, seeking for the Bill to go into effect

---

[49]  *Id.*; Robert Stewart, *Under bill passed by state Senate, New Orleans' elected court clerk might not be able to take office*, Verite News (Apr. 9, 2026), https://veritenews.org/2026/04/09/senate-bill-256-calvin-duncan-clerk/.

[50]  Clerk of Civil District Court for the Parish of Orleans, https://www.orleanscivilclerk.com/ (last visited Apr. 13, 2026).

[51]  S.B. 256, *supra* note 47.

[52]  Kaylee Poche, *Louisiana GOP Races to Keep an Exonerated Black Man from Taking Office in New Orleans*, The Gambit (Apr. 16, 2026), https://www.nola.com/gambit/news/politics_elections/louisiana-house-panel-passes-new-orleans-clerk-of-court-bill/article_638bacdd-b7c7-45b4-a530-75896f2435a5.html.

upon gubernatorial signature—aims to ensure immediate success of Defendants' conspiratorial plan.

75.    Once the Landry Bill passed through the Senate Judiciary A Committee, on April 8, 2026, Senator Morris introduced the first of two amendments, referred to herein as the First Landry Amendment. That Amendment, which aims to ensure the Bill goes into effect immediately upon Governor Landry's signature—passed through the Senate Floor.[53] The specific intent of the First Landry Amendment was to ensure the Landry Bill would become law before Mr. Duncan takes office on May 4, 2026.[54]

76.    On the Senate Floor, Senator Morris made plain that the First Landry Amendment was brought at the behest of the Governor who sought "[t]o go ahead and get [the Bill passed into law] before Mr. Duncan takes office."[55]

77.    When New Orleans Senator Royce Duplessis questioned Morris as to why the First Amendment was sought, Morris underscored: "[O]therwise, we'd probably have to pay him for the next four years in a job that is gonna be eliminated. So, it would make him an immediate lame duck."[56]

78.    When asked whether he had consulted with the Attorney General about the potential for legal claims being raised as a result of the First Landry Amendment, Senator Morris acknowledged that he understood the state constitution prevented shortening an official's term once he took office and thereby confirmed that the First Landry Amendment was designed to ensure Mr. Duncan never took office as Clerk of the Criminal District Court.[57]

---

[53]    S.B. 256, *supra* note 47.

[54]    Exh. D-1, Unofficial Transcript of April 8, 2026 Senate Floor Debate on SB 256, at 1:46:05-1:48:00.

[55]    *Id*.

[56]    *Id*.

[57]    *Id*. at 1:46:56–1:48:47; 1:56:31.

17

79.     Senator Duplessis pressed Senator Morris as to the suspicious timing, given the already widespread and publicly voiced fears of retaliation by the Governor against Mr. Duncan: "If we needed to consolidate the offices so badly, why wasn't this Bill brought last year?"[58]

80.     Senator Morris stated candidly that he was following the Governor's directives: "Well. I don't know. I didn't think about bringing it last year. And this is in *the Governor's package*. So maybe it's something *got his attention as well*."[59]

81.     But the First Landry Amendment failed to contend with the constitutional requirement that the state fill the redesigned office of Clerk of Court via an election. *See* La. Const. Art. V. § 28(A).

82.     The constitutional requirements are clear: voters deserve the opportunity to exercise their rights in electing their candidate of choice to the new Office of Orleans Parish Clerk of Court.

83.     That Office cannot be filled by the current Clerk of Civil District Court because that position did not even appear on the ballot in 2025—indeed, Ms. Napoleon was seated because she was unopposed.

84.     Nevertheless, in or around the first weeks of April, Ms. Napoleon revealed that she had adopted the discriminatory purpose of the Bill and the conspiracy's efforts to enact it. At the time, despite the absence of any mention in the text of the Bill that she would assume the new role of Clerk of Court, she shared conspirators' understanding of the Bill's intended effect and appeared before the legislature to testify.

85.     Even before the Second Landry Amendment was introduced, Ms. Napoleon began touring the Office of the Criminal District Court Clerk in preparation for taking that newly created role on May 4, 2026.

---

[58]    *Id.* at 1:46:12:19.
[59]    *Id*. at 1:46:19:00.

86.     As Mr. Duncan told the Senate Judiciary A Committee, which first heard the Bill, the passage of the Bill is "a sad statement for this committee to send to New Orleans that your vote did not count."[60]

87.     On April 8, following Senator Morris's testimony, the Louisiana Senate voted 25 to 11 to pass SB 256 with the First Landry Amendment.[61] Not a single Orleans-based senator voted in favor of the Bill.[62]

88.     SB 256 was set for a vote before the House Judiciary Committee on April 16, 2026.[63] It passed with 8 yeas, 5 nays, and 1 abstention.[64]

89.     That day, in committee, prior to the vote, Mr. Duncan and others continued to express concerns. Mr. Duncan stated: "I sincerely and honestly believe I'm being targeted." Republican Representative Kathy Edmonston expressed her concerns about the impact of the Bill on voters: "I'm just really concerned with the people's right to vote for who or what they want to vote for. I mean, this doesn't have anything to do with anything else to me but integrity."[65]

90.     That same day, when pressed about how the Bill would operate in practice, Senator Morris did not provide answers. Instead, he noted that he anticipated litigation over the Landry Bill.

---

[60]   SB 256 Senate Hearing: Judiciary A, *supra* note 6, at 5:11:27-5:11:36.

[61]   Daily Proof of the Official Journal of the Senate of the State of La., Fourteenth Day's Proceedings, 52d Reg. Sess. 27 (Apr. 8, 2026), https://senate.la.gov/Journals/2026/RS/26RS%20-%20SJ%200408%2014.PDF (last visited Apr. 15, 2026); Bernard Smith, *Louisiana Senate Rejects Amendment to Let Newly Elected Clerk Calvin Duncan Serve His Term*, WWNO (Apr. 9, 2026), https://www.wwno.org/law/2026-04-09/louisiana-senate-rejects-amendment-to-let-newly-elected-clerk-calvin-duncan-serve-his-term.

[62]   Smith, *supra* note 61.

[63]   Matt Bruce, *Senate bill to merge Orleans Parish clerks of court clears Louisiana House committee*, Times Picayune (Apr. 16, 2026), https://www.nola.com/news/courts/louisiana-senate-approves-bill-merge-orleans-court-clerks-local-opposition/article_cd064ac9-fb18-41cd-bffa-28c3aec19f40.html.

[64]   *Id.*

[65]   Poche, *supra* note 52.

19

91.      Determined to do all he could to preserve his ability to take office, on April 17, 2026, Mr. Duncan called the Secretary of State's Office and asked for his Commission Certificate and Oath of Office forms. He was told they would be ready on April 20, 2026.

92.      On April 20, 2026, Mr. Duncan retrieved his Commission Certificate, Criminal District Clerk of Court identification badge, and Oath of Office forms from the Secretary of State's Office. *See* Exh. A.

93.      On April 21, 2026, he was sworn into Office, as permitted by La. R.S. 42:141(B). An article published that same day quoted Governor Landry, who the Friday prior—when asked about the Landry Bill—had said: "Not only am I going to sign it, I'm going to absolutely support it and *make sure it's passed*" (emphasis added).[66]

94.      The House passed the Landry Bill on April 23, 2026, but not without a late-breaking amendment by House Representative Dixon McMakin. The new amendment, also brought at the Governor's behest, explicitly acknowledges that the sitting Civil District Court Clerk will assume by legislative appointment the new position of Orleans Clerk of Court for the upcoming term (the "Second Landry Amendment"). This last-minute amendment to satisfy the Governor's agenda to unseat Mr. Duncan made the First Landry Amendment's intention explicit. The Second Landry Amendment passed the House that same day on April 23, 2026. On April 29, 2026, the Senate concurred with the addition of the Second Landry Amendment. The Bill now heads to the Governor's desk for signature. By virtue of the two Landry Amendments, the Governor's signature stands to immediately appoint Ms. Napoleon to a vacant office for which no election has been held.

---

[66]   Matt Bruce, *New Orleans criminal clerk-elect Calvin Duncan takes oath of office as legislature weighs axing seat*, NOLA.com (Apr. 21, 2026), https://www.nola.com/news/courts/new-orleans-criminal-court-clerk-calvin-duncan-swearing-in/article_be71c24a-bb9b-4c7d-a9c6-effc04a73965.amp.html.

*Orleans Parish and Louisiana Have a Long History of Racial Disenfranchisement.*

95.    If sworn into the office for which he was elected, Mr. Duncan will serve the predominantly African American residents of Orleans Parish.[67]

96.    Mr. Duncan's voters overwhelmingly understood that Mr. Duncan is uniquely equipped with the expertise and experience to improve record keeping in criminal court, particularly considering that 80% of people subjected to arrest in New Orleans are Black, despite only representing 54% of the overall population.[68]

97.    These racial disparities are historic and lasting. Orleans Parish is a majority-minority jurisdiction, and federal courts have recognized it as such, acknowledging its history of racial segregation, voting discrimination, and racially discriminatory gerrymandering.[69]

98.    The legislature that voted to undo the choice of these voters is overwhelmingly white and Republican.[70]

99.    Senator Duplessis, speaking on the floor of the Louisiana Senate in opposition to SB 256, invoked the racist history of voter disenfranchisement in Louisiana directly.[71] He drew a parallel between Calvin Duncan and John Willis Menard, a Black man elected in 1868 to represent

---

[67]    U.S.    Census    Bur.,    *Quick    Facts:    New    Orleans,    Louisiana*, https://www.census.gov/quickfacts/fact/table/neworleanscitylouisiana/PST045225 (last visited Apr. 13, 2026).

[68]    Michelle Liu, *New Orleans police say their use of force data shows no racial disparities. We checked the numbers,* Verite News (Oct. 31, 2024), https://veritenews.org/2024/10/31/nopd-consent-decree-force-racial-disparity/.

[69]    *See Bush v. Orleans Parish Sch. Bd.*, 138 F. Supp. 336 (E.D. La. 1956) (striking down legally mandated racial segregation in New Orleans public schools), *aff'd*, 242 F.2d 156 (5th Cir. 1957); *Chisom v. Roemer*, 501 U.S. 380 (1991) (recognizing Orleans Parish as a majority-Black jurisdiction and holding that at-large judicial elections diluted minority voting strength under Section 2 of the VRA).

[70]    La. House of Representatives, *Member Demographics*, https://house.louisiana.gov/H_Reps/H_Reps_ByDemographicProfile (last visited Apr. 15, 2026).

[71]    Exh. D-1 at 1:51:00:01-1:56:24:18.

21

Louisiana's 2nd Congressional District following the Civil War, who was also prevented from assuming the office to which he had been duly elected.[72]

100.    Moments before the Senate passed the First Landry Amendment, Senator Duplessis represented how many New Orleans voters felt witnessing their votes cast aside: "I'm not making this up. I'm just repeating what happened. In the same era. PBS Pinchback. We all know him. For the few days he served as the first Black governor of Louisiana. But we often don't hear the story about when he ran and was elected to serve in the U.S. Senate and was not allowed to serve for whatever reasons were given, just like whatever reasons were given today, why Calvin Duncan will not be allowed to serve."[73]

101.    On April 16, 2026, the NAACP Legal Defense Fund ("LDF") sent a letter to the Louisiana House Committee on Judiciary underscoring the Governor's retaliatory motive behind the Landry Bill: "This bill amounts to retaliation against Clerk-Elect Duncan, a formerly incarcerated person whose conviction was vacated, and who has been critical of the current administration's handling of court records, one of many issues he campaigned to change through serving in the position for which he was elected, as the Criminal Court Clerk." *See* Exh. E.

102.    LDF also underscored how the Landry Bill "is an attack on the rights of voters in Orleans Parish—a racially-diverse electorate comprised of a significant number of Black voters" because it "threatens to defy the will of Orleans Parish voters and deny them their right to have their recently elected candidate of choice, Calvin Duncan, serve them as Clerk of Orleans Parish Criminal Court." *Id.*

---

[72]    *Id*. at 1:51:00:01-1:56:24:18; Tammy C. Barney, *First Black person elected to Congress not allowed to take seat*, Verite News (Nov. 14, 2025), https://veritenews.org/2025/11/14/bitd-john-menard-first-black-person-elected-congress/.

[73]    Exh. D-1 at 1:51:00:01-1:56:24:18.

***Mr. Duncan Ran and Won on a Platform Championing Racial Justice, For Which He Has Now Been Targeted and Punished.***

103.    Given the disproportionate impact of mass incarceration on Black people in this country, advocates for criminal justice reform are, by their very nature, advocates for racial justice. As an outspoken critic of the criminal legal system, Mr. Duncan is well known as a champion of racial justice.[74]

104.    In Louisiana, 66% of people incarcerated in prison are Black, despite Black people making up only 32% of the general population. By contrast, 34% of Louisiana's prison population is white (non-Hispanic), despite making up 58% of the general population.[75] The Louisiana State Penitentiary (colloquially referred to as "Angola" based on its racist plantation history), where Mr. Duncan was incarcerated for over two decades, is 74% Black.[76]

105.    In addition, 84% of the overall wrongful convictions in Louisiana concern Black people, and 96% of wrongful imprisonments lasting over 25 years concern Black people. One-hundred (100) percent of wrongfully convicted children in Louisiana were Black.[77] Nationally, 61% of all exonerations in 2024 involved Black people, according to the National Registry of Exonerations' 2025 Report.[78]

106.    Mr. Duncan's advocacy, as a Black exoneree, seeks to address these racial disparities. As a jailhouse lawyer at Angola, Mr. Duncan helped hundreds of incarcerated people

---

[74]    Liptak, *supra* note 15.

[75]    Prison Policy Initiative, *Comparing Louisiana's Resident and Incarcerated Populations*, https://www.prisonpolicy.org/profiles/LA.html (last visited Apr. 18, 2026).

[76]    Am. Civil Liberties Union & Univ. of Chi. Law Sch. Global Human Rights Clinic, *Captive Labor: Exploitation of Incarcerated Workers* 34 (Research Report, 2022), https://www.aclu.org/publications/captive-labor-exploitation-incarcerated-workers.

[77]    Innocence & Justice La., *Wrongful Convictions in Louisiana*, https://justicelouisiana.org/criminal-justice-issues/wrongful-convictions/ (last visited Apr. 19, 2026).

[78]    Nat'l Registry of Exonerations, *2025 Annual Report* 2 (2025), https://exonerationregistry.org/sites/exonerationregistry.org/files/documents/2025Exonerations.pdf (last visited Apr. 19, 2026).

23

access their records and file motions in court for post-conviction relief and to overturn wrongful convictions.[79] Given that Angola's population is majority Black, these efforts overwhelmingly benefitted Black people in prison. Mr. Duncan, for his part, has regularly emphasized the racialized nature of Louisiana's criminal legal system.

107.    Mr. Duncan co-founded the Visiting Room Project, which interviews men serving life without parole at Angola, the majority of whom are Black.[80]

108.    As described *supra* ¶¶ 39–40, Mr. Duncan played a pivotal role in ending Louisiana's non-unanimous juries, which are often referred to by advocates for criminal justice reform as "Jim Crow Juries."[81] The practice of non-unanimous juries became law in 1898 when it was enshrined in the Louisiana Constitution with the explicit purpose of "establish[ing] the supremacy of the white race in the state."[82]

109.    As a candidate for Clerk of the Criminal District Court, Mr. Duncan pledged that he would properly preserve case records and evidence, understanding that failing to do so can lead to wrongful convictions, which disproportionately impact Black Orleanians.[83] He pledged to make it easier for incarcerated people, the majority of whom are Black, to exercise their rights by giving them easier access to their court records.[84]

110.    Mr. Duncan brings this suit because there is no doubt in his mind (particularly now with the passage of the Second Landry Amendment) that he was targeted as a Black exoneree who champions racial justice. This view is shared by thousands of other Orleans Parish voters who

---

[79]    Liptak, *supra* note 15.
[80]    *About Angola*, The Visiting Room Project, https://www.visitingroomproject.org/about/?about=2 (last visited Apr. 19, 2026).
[81]    *Id.*
[82]    Jessica Rosgaard & Wallis Watkins, *The History of Louisiana's Non-Unanimous Jury Rule*, WWNO (Oct. 22, 2018), https://www.wwno.org/politics/2018-10-22/the-history-of-louisianas-non-unanimous-jury-rule.
[83]    Calvin Duncan, Clerk-Elect, *Platform*, https://calvinforclerk.com/platform (last visited Apr. 19, 2026).
[84]    *Id.*

stand to have their vote erased if Mr. Duncan does not take his rightful place as Criminal District

Court Clerk on May 4, 2026.[85]

## DEFENDANTS' VIOLATIONS OF LAW

**A.    Issuance of a Commission Certificate (with Defendant Jeff Landry's Signature) and Oath of Office Forms to Ms. Napoleon by Defendant Nancy Landry—Prior to the Necessary Calling of an Election for the Vacant and New Clerk of Court Seat—Denies Mr. Duncan, in His Personal Capacity, the Effective Right to Vote for that Office.**

111.    The Fourteenth Amendment right to vote is a fundamental right safeguarded by the Constitution.[86] The vote is the quintessential mechanism "to *express* [one's] political preferences."[87]

112.    The right to an effective vote is broadly interpreted "as a right of meaningful access to the political process rather than narrowly as a mere right of registration and access to the ballot box."[88]

113.    Regulations that "burden a relevant constitutional right, such as the [Fourteenth Amendment] right to vote or the First Amendment rights of *free expression* and association," yet "primarily regulate the mechanics of the electoral process, as opposed to core political speech," trigger an analysis under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).[89]

114.    Under the Fifth Circuit's two-part test applying *Anderson* and *Burdick*, "the court 'must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.'"[90] Then "the court

---

[85]    LaRose, *supra* note 34.
[86]    *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).
[87]    *Cf. Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, (1979) (emphasis added).
[88]    *Smith v. Winter*, 717 F.2d 191, 198 (5th Cir. 1983), c*iting Kirksey v. Board of Supervisors*, 554 F.2d 139, 142 (5th Cir. 1977).
[89]    *See  Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 138 (3d Cir. 2022) (emphasis added).
[90]    *La Union del Pueblo Entero v. Abbott,* 167 F.4th 743, 760 (5th Cir. 2026) (citation omitted).

'must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule."[91]

115.    Here, the "character and magnitude" of the injury is of the utmost import—the right to have one's vote mean something. "In pursuing [a substantial state interest], the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity [because] [s]tatutes affecting constitutional rights must be drawn with 'precision,' and must be tailored to serve their legitimate objections."[92]

116.    It is a "substantive right to participate on an equal basis with other qualified voters whenever the State has adopted an electoral process for determining who will represent any segment of the State's population."[93] There is a "concomitant right to have [one's] vote[] counted[.]"[94]

117.    The citizens of Louisiana's 64 parishes, by its very Constitution, elect their clerks of court in each parish.[95]

118.    The voters of Orleans Parish resoundingly elected Mr. Duncan to his office on November 15, 2025.

119.    In flagrant violation of that right, the First and Second Landry Amendments serves to bar Mr. Duncan from taking the office to which he was duly elected.

120.    Erasing the will of a voter—without providing for an election for the newly-created Orleans Clerk of Court seat—demonstrates that Mr. Duncan, as an Orleans Parish voter, is being

---

[91]    *Id.*
[92]    *Dunn,* 405 U.S. at 343 (citation omitted).
[93]    *Lubin v. Panish*, 415 U.S. 709, 713 (1974).
[94]    *Gamza v. Aguirre*, 619 F.2d 449, 452 (5th Cir. 1980) (collecting cases outlining the right to vote and government prohibitions on diluting or discarding those votes).
[95]    La. Const. Art. V § 28(A).

26

discriminated against in a way that no other Parish voters have been discriminated against as to their respective Clerk of Court seats.

121.    There can be no state interest that outweighs this injury when the solution to the problem is simple—seat Mr. Duncan in the seat to which he was duly elected: Clerk of the Criminal District Court.

122.    At issue here is an "ipso facto" vacancy.[96] This means that the new Orleans Clerk of Court office at issue only comes into existence after a general election, such that the First and Second Landry Amendments have no force of law.[97]

123.    Alternatively, for the sake of argument, assuming Defendants claim this is not a "vacancy" and that no new election is required, the understanding of the term "clerk of court" in SB 256 is necessarily anchored to the term's usage at the time of Mr. Duncan and Defendant Ms. Napoleon's respective elections. This means the revised definition for "clerk of court" in SB 256 cannot operate to alter the term's meaning that it had on the date of the election at issue (November 15, 2025), which the Second Landry Amendment purports to do.[98] At the time of Mr. Duncan's election, up and through today, the term "'Clerk of court' or 'clerk' means the clerk of the district court, except that in any parish having a civil district court and a criminal district court, these terms mean the clerk of the criminal district court."[99] Accordingly, on November 15, 2025, Mr. Duncan

---

[96]    *See State ex rel. Sanchez v. Dixon*, 4 So. 2d 591, 595 (La. Ct. App. 1941) (holding that "a newly created office becomes ipso facto vacant when it is created and remains vacant until it is filled by an incumbent"); *id.* ("Since the act specifically requires an election to fill the office of additional police juror and makes no provision for an appointment to fill the office until the general election is held, we conclude that no such office can come into existence until an election is held to fill it, and there can be no vacancy in an office that has not come into existence."); *see also* La. R.S. 18:402(E)(1) ("Special elections to fill newly created offices or vacancies in office shall be held on dates fixed by the appropriate authority in the proclamation issued in accordance with law."); *cf.* La. R.S. 18:581(a)-(g).

[97]    *See also* R.S. 18:402(E)(1) (detailing the dates for elections, with special elections correcting for newly-created offices and vacancies).

[98]    *See Avoyelles Par. Justice of the Peace v. Avoyelles Par. Police Jury*, 758 So. 2d 161, 166–69 (La. 3rd Cir. 1999) (holding that scope and term of office defined on election date and not on date of assumption of office).

[99]    *Id.*

was elected to take on the duties of "clerk of court," which included the duty of chief elections officer, per the definition in effect at the time.[100]

124.    Defendants cannot simply bypass the need for an election (be it a general election or a special election) with the quick-to-pass Second Landry Amendment.

125.    Lest the State intend to run afoul of the First and Fourteenth Amendments, the Landry Bill, the First Landry Amendment, and the Second Landry Amendment cannot go into effect.

### B. Discarding Mr. Duncan's Vote for Orleans Parish Criminal Court Clerk Unconstitutionally Disenfranchises Him as a Voter in Violation of His Substantive Due Process Rights.

126.    Although the Louisiana Legislature may possess general authority to abolish non-judicial elected offices, post-election legislative action that nullifies a completed election and attempts to install an unelected official implicates federal constitutional protections governing the fairness of the electoral process.

127.    State action that fundamentally undermines the fairness and integrity of the electoral process is unconstitutional.[101]

128.    While not every election irregularity rises to the level of a constitutional violation, federal courts may intervene where state officials deliberately nullify a completed election in violation of governing law, resulting in "patent and fundamental unfairness."[102] Some election

---

[100]    La. R.S. 18:2(3).

[101]    *Duncan v. Poythress*, 657 F.2d 691, 703–05 (5th Cir. 1981) (holding Due Process Clause of the Fourteenth Amendment protects against the disenfranchisement of a state electorate in violation of state election law); *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (recognizing that the right to vote may be denied through "debasement or dilution of the weight of a citizen's vote" as effectively as through outright denial of the franchise); *Smith v. Winter*, 717 F.2d 191, 198 (5th Cir. 1983) (emphasizing that voting rights encompass "meaningful access to the political process," not merely the act of casting a ballot) (citing *Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 142 (5th Cir. 1977)).

[102]    *Duncan,* 657 F.2d at 703.

interference is so extreme that, even absent classic vote dilution, it violates substantive due process.[103]

129.    Under Fifth Circuit precedent, retrospective interference with a completed election may give rise to constitutional injury under the Fourteenth Amendment.[104]

130.    The dispute at issue here does not arise from a generalized challenge to legislative authority, but from the use of that authority (through the Second Landry Amendment) to override the outcome of a completed election.

131.    Louisiana law and the Louisiana Constitution require that clerks of court be elected by the voters of the parish they serve.[105] Here, Mr. Duncan was duly elected to the office of Clerk of Criminal District Court by a decisive majority of Orleans Parish voters in a completed, certified election.

132.    Through the Second Landry Amendment, Defendants seek to install by legislative appointment an incumbent official holding a different office into a newly created position without any intervening vote, thereby nullifying the election that thrust Mr. Duncan into the Office of Orleans Parish Criminal District Court Clerk. *See supra* ¶¶ 95-102.

133.    This conduct represents a calculated effort to disenfranchise voters and override the outcome of a completed election through legislative maneuvering, rather than through lawful electoral processes.[106]

---

[103]    *Id.* at 705.
[104]    *Id.* at 704–05.
[105]    La. Const. art. V, § 28(A).
[106]    *Duncan*, 657 F.2d at 704; *see also Phillips v. Snyder*, No. 2:13–CV–11370, 2014 WL 6474344, at *8 (E.D. Mich. Nov. 19, 2014) ("[I]f the right to vote is to mean anything, certainly it must provide that the elected official wields the powers attendant to their office").

29

134. Unlike recall or removal procedures initiated through established electoral mechanisms, the injury here arises from legislative action (the Second Landry Amendment) eliminating an office after a completed, certified election, without any intervening vote.

135. The timing and structure of the Second Landry Amendment demonstrate that it was designed not to address administrative necessity, but to ensure that Mr. Duncan never assumes office. Such conduct shocks the conscience and constitutes "patent and fundamental unfairness" in the administration of an election.[107] *See supra* ¶¶ 79-81.

136. Whether this legislative maneuvering is characterized as an abolition or a reorganization does not alter the constitutional analysis. Under Louisiana law, a legislative act creates a "new office," rather than merely reorganizing an existing one, where it extinguishes the prior office and alters the character or core duties of the position. Louisiana courts have long distinguished between statutes that merely reorganize an existing office and those that abolish one office and substitute a materially different role.[108]

137. Where an act rearranges jurisdiction, duties, or constituency such that the prior office no longer exists, the resulting position is treated as a new office.[109] When a new elected office is created, Louisiana law requires that it accordingly be filled by election, not appointment.[110]

138. Accordingly, even if the legislature possesses authority to abolish a statutory office, it may not evade constitutional election requirements by consolidating that office into a materially

---

[107] *Duncan*, 657 F.2d at 704–05.
[108] *State ex rel. Holmes v. Wiltz*, 11 La. Ann. 439, 441 (La. 1856).
[109] *State ex rel. Garland v. Guillory*, 166 So. 94, 103–04 (La. 1935).
[110] *State ex rel. Sanchez v. Dixon*, 4 So. 2d 591, 597 (La. 1941) ("[T]he Legislature intended that any office created by it, or which might come into existence by reason of the Act of 1940, should be filled by an election of the voters of the ward as the act specifies, and that only vacancies arising in an office already filled by election should be filled by the Governor for the remainder of the unexpired term."); *Russell v. McKeithen*, 239 So.2d 656, 658 (1st. Cir. 1970).

30

different one and then filling it without an election. By nullifying a completed election, Defendants aim to deprive both Mr. Duncan and Orleans Parish voters of the office and representation they lawfully secured. In doing so, Defendants violate the substantive due process clause of the Fourteenth Amendment.

139. Louisiana courts recognize that constitutional protections attach to an elected term and vest at the time of election.[111]

140. Defendants cannot legally reduce the term fixed at Mr. Duncan's election to zero by creating a vacant office that aims to discard the results of a completed and certified election.

### C. The Landry Bill and Landry Amendments Operate as a Targeted Legislative Punishment Against Mr. Duncan as a Single, Identifiable Individual.

141. Article I, §10 of the U.S. Constitution prohibits state Bills of Attainder—legislative acts (SB 256 and the Landry Amendment) that inflict punishment (disqualification from office) on a specifically identifiable individual (Mr. Duncan) without the protections of a judicial trial.[112]

142. In the Fifth Circuit, a statute constitutes a Bill of Attainder where it (1) applies with specificity to an identifiable individual or group, and (2) inflicts punishment (3) without a judicial trial.[113]

143. The Landry Bill and Amendments satisfy each of these elements.

144. Although framed as a generally applicable legislative measure, the record and context make clear that the purpose of SB 256 is to prevent Mr. Duncan alone from taking office as retaliation and punishment for his protected speech and for no other reason.

---

[111] *Hoag v. Kennedy ex rel. State*, 836 So. 2d 207, 231 (La. Ct. App. 2002); *Avoyelles Par. Justice of the Peace*, 758 So. 2d at 166–69 (explaining that constitutional protections tied to the "term for which elected" attach on election day, not the date of assumption of office); *Calogero v. State ex rel. Treen*, 445 So. 2d 736, 739 (La. 1984) (similar).

[112] *See United States v. Brown*, 381 U.S. 437, 447 (1965) (holding statute at issue unconstitutional as a Bill of Attainder).

[113] *See SBC Communications, Inc. v. F.C.C*, 154 F.3d 226, 233 (5th Cir. 1998).

145.    The First Landry Amendment was passed to prevent Mr. Duncan from taking office, and the  Second Landry Amendment attempts to perfect that effort. Taken together, the Amendments further clarify that the Landry Bill is aimed at punishing Mr. Duncan by targeting his successful election to the Office Criminal District Court Clerk.[114]

146.    The Landry Bill and Amendments inflict punishment by permanently disqualifying Mr. Duncan from assuming the office to which he was duly elected, for no reason other than retaliation for his protected speech, thereby stripping him of a position of public trust secured through a completed election.[115]

147.    The Landry Bill and Amendments were enacted without any judicial process, factual findings, or opportunity for Mr. Duncan to be meaningfully heard, and thus operate as a legislative adjudication of guilt and punishment.[116]

148.    Neither the Landry Bill nor the Landry Amendments can be justified as a neutral regulatory measure. Their timing, structure, and legislative history demonstrate that they were enacted for the specific and impermissible purpose of punishing Mr. Duncan for his protected speech and electoral success, rather than to serve a legitimate, non-punitive governmental objective.[117]  The record and context of SB 256 and the Second Landry Amendment evince an intent to punish Mr. Duncan.

149.    By singling out Mr. Duncan for punishment without a judicial trial, the Landry Bill, the First Landry Amendment, and the Second Landry Amendment violate the Bill of Attainder

---

[114]  *See cf. Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 847 (1984) (a law may be a Bill of Attainder where "past activity serves as a point of reference for the ascertainment of particular persons ineluctably designated by the legislature") (citations omitted); *see also United States v. Lovett*, 328 U.S. 303, 315 (1946) (holding law at issue constituted Bill of Attainder and that Bills of Attainder need not name specific individuals if the target is "easily ascertainable").

[115]  *See Brown*, 381 U.S. at 447–48 (stating that disqualification from office may constitute punishment for purposes of the Bill of Attainder Clause).

[116]  *Cf. Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468–69 (1977).

[117]  *Cf. id.* at 475–76; *SBC Communications, Inc. v. F.C.C*, 154 F.3d at 241.

Clause. Indeed, Louisiana courts recognize that constitutional protections attach to an elected term vest at the time of election.[118] Thus, post-election legislative action eliminating an office constitutes a cognizable injury where it operates to effectively reduce the term fixed at election to zero.

150.    Defendant Jeff Landry, by advocating for, advancing, and intending to give effect to the Landry Bill, the First Landry Amendment, and the Second Landry Amendment, has violated Article I, §10 of the U.S. Constitution.

### D.  In Retaliation for Mr. Duncan's Protected Speech, Defendants Sought to Push Through an Amendment to SB 256 That Provided for the Bill to Take Effect Upon the Governor's Signature.

151.    Defendants' efforts, led by Governor Landry, to strip Mr. Duncan of his duly elected position violates the First Amendment, which prohibits the abridgement of the freedom of speech. "A plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.'"[119] In reviewing whether an adverse action is sufficiently material to give rise to a legal claim, courts have looked to, among other factors, the relationship between the speaker and the retaliator to determine the materiality of the violation.[120]

152.    Courts routinely apply First Amendment retaliation "principle[s] to denials of public employment."[121] This is because regardless of whether there is a "right" to a governmental position, "there are some reasons upon which the government may not rely [to, *e.g.*, block a person

---

[118]  *Hoag v. Kennedy ex rel. State*, 836 So. 2d at 231; *Avoyelles Par. Justice of the Peace*, 758 So. 2d at 166–69 (explaining that constitutional protections tied to the "term for which elected" attach on election day, not the date of assumption of office); *Calogero*, 445 So. 2d at 739 (similar).

[119]  *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (denying relief but holding that the First Amendment limits government reactions to protected speech).

[120]  *Id*.

[121]  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (affirming Fifth Circuit judgment reversing lower court decision denying First Amendment relief to plaintiff).

from a governmental position]. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."[122]

153.    For public elected officials like Mr. Duncan, these First Amendment protections are essential to democracy, so "that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them."[123]

154.    Retaliation against elected officials for speech "implicate[s] not only the speech of an elected official, it also implicate[s] the franchise of his constituents. And [refusing to seat an elected official] involve[s] not just counter speech from colleagues but exclusion from office."[124]

155.    The Fifth Circuit has knitted this jurisprudence into a three-part test to determine whether a claim for First Amendment Retaliation lies. In order to succeed on a First Amendment Retaliation Claim, a plaintiff must show that (1) he "engaged in constitutionally protected activity"; (2) the retaliator's action caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) those "adverse actions were substantially motivated against [a plaintiff's] exercise of constitutionally protected conduct."[125]

156.    Mr. Duncan satisfies each prong of the First Amendment Retaliation test.

157.    *First*, as made clear *supra*, Mr. Duncan consistently engaged in constitutionally protected speech activity concerning Louisiana's deeply flawed criminal legal system. His conviction, his exoneration, his successful advocacy against non-unanimous jury convictions, and

---

[122]    *Id.* at 597.
[123]    *Bond v. Floyd,* 385 U.S. 116, 136–37 (1966) (holding exclusion of state representative from membership in state house of representatives violated the right of free expression under the First Amendment).
[124]    *Houston Cmty. Coll. Sys.*, 595 U.S. at 481 (denying plaintiff relief but explaining the import of the rule in *Bond*, 385 U.S. 116).
[125]    *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (explaining test and holding that plaintiffs provided evidence of First Amendment retaliation).

his critiques of the deeply flawed administration of the Criminal District Court Clerk's Office, are clearly constitutionally protected speech.[126]

158.    *Second*, Mr. Duncan's speech was deeply concerning to the now Governor and other Defendants who sought to punish him for it. As Attorney General, Defendant Murrill threatened to challenge Mr. Duncan's ability to practice law if he did not drop his claim for damages to compensate him for his wrongful conviction (the basis for his exoneration). Due to Mr. Duncan's well-founded fear that he would not be able to practice law, he dropped his claims, evidence of the chilling effect of Defendants' efforts to target him. *See supra* ¶ 52.

159.    Moreover, when Mr. Duncan continued to refer to himself as an exoneree on the campaign trail, the Governor, through his lead attorney, threatened Mr. Duncan with further action if he did not cease to do so. *See supra* ¶ 6. And when Mr. Duncan refused to bow to the Governor's and Attorney General's wills, as he had been forewarned, the Governor took action against him. He did so by successfully moving up the effective date of the Landry Bill through the First Landry Amendment. *See supra* ¶¶ 54, 56. And, through the Second Landry Amendment, the Governor aims to avoid an election for the newly-created Orleans Clerk of Court position. The Governor's signature, which he will put on the Landry Bill mere days before Mr. Duncan takes office, will prevent Mr. Duncan from assuming the office to which he was duly elected. This action necessarily serves to chill a person of ordinary firmness from running for office in the State of Louisiana in any manner, or premised on any platform, that conflicts with the Governor's agenda.[127]

160.    *Third,* Defendants' actions—which amount to (a) threatening Mr. Duncan during the course of his campaign through his top attorney (Defendant Murrill) and (b) following through

---

[126] *See Bond*, 385 U.S. at 136 (holding that speech "criticizing public policy and the implementation of it *must*" be protected) (emphasis added).

[127] *Houston Cmty. Coll. Sys.*, 595 U.S. at 481 (explaining that the United States Supreme Court made clear that the refusal to seat an elected official due to protected speech violates the First Amendment).

on that threat by pushing through legislative actions (the First and Second Landry Amendments) that effectively bar Mr. Duncan from ever taking the office to which he was elected—were substantially motivated by Mr. Duncan's protected speech criticizing the State's deeply flawed criminal legal system.[128] *See supra* at ¶ 40.

161.    There is little, if any, question that the Governor, through Defendant Murrill publicly attacked and threatened to retaliate against Mr. Duncan if he did not chill his own speech. *See supra* ¶ 40. Nor is there any question that the Governor followed through on that threat when he pushed the Landry Amendments through, with the understood purpose of preventing an exoneree, Mr. Duncan, from being seated into the office to which he was elected. *See supra* ¶ 54.

162.    The Governor's retaliatory motive is laid bare by the fact that the Landry Amendments seek to circumvent the legal requirement that an election must be held for the Orleans Parish Clerk of Court position and to retroactively change the definition of "clerk of court" applicable at the time of the 2025 elections, when Ms. Napoleon and Mr. Duncan ran for two separate offices and, when it was clear, that those offices carried very different duties, with the "clerk of court" by default carrying the duties of the Clerk of the Criminal District Court.

163.    The effort to punish Mr. Duncan for his speech "impinges on the liberal discourse essential to democratic processes."[129]

164.    The Second Landry Amendment runs headlong into the 1974 Louisiana Constitution, which requires an election to be held for Clerks of Court.[130]

165.    But no such election has been held for this new office.

---

[128]    *Keenan*, 290 F.3d at 261 (holding in a First Amendment Retaliation case that the chronology and nature of events provided "sufficient evidence that the defendants' actions were substantially motivated as a response to the plaintiffs' exercise of protected conduct").

[129]    *Rash-Aldridge v. Ramirez,* 96 F.3d 117, 119 (5th Cir. 1996) (not finding for plaintiff, who was not an elected official, but examining *Bond'*s rule prohibiting First Amendment retaliation against *elected* officials charged with representing themselves and their constituents).

[130]    La. Const. Art. 5 § 28(A) ("In each parish a clerk of the district court shall be elected for a term of four years.").

166. As such, the Governor's attempt to use the Second Landry Amendment as a circumvention technique to avoid state constitutional requirements runs roughshod over Mr. Duncan's constitutional rights.

167. The Governor, as powerful as he may be, cannot by the stroke of his pen violate the First Amendment and the Louisiana Constitution.

### E. Defendants Jeff Landry and Liz Murrill Engaged in a Conspiracy to Violate Mr. Duncan's Civil Rights.

168. Title 42 of the U.S. Code, specifically § 1985(3), provides for a private right of action for conspiracies that violate civil rights. The statute prohibits "two or more persons in any State or Territory" from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."[131]

169. To prevail on a § 1985(3) claim, a plaintiff must show the following four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."[132]

170. The conspiracy must have as its intent not only the deprivation of equal protection of the laws, but also "some racial, or perhaps otherwise class-based, invidiously discriminatory animus."[133] As the Supreme Court has explained, "[t]he predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes *and their supporters*."[134]

---

[131]   42 U.S.C. § 1985(3).
[132]   *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v. Scott,* 463 U.S. 825, 828–29 (1983).
[133]   *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).
[134]   *Carpenters v. Scott,* 463 U.S. at 836 (emphasis added).

171.    The Fifth Circuit has repeatedly upheld the requirement that the conspiracy be motivated by class or race-based animus.[135]

172.    Similarly, La. Civ. Code Ann. art. 2324 prohibits civil conspiracies. The Fifth Circuit has held that to make out a claim for a civil-conspiracy under Louisiana law, "a plaintiff must prove the following elements: '(1) an agreement existed with one or more persons to commit an illegal or tortious act; (2) the act was actually committed; (3) the act resulted in plaintiff's injury; and (4) there was an agreement as to the intended outcome or result.'"[136]

173.    Unlike a claim under 42 U.S.C. § 1985(3), civil-conspiracy claims under Louisiana law do not require a showing of racial animus.

174.    Defendants have conspired to punish and deprive Mr. Duncan of his constitutionally protected speech under the First Amendment and Fourteenth Amendment because of their animus toward Mr. Duncan as a Black man advocating for racial justice.

175.    As discussed above, when Defendant Murrill's letter threatening "further action" if Mr. Duncan did not stop referring to himself as an exoneree (a term that conjures up the racial injustices of our criminal legal system) failed to silence Mr. Duncan, Governor Landry introduced the Landry Bill and thereafter the Landry Amendments, in a further attempt to punish Mr. Duncan for championing a message of support for racial justice.

176.    As made clear by the Second Landry Amendment, Defendants are all operating with a shared understanding that it will be Ms. Napoleon (not Mr. Duncan) who will assume the new Clerk of Court role. Governor Landry's intent is evinced by Senator Morris' and

---

[135]    *See Lockett v. New Orleans City,* 607 F.3d 992, 1002 (5th Cir. 2010) ("Additionally, the conspiracy must also have a racially based animus."); *see also Bryan v. City of Madison, Miss.,* 213 F.3d 267, 276 (5th Cir. 2000) ("In this circuit, we require an allegation of a race-based conspiracy.")

[136]    *Doe v. Mckesson*, 71 F.4th 278, 287 (5th Cir. 2023) (first citing *Crutcher-Tufts Resources, Inc. v. Tufts*, 2007-1556 (La. App. 4 Cir. 9/17/08), and then La. Civ. Code Ann. art. 2324).

Representative McMakin's statements. Ms. Napoleon has toured the criminal courthouse in anticipation of her assuming that Office, presumably at the behest of the Governor.

177.    The racial animus underlying the conspiracy to deprive Mr. Duncan of his First and Fourteenth Amendment rights is unmistakable. Mr. Duncan is a Black exoneree who campaigned on promises that would make the criminal legal system more just for the disproportionate number of Black people who are subject to it. Although Ms. Napoleon, the Civil District Court Clerk is also Black, she did not run on a platform championing racial justice as Mr. Duncan did. Indeed, with no opposition in the 2025 election, she did not appear on the ballot.

**CLAIMS FOR RELIEF**
**COUNT I**
**(42 U.S.C. § 1983)**
**Denial of Effective Right to Vote Violation (U.S. Const. amend. I and XIV)**
***By Calvin Duncan in his personal capacity as an Orleans Parish***
***against Defendants Jeff and Nancy Landry regarding the Seat to which he was elected***

178.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

179.    The Louisiana Constitution establishes that the clerks of court are to be elected by the people of Louisiana.[137]

180.    Voters, including Mr. Duncan, elected Mr. Duncan to be the Clerk of Criminal District Court, a position defined in the Louisiana Constitution and its Revised Statutes and subject to changes in law.[138]

181.    The removal of the Clerk of Criminal District Court position prior to an election being held for the newly-constituted Orleans Clerk of Court position runs headlong into Mr. Duncan's First and Fourteenth Amendment protections. He has the right not only to have the

---

[137]    La. Const. Art. 5 § 28(A).
[138]    La. Const. Art. V § 32; La. R.S. 13:1371.2.

Criminal District Court position for which he voted to remain steadfast, but to also (in the event of any legislative changes that reconstitute how the current civil and criminal district courts operate)  express his opinion and vote for whoever will fill that position, which by law is necessarily vacant and cannot be filled by legislative appointment.

182.    The harm to Mr. Duncan of both being unseated and having no say in who will hold the position of Orleans Clerk of Court vastly outweighs any possible interest proclaimed by the State, wherein it seeks to construct a new position (the Orleans Parish Clerk of Court) and to discard two elected positions (the Civil and Criminal District Court Clerks) in one fell swoop.

183.    The solution is simple: allow Mr. Duncan, in his official capacity, to take his duly-elected office on May 4, 2026.

184.    At bottom, state action that fundamentally undermines the fairness and integrity of the electoral process is unconstitutional.[139]

185.    The deliberate nullification of a completed election results in "patent and fundamental unfairness," making federal court intervention appropriate.[140]

186.    In Louisiana, constitutional protections attached to an elected term vest at the time of the election.

187.    Retrospective interference with a completed election gives rise to constitutional injury under the Fourteenth Amendment.[141]

188.    Defendants here seek to nullify a completed election.

189.    Unlike recall or removal, established electoral mechanisms, the actions here eliminate an office after a completed, certified election, without any intervening vote.

---

[139]  *Duncan v. Poythress*, 657 F.2d at 703–05.
[140]  *Id*. at 704–05.
[141]  *Id.*

190.    The Louisiana Constitution mandates that clerks of court be elected and not appointed by the Governor, thereby prohibiting Defendant Nancy Landry from issuing a commission for this new office to anyone so appointed.

191.    Eliminating the Office of the Criminal Court Clerk reduces the term to which Mr. Duncan was elected to zero.

192.    Such an act shocks the conscience and constitutes patent and fundamental unfairness.

193.    Nullifying a completed election and depriving Mr. Duncan (an Orleans Parish voter in his personal capacity) of the office and representation lawfully secured by Mr. Duncan (Clerk-Elect of the Criminal District Court) violates the substantive due process clause of the Fourteenth Amendment.

194.    The solution is simple: enjoin Defendants from barring Mr. Duncan from assuming office on May 4, 2026.

<h3 style="text-align:center"><u>COUNT II</u></h3>
**(42 U.S.C. § 1983)**
**Bill of Attainder Violation (U.S. Const. Art. I, § 10) as to the First and Second Landry Amendments**
***By Plaintiff Calvin Duncan in his official capacity as Clerk-Elect of the Criminal District Court against Defendant Jeff Landry***

195.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

196.    Defendant Jeff Landry directed the Louisiana legislature to pass a Bill of Attainder that he intends to sign as punishment for Mr. Duncan's refusal to stop talking about Louisiana's deeply flawed criminal legal system. *See supra* ¶¶ 68–94 (Landry's legislative agenda, ¶¶ 57–67 (reasons for wanting to punish Mr. Duncan).

197.    This action is intended to, and has the effect of, punishing Mr. Duncan by preventing him from being employed as the Clerk of Criminal Court in Orleans Parish, a position to which he was duly elected.

198.    When the Landry Bill was introduced, it was made clear that no supportive studies, data, or conversations with Orleans Parish representatives took place before the Bill was drafted. Instead, the Landry Bill was a directive from the Governor. *See supra* ¶¶68–94.

199.    The First Landry Amendment was added to the Landry Bill in the final hours before the Senate Vote for the punitive purpose of ensuring Mr. Duncan never takes the office to which he was elected because he refused to stop talking about his exoneration and desire for criminal legal reform during the campaign. *See supra* ¶¶57–67.

200.    The Second Landry Amendment was added to the Landry Bill in the House to finish the job left undone by the First Landry Amendment. That job was to ensure beyond a shadow of any doubt that Mr. Duncan never take the office to which he was elected, because he refused to stop talking about his exoneration and desire for criminal legal reform during the campaign. *See supra* ¶¶ 57–67.

201.    In the Fifth Circuit, state legislative action violates Article 1, §10 of the U.S. Constitution if it (1) applies with specificity, and (2) imposes punishment (3) without trial.[142]

202.    First, the Landry Amendments are specific because, even though it does not name Mr. Duncan, it is "easily ascertainable" from the text and the legislative history that he is the target of the Landy Amendments. No other employee of the Criminal Court of Orleans Parish is immediately impacted by the Amendments—not the incumbent Clerk of Criminal Court, not the Criminal Court's employees, and not Ms. Napoleon in her capacity as the Clerk of Civil District

---

[142]    *See SBC Communications, Inc. v. F.C.C*, 154 F.3d at 233.

Court.[143] The fact is, the Landry Bill goes to great lengths to protect every employee of the Criminal Court of Orleans Parish *except* Mr. Duncan. SB 256 §1211.1(A) (as proposed). The Landry Amendment thus clearly singles out and condemns Mr. Duncan and only Mr. Duncan.

203.    Second, the Landry Amendments are punitive and impose punishment as a "bill of pains and penalties." *Cummings v. Missouri*, 71 U.S. 277, 323 (1867). The Landry Amendment "viewed in terms of the type and severity of burden[] imposed" cannot "be said to further non-punitive legislative purposes." *Nixon.*, 433 U.S. at 475.

204.    *Third*, the Landry Amendments constitute impermissible legislative action that violates the Bill of Attainder Clause because the Amendments single out Mr. Duncan for punishment without trial.

205.    Therefore, Mr. Duncan states a colorable claim against the Landry Amendments.

206.    Accordingly, he respectfully asks the Court to enjoin the First and Second Landry Amendments.

## COUNT III
### (42 U.S.C. § 1983)
### Bill of Attainder Violation (U.S. Const. Art. I, § 10) as to SB 256
*By Plaintiff Calvin Duncan in his official capacity as Clerk-Elect of the Criminal District Court against Defendant Jeff Landry*

207.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

208.    Defendant Jeff Landry directed the Louisiana legislature to pass a bill of attainder that he intends to sign against Calvin Duncan as punishment for Mr. Duncan's refusal to stop talking about his experience of wrongful conviction, 28 years of imprisonment, and long withheld

---

[143]    *See U.S. v. Lovett*, 328 U.S. at 315; *see also Selective Service*, 468 U.S. at 847 (finding that specificity should be interpreted broadly).

43

exoneration. *See supra* ¶¶68-94 (Landry's legislative agenda, 59-65 (reasons for wanting to punish Mr. Duncan).

209.    This action is intended to, and has the effect of, punishing Mr. Duncan by preventing him from being sworn in and employed as the Clerk of Criminal Court in Orleans Parish, a position to which he was duly elected.

210.    The Landry Bill is part of Defendant Landry's 2026 legislative agenda in his official capacity as governor for the 2026 legislative session. *See supra* ¶ 68.

211.    During the introduction of the bill during a Senate committee hearing, it was made clear that no supportive studies, data, or conversations with New Orleans representatives took place before the bill was drafted. Instead, the Landry Bill was a directive from the governor. *See supra* ¶¶ 69-80.

212.    After the Landry Bill passed in the Senate with the First Landry Amendment, the House rushed to hold a special meeting solely for the purpose of considering SB 256.

213.    On April 23, 2026, the House passed the Landry Bill with the Second Landry Amendment.

214.    In the Fifth Circuit, state legislative action violates Article 1, section 10 of the U.S. Constitution if it (1) applies with specificity, and (2) imposes punishment without trial.[144]

215.    First, SB265 is specific because, even though it does not name Mr. Duncan, it is "easily ascertainable" from the text and the legislative history that he is the target of the bill. No other employee of the Criminal Court of Orleans Parish is impacted by the bill.[145] In fact, the bill

---

[144]    *SBC Communications, Inc. v. F.C.C*, 154 F.3d at 233.
[145]    *U.S. v. Lovett*, 328 U.S. at 315; *see also Selective Service*, 468 U.S. at 847 (finding that specificity should be interpreted broadly).

goes to great lengths to protect every employee of the Criminal Court of Orleans Parish *except* Calvin Duncan.[146]

216. SB265 condemns Mr. Duncan and only Mr. Duncan.

217. Second, SB 256 is punitive and imposes punishment as a "bill of pains of penalties."[147]

218. The U.S. Supreme Court has adopted a three-part analysis of whether legislative action is punishment: (1) whether it imposes a sanction historically associated with bills of attainder, (2) whether "viewed in the terms of the type and severity of burdens imposed" the legislative action "can be said to further nonpunitive purposes," and (3) whether the legislative record evinces a punitive purpose.[148]

219. SB 256 "viewed in terms of the type and severity of burden[] imposed" cannot "be said to further non-punitive legislative purposes."[149]

220. Further, the record demonstrates a punitive purpose.

221. If SB 256 is allowed to have its intended effect, the consequences are clear: any duly elected candidate-elect who has not submitted to threats from the executive branch can be prevented from taking office as punishment.

222. For these and the reasons discussed above in Count III, passage of SB 256 at Defendant Jeff Landry's direction violates the Bill of Attainder Clause.

223. Therefore, Mr. Duncan states a colorable claim for bill of attainder against the Landry Bill.

---

[146]  SB265 §1211.1(A).
[147]  *Cummings v. Missouri*, 71 U.S. 277, 323 (1866).
[148]  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 474-478 (1977).
[149]  *Id.* at 475.

224. If SB 256 is allowed to have its intended effect, the consequences are clear: any duly elected official who does not submit to threats from the executive branch can not only be prevented from taking their office, their whole office stands to be abolished.

225. Accordingly, Mr. Duncan respectfully asks the Court to enjoin the Bill.

**COUNT IV**
**(42 U.S.C. § 1983)**
**First Amendment Retaliation as to the First and Second Landry Amendments**
*By Plaintiff Calvin Duncan in his official capacity as Clerk-Elect of the Criminal District Court against Defendants Jeff Landry and Murrill*

226. Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

227. Defendant Jeff Landry retaliated against Mr. Duncan as Clerk-Elect of the Criminal District Court for his protected speech (speech consistently critical of Louisiana's criminal legal system) through the First and Second Landry Amendments. This action is intended to have the effect of barring Mr. Duncan from taking office outright.

228. Additionally, Defendant Murrill retaliated against Mr. Duncan as a candidate for Clerk of Criminal District Court for his protected speech (truthfully and factually referring to himself as an exonerated man) through issuances of public statements threatening legal action. *See supra* ¶¶ 57–67.

229. Mr. Duncan has shown that he engaged in protected speech that displeased the Governor. *See supra* ¶ 67. That speech garnered threats from Defendant Murrill, who vowed to have the State take further action against Mr. Duncan if he failed to stop referring to himself as an exoneree during his campaign. *See supra* ¶ 59.

230. Because Mr. Duncan spoke out about the criminal legal system and won the election, all while refusing to bow to the Governor's and Attorney General's threats, the Governor

46

now plans to sign a Bill into law that has the effect of retaliating against Mr. Duncan for his speech by barring him from taking the office to which he was duly elected. *See supra* ¶¶ 68–94.

231.    If Defendant Jeff Landry's signature is to have its intended effect, Mr. Duncan's core political speech will be chilled, as will the political speech of future candidates who seek to run for office on a platform contrary to Defendants' agenda.

232.    Defendant Jeff Landry's and Murrill's actions are and were substantially motivated by Mr. Duncan's protected speech and status as an exoneree, as evidenced by the sequence of events that bring us here today.

233.    The Governor's attacks on Mr. Duncan go well beyond mere censure or criticism, and instead constitutes an "expulsion" that is impermissible under the First Amendment.[150]

234.    Therefore, Mr. Duncan states a colorable claim.

235.    Accordingly, he respectfully asks the Court to enjoin the First and Second Landry Amendments so that he can take his duly-elected office on May 4, 2026.

**COUNT V**
**(42 U.S.C. § 1983)**
**First Amendment Retaliation as to the Landry Bill**
*By Plaintiff Calvin Duncan in his official capacity as Clerk-Elect of the Criminal District*
*Court against Defendants Jeff Landry and Murrill*

236.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

237.    For the same reasons as discussed in Count IV, Defendants engaged in First Amendment Retaliation as to their actions that preceded and culminated in the introduction of, and support for, the Landry Bill more generally.

---

[150]    *Cf. Houston Cmty. Coll. Sys.*, 595 U.S. at 482.

47

238.    Accordingly, he respectfully asks the Court to stay the effect of the Bill so that he can take his duly-elected office on May 4, 2026.

**COUNT VI**
**(42 U.S.C. § 1985)**
**Conspiracy**
***By Plaintiff Calvin Duncan in his official capacity as Clerk-Elect of the Criminal District***
***Court against Defendants Jeff Landry, and Liz Murrill***

239.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

240.    Defendants plotted, planned, coordinated, and conspired collectively to target Mr. Duncan as a Black exoneree and supporter of racial justice, to prevent him from taking office as Clerk-Elect of the Criminal District Court and to deprive him of his First and Fourteenth Amendment Rights.

241.    To prevail on a § 1985(3) claim, a plaintiff must show the following four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."[151]

242.    Each of the four elements required to establish a conspiracy are satisfied.

243.    First, Defendants formed an agreement to prevent Mr. Duncan from taking office as Clerk of the Criminal District Court.

244.    Second, the agreement was aimed at preventing Mr. Duncan from taking office, thereby depriving Mr. Duncan of his First and Fourteenth Amendment rights.

---

[151]    *Carpenters v. Scott,* 463 U.S. at 828–29.

245.    Third, each Defendant took an act in furtherance of the conspiracy: Defendant Murrill sent a letter to Mr. Duncan, and Defendant Landry arranged for SB 256 and the Landry Amendments to be introduced.

246.    Fourth, Mr. Duncan was injured when SB 256 was passed with the Landry Amendments, with the intent of preventing him from assuming the office to which he was duly elected.

247.    Accordingly, he respectfully asks the Court to enjoin the Landry Bill from going into effect so that he can take his proper office on May 4, 2026.

**COUNT VII**
**La. Civ. Code Ann. Art. 2324**
**Conspiracy**
***By Plaintiff Calvin Duncan in his official capacity as Clerk-Elect of the Criminal District Court against Defendants Jeff Landry, and Liz Murrill***

248.    Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

249.    La. Civ. Code Ann. art. 2324 prohibits civil conspiracies. The Fifth Circuit has held that to make out a claim for a civil-conspiracy under Louisiana law, "a plaintiff must prove the following elements: '(1) an agreement existed with one or more persons to commit an illegal or tortious act; (2) the act was actually committed; (3) the act resulted in plaintiff's injury; and (4) there was an agreement as to the intended outcome or result.'"[152]

250.    Defendants here formed an agreement to prevent Mr. Duncan from assuming the Office of Criminal District Court Clerk, to which he was duly elected on November 15, 2025; for which he received his Commission Certificate on April 20, 2026; and to which he was sworn in

---

[152]    *Mckesson*, 71 F.4th at 287 (first citing *Tufts*, 2007-1556 (La. App. 4 Cir. 9/17/08), and then La. Civ. Code Ann. art. 2324).

on April 21, 2026. That agreement has now manifested in passage of SB 256. Plaintiff stands to be imminently injured if the Bill is to take effect as intended by Defendants.

251.    Accordingly, he respectfully asks the Court to stay the effect of the Bill in order for him to take office on May 4, 2026.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks the Court to:

A.    Assume jurisdiction over the claims in this matter;

B.    Issue an Order authorizing Plaintiff Calvin Duncan to assume the Office of Orleans Parish Criminal District Court Clerk at 12:00 a.m. on May 4, 2026.

C.    Enjoin SB 256, or in the alternative enjoin the First and Second Landry Amendments

D.    Declare that the Landry Bill, including the Landry Amendments, violate federal and state law;

E.    Award such further relief as the Court deems just and proper.

Dated: April 29, 2026                                    Respectfully submitted,

*/s/ Sarah Whittington*
Sarah Whittington, La. Bar No. 36725
*Nora Ahmed, NY Bar No. 5092374
Malcolm Lloyd, La. Bar No. 41573
Andrew Perry, La. Bar No. 40906
Ashley Fox, La. Bar No. 41748
ACLU Foundation of Louisiana
1340 Poydras St., Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
swhittington@laaclu.org
nahmed@laaclu.org
mlloyd@laaclu.org
aperry@laaclu.org
afox@laaclu.org

William P. Quigley, La. Bar No. 07769
Professor Emeritus of Law
Loyola University College of Law
7214 St. Charles Avenue
New Orleans, LA 70118
Tel: (504) 710-3074
Fax: (504) 861-5440
quigley77@gmail.com

Ronald L. Wilson, La. Bar No. 13575
Attorney at Law
701 Poydras Street, Suite 4100
New Orleans, LA  70139
Tel: (504) 525-4361
Fax: (504) 525-4380
cabral2@aol.com

*Adina Marx-Arpadi
*Kayla Vinson
Center for Constitutional Rights
666 Broadway, 7 Fl
New York, NY 10012
Tel: (212) 614-6464
amarxarpadi@ccrjustice.org
kvinson@ccrjustice.org

*Attorneys for Plaintiff*
*Pro hac vice application forthcoming*

51

**VERIFICATION STATEMENT**

I, Calvin Duncan, declare as follows:

1. I am the Plaintiff in the present case, a citizen of the United States of America, and a resident and registered voter of Orleans Parish and the State of Louisiana.

2. I have personal knowledge of myself, my activities, my intentions, and the actions undertaken by myself and Defendants, as set out in the foregoing *Verified Complaint for Declaratory and Injunctive Relief*.

3. If called to testify, I would competently testify as to the matters discussed in the foregoing *Verified Complaint for Declaratory and Injunctive Relief*.

4. Under the laws of the United States of America, I verify under penalty of perjury that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* are, to the best of my knowledge, true and correct. 28 U.S.C. § 1746.

Executed on April 28, 2026

Calvin Duncan

Calvin Duncan

52