## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

CALVIN DUNCAN, in his official capacity as Clerk-Elect of Orleans Parish Criminal District Court, and in his personal capacity as an Orleans Parish voter,

*Plaintiff*,

v.

JEFFREY LANDRY, in his official capacity as Governor of the State of Louisiana, NANCY LANDRY, in her official capacity as Louisiana Secretary of State, and ELIZABETH MURILL, in her official capacity as Attorney General for the State of Louisiana,

*Defendants*.

Case No. 3:26-cv-00460

Judge John W. deGravelles

Magistrate Judge Scott Johnson

*Jury Trial Demanded*

## <u>MEMORANDUM OF LAW IN SUPPORT OF<br>PLAINTIFF'S EMERGENCY<br>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>

**TABLE OF CONTENTS**

INTRODUCTION 1

STATEMENT OF FACTS 3

ARGUMENT 6

    I.   MR. DUNCAN IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS. 7

    II.  MR. DUNCAN WILL SUFFER IRREPARABLE HARM ABSENT A TRO. 18

    IV. A TRO WILL SERVE THE PUBLIC INTEREST. 19

    V.  THE COURT SHOULD NOT REQUIRE SECURITY PRIOR TO ISSUING INJUNCTIVE RELIEF 20

CONCLUSION 21

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983)     9

*Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F.Supp.3d 511 (S.D. Tex. 2020)     18

*Avoyelles Parish Justice of the Peace v. Avoyelles Par. Police Jury,* 758 So.2d 161 (La. 3rd Cir. 1999).     14

*Bond v. Floyd*, 385 U.S. 116 (1966)     16,20

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024)     20

*Burdick v. Takushi*, 504 U.S. 428 (1992)     9

*Calogero v. State ex rel. Treen*, 445 So.2d 736 (La. 1984)     14

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. 1981)     20

*Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300 (5th Cir. 1978)     21

*Deep S. Today v. Murrill,* 779 F. Supp. 3d 782 (M.D. La. 2025)     19

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981)     17

*Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981)     9

*Dunn v. Blumstein*, 405 U.S. 330 (1972)     8, 12

*Gamza v. Aguirre*, 619 F.2d 449 (5th Cir. 1980)     8

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966)     8

*Hatten v. Rains*, 854 F.2d 687 (5th Cir. 1988)     8

*Hoag v. Kennedy ex rel. State*, 836 So. 2d 207 (La. Ct. App. 2002)     14

*Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010)     18

*Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022)     15, 16

*Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979)     8

*In re Nw. Airlines Corp.*, 349 B.R. 338 (S.D.N.Y.2006)     18

*Ingebretsen on Behalf of Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274 (5th Cir. 1996)     20

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448 (5th Cir. 2014)     20

*Janvey v. Alguire,* 647 F.3d 585 (5th Cir. 2011)     7

*Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002)     15, 16,17

*Killebrew v. City of Greenwood*, Mississippi, 988 F.Supp. 1014 (N.D. Miss 1997)     18

*Kirksey v. Board of Supervisors*, 554 F.2d 139 (5th Cir. 1977))     8

*La Union del Pueblo Entero v. Abbott,* 167 F.4th 743 (5th Cir. 2026)     9

*Lubin v. Panish*, 415 U.S. 709 (1974).     8

*Mazo v. New Jersey Sec'y of State*, 54 F.4th 124 (3d Cir. 2022)     9

*Merrill v. Milligan*, 142 S. Ct. 879 (2022)     20

*Morial v. Judiciary Commission of Louisiana*, 565 F.2d 295 (5th Cir. 1977)     8,9

*Nieves v. Barlett* 587 U.S. 391, 400 (2019)15     15

*Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279 (5th Cir. 2012)     18

*Phillips v. Snyder*, 2014 WL 6474344 (E.D. Mich. Nov. 19, 2014)     10

*Planned Parenthood Gulf Coast, Inc. v. Klieber*, 141 F. Supp. 3d 604 (M.D. La. 2015)     7
*Powers v. State*, 318 P.3d 300 (Wyo. 2014)     11
*Purcell v. Gonzalez*, 549 U.S. 1 (2006)     8,20
*Rash-Aldridge v. Ramirez*, 96 F.3d 117 (5th Cir. 1996)     16
*Reynolds v. Sims*, 377 U.S. 533 (1964)     8
*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022)     20
*Russell v. McKeithen*, 257 La. 225 (1970)     10,13
*Saunders v. Haynes*, 13 Cal. 145, 153–54 (Cal. 1859)     11, 12
*Smith v. Sells*, 156 Tenn. 539 (Tenn. 1927)     11
*Smith v. Winter*, 717 F.2d 191 (5th Cir. 1983)     8
*State ex rel. Garland v. Guillory*, 166 So. 94 (La. 1935)     10
*State ex rel. Holmes v. Wiltz*, 11 La. Ann. 439 (La. 1856)     10
*State ex rel. Mattson v. Kiedrowski*, 391 N.W.2d 777 (Minn. 1986)     11
*State ex rel. Sanchez v. Dixon*, 4 So. 2d 591 (La. 1941)     3,10,11,13
*United States v. State of Tex.*, 508 F.2d 98 (5th Cir. 1975)     20

## Statutes

La. Const. Art. V § 28(A)     13
La. Const. Art. V § 32     10
La. R.S. 13:1371.2(A)     6,18,19
La. R.S. 18:2(3)     14,15
La. R.S. 18:402(E)(1)     13
La. R.S. 18:422     14,15
La. R.S. 42:141(B)     19
La. R.S.13:1211.1(B) (as amended by SB 256)     2,11,13,19

**INTRODUCTION**

For the avoidance of any doubt, this temporary restraining order ("TRO") is strictly about deciding what happens on Monday, May 4, 2026, at 12:00 a.m. This TRO is not about whether the legislature can create the Orleans Clerk of Court seat. Arguably, if the legislature follows the law, they can create a new seat. But what Defendants cannot do through the legislature is fill that newly-created clerk of court seat, which requires an election, themselves. That is the problem at issue—the targeted and concerted attempt to (a) unlawfully nullify Plaintiff Calvin Duncan's vote as an Orleans Parish voter for the Clerk of Criminal District Court seat by attempting to retroactively invalidate a completed election; and (b) illegally abolish the Criminal District Court Clerk seat in retaliation for Mr. Duncan's political speech on the campaign trail. *See* Exh. A, Pl. Demonstratives. The injury to Mr. Duncan, both as Clerk-Elect and as a voter, is accordingly immense and stands to be irreparable absent court intervention. For this reason, Mr. Duncan respectfully asks this Court to order that he take the office to which he was elected on November 15, 2025; for which he received his commission on April 20, 2026; and to which he was sworn into on April 21, 2026. Such a temporary order would have the effect of preventing any immediate, premature violations of Mr. Duncan's First and Fourteenth Amendment rights.

Most relevant to this TRO are two amendments to the bill at issue—Senate Bill 256 ("SB 256" or the "Landry Bill")—that occurred on April 8 and 23, 2026. On April 8, Senator John C. "Jay" Morris III introduced an amendment to the Landry Bill at the Governor's behest, which provided for the Act to go into effect immediately upon the Governor's signature (the "First Landry Amendment").[1] Exh. B, "First Landry Amendment," S. Floor Amends. to Engrossed S.B. 256,

---

[1] The text of the First Landry Amendment reads: "**Section 3**. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without

1

Amend. No. 4, 2026 Reg. Sess. (La. 2026). The First Landry Amendment had the goal of barring

Mr. Duncan from rightfully taking the Office of Orleans Parish Criminal District Court Clerk (to

which Orleans Parish voters elected him by a landslide) by giving effect to the Landry Bill

immediately upon the Governor's signature. Lawmakers were nonetheless concerned that this

amendment alone was not sufficient to outright bar Mr. Duncan from taking the Criminal District

Court Clerk seat to which he was elected. Accordingly, a late-breaking amendment to satisfy the

Governor's agenda to unseat Mr. Duncan was passed on April 23. This second amendment (the

"Second Landry Amendment"),[2] introduced by House Representative Dixon McMakin, made the

previous amendment's implicit intention explicit—it purports to unequivocally install Chelsey

Napoleon to the new Clerk of Court seat created by the Landry Bill absent an election, even though

the Bill itself requires the new seat to be filled by "the qualified electors of Orleans." Exh. C,

"Second Landry Amendment," H. Floor Amends. to Reengrossed S.B. 256, 2026 Reg. Sess. (La.

2026); La. R.S. 13:1211.1(A) (as amended in SB 256); *accord* La. Const. Art. 5, §28(A) ("In each

parish a clerk of the district court shall be elected for a term of four years.").

---

signature by the governor, as provided by Article III, Section 18 of the Constitution of Louisiana. If vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval." (emphasis added).

[2]   The Second Landry Amendment includes "**Section 4**. The provisions of this Act shall not reduce the current term of office of the clerk of criminal district court for the Parish of Orleans on the effective date of this Act. The office of clerk of criminal district court for the Parish of Orleans shall be abolished at the end of May 3, 2026 and before the term of any other criminal clerk of court begins. Immediately thereafter, the authority, functions, duties, and responsibilities of the office of clerk of criminal district court for the Parish of Orleans, and all of the books, papers, records, monies, actions, and other property of every kind and description, movable and immovable, real and personal, possessed, controlled, or used by the office of the clerk of criminal district court for the Parish of Orleans shall be transferred and owned, possessed, controlled, and used by the clerk of the civil district court for the Parish of Orleans, who shall thereafter be referred to as the clerk of court for the Parish of Orleans." (emphasis added). The Second Landry Amendment also includes, among a separate section repealing various criminal district court clerk provisions, "**Section 5.** Whenever the clerk of the criminal district court for the Parish of Orleans is referred to or designated by law, rule, or regulation on and after the date that office is abolished, such reference or designation shall be deemed to apply to the clerk of civil district court for the Parish of Orleans or hereafter "clerk of court for the Parish of Orleans." (emphasis added).

2

Simply put, the Landry Amendments are at odds with the United States Constitution. Unfortunately for Defendants, the remedy for a lost election is political: run a better candidate or message in the *next election*. Our Constitution does not allow high-level officials to subvert the electoral process and deny someone their rightful office out of punishment, political retribution, or personal animus. At bottom, no matter what the legislative instrument says, Ms. Napoleon is no heir to the proverbial Orleans Clerk of Court throne. That newly created office is necessarily "ipso facto" vacant and requires an election before it can be filled by anyone on a permanent basis. *See State ex rel. Sanchez v. Dixon*, 4 So. 2d 591, 595 (La. Ct. App. 1941) (holding that "a newly created office becomes ipso facto vacant when it is created and remains vacant until it is filled by an incumbent" because "no such office can come into existence until an election is held to fill it, and there can be no vacancy in an office [that can be filled via appointment] that has not come into existence).

There is no valid, legal justification for Defendants to nullify the will of Orleans Parish voters, like Mr. Duncan, who voted in the November 2025 election for Orleans Parish Criminal District Court Clerk (Count I), and to violate the First Amendment through unlawful retaliation against Mr. Duncan for his political speech and status as an exoneree (Count IV). *See* Exh. A, Pl. Demonstratives. Defendants cannot deny Mr. Duncan the ability to assume the office for which he was duly elected, commissioned, and sworn in, Compl. at ¶¶ 92–94—least of all in retaliation for his speech and advocacy critical of Louisiana's criminal legal system, or to prevent him from carrying out the policy reforms he promised voters.

As discussed further below, Mr. Duncan satisfies the elements for a TRO. He respectfully asks this Court to issue an order allowing him, in accordance with the commission for office he received (dated May 4, 2026), to assume office as Orleans Parish Criminal District Court Clerk on

3

May 4, 2026, with all the duties and responsibilities of that office determined on the date of his election. Such an order would operate to stay the effects of the First and Second Landry Amendments, and thereby stay the impacts of the Landry Bill for a minimum of 14 days. This narrow TRO request is both what Mr. Duncan, as Clerk-Elect and as a voter, expected to occur on November 15, 2025. He did not expect (because it is unconstitutional) for the results of a free and fair election to be overridden through the legislative appointment of an official (whose election was premised on duties that never included the full scope of those now at issue in the Landry Bill) to a newly-created, vacant office.

## STATEMENT OF FACTS

In 1982, Mr. Duncan was charged with first-degree murder. Compl. ¶ 26. He was convicted in 1985. *Id.* at ¶ 27. Thereafter, from his cell block at the largest maximum-security penitentiary in the country, he dedicated himself to learning the law and clearing his name. *Id.* at ¶¶ 28–31. The effort to prove his innocence involved myriad attempts to access his case files from the Orleans Parish Criminal Court Clerk's Office. *Id.* at ¶¶ 30–32. But he was refused at every turn due to the Office's chronic mismanagement of records. *Id.* at ¶¶ 30–32. Eventually, with the tireless assistance of the Innocence Project of New Orleans, he was freed in 2011. *Id.* at ¶¶ 32–33. His name was cleared and he was exonerated in 2021. *Id.* at ¶ 43.

In 2023, the same year that he earned his law degree, Mr. Duncan sought to obtain $330,000 in state compensation for his wrongful conviction. *Id.* at ¶ 46. In response, the Attorney General, Governor Landry's legal counsel, threatened to contest Mr. Duncan's ability to practice law if he did not drop his damages claim. *Id*. Weighing the significance of the threat and the Attorney General's very real ability to carry it out, Mr. Duncan reluctantly withdrew his claim. *Id*. Still,

4

Mr. Duncan never ceased speaking out about the mismanagement of records by the Criminal District Court Clerk's Office and its role in producing wrongful convictions. *Id.* at ¶ 50.

In 2025, Mr. Duncan decided to run for the Office of Orleans Parish Criminal District Court Clerk. *Id.* at ¶ 49. During a September 23, 2025 debate against then-incumbent Darren Lombard, Mr. Duncan told voters directly: "I stayed in prison 28 and a half years trying to get my records. I've never wanted that to happen to nobody else." *Id.* at ¶ 51. He continued: "I know the consequences of getting it wrong. I know the consequences of why when records are not properly stored, and evidence are not properly stored and secured, victims cannot get the justice they deserve." *Id.*

On September 30, 2025, Defendant Attorney General Liz Murrill, the highest-ranking attorney in the State—who represents all state actors in their official capacity (including Governor Landry)—took the extraordinary and unprecedented step of publicly attacking and threatening retaliation against Mr. Duncan if he continued to describe himself as an exoneree on the campaign trail. *Id.* at ¶ 59. She demanded that Mr. Duncan "cease representing to the public that you were 'exonerated' to avoid further action from this office," while acknowledging that "criminal court records confirmed that Mr. Duncan's conviction was vacated in 2021." *Id.* at ¶¶ 58–61. Defendant Murrill claimed that the circumstances surrounding the vacatur of Mr. Duncan's conviction caused her "grave concern about abuse and manipulation of the justice system," and threatened further action if he did not comply with her demand. *Id.* Mr. Duncan did not heed her threat and continued to use his protected political speech to speak truth to power. *Id.* at ¶¶ 62–67.

On October 1, 2025, mere days after she sent her initial letter, Defendant Murrill doubled down, vowing to take "further action" against Mr. Duncan if he did not stop calling himself exonerated. *Id.* at ¶ 65. Again, Mr. Duncan did not heed her threat and continued to use his

protected political speech. *Id.* at ¶¶ 66–67. Defendant Murrill's letter nonetheless had its intended effect: shortly afterward, then-incumbent Lombard's campaign filed a TRO against Mr. Duncan seeking to prevent him from using the word "exonerated," a filing built directly on Defendant Murrill's public statements. *Id.* at ¶ 63. Mr. Lombard later withdrew the petition, having secured the media attention he sought. *Id.* at ¶ 64.

On October 11, 2025, Mr. Duncan appeared on the ballot for Orleans Parish Clerk of Criminal District Court. *Id.* at ¶ 48. On November 15, 2025, he was elected to the position with 68 percent of the vote. *Id.* at ¶ 54. On April 20, 2026, Mr. Duncan received his Commission Certificate, Criminal District Clerk of Court identification badge, and Oath of Office forms. *Id.* at ¶ 56. He was sworn into Office the following day. *Id.* In accordance with La. R.S.13:1371.2.(A), he is scheduled to take office on May 4, 2026. *Id.*

But Defendants Jeff and Nancy Landry, and Murrill aim to unconstitutionally obstruct Mr. Duncan's entitlement to that office. *Id.* at ¶ 58. Senator John "Jay" Morris, a Republican representing Monroe, over 200 miles from New Orleans, with no constituent interest in the administration of Orleans Parish criminal courts, introduced the Landry Bill. *Id.* at ¶ 69. He repeatedly claimed, albeit without support at the time, that the then-plain text of the statute made clear that Ms. Napoleon was the heir to the new clerk of court office. *Id.* at ¶¶ 70–74. The Governor too made public statements asserting that the Landry Bill would have this intended effect. *Id.* at ¶¶ 68-80. Initially, to ensure Mr. Duncan would never be seated at all, Senator Morris worked with the Governor's Office to introduce an amendment to the Bill that would make it effective upon the Governor's signature—the First Landry Amendment. *Id.* at ¶¶ 75, 94. When pressed at the time about the reach of the Landry Bill and its ability to, on its face, legally unseat Mr. Duncan before

6

he takes office, Senator Morris conceded litigation is likely going to be necessary to resolve this question. *Id.* at ¶ 90.

On April 8, 2026, the Louisiana Senate passed the Landry Bill, which included the First Landry Amendment, 25 to 11. *Id.* at ¶ 87. The Bill was voted through the Louisiana House Judiciary Committee on April 16, 2026. *Id.* at ¶ 88. It was voted through the House on April 23, 2026—but not prior to the inclusion of the late-breaking Second Landry Amendment, which unequivocally underscored that Ms. Napoleon would, absent any election, be stepping into the newly-created clerk of court seat on May 4, 2026. *Id.* at ¶ 94. The Senate issued a concurring vote on April 29, 2026. *Id.* The Landry Bill now heads to the Governor's desk for signature (albeit with pro forma signatures from the Senate President and House Speaker occurring in the interim). *Id.*

Mr. Duncan files suit now, before the Landry Bill reaches the Governor's desk, to stay the effect of the Landry Amendments, which would produce an unconstitutional result—preventing Mr. Duncan from taking office at 12:00 a.m. on May 4, 2026, with the duties and responsibilities of that office, which were determined on the date of his election. *Id.* at ¶ 110.

## ARGUMENT

TROs are only granted when a plaintiff establishes that (1) he has a substantial likelihood of success on the merits of his claims; (2) he will suffer a substantial threat of irreparable injury if the injunction requested is not issued; (3) the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) the grant of an injunction will not disserve the public interest. *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). In applying this four-factor test, courts consider the factors on a "sliding scale," where a greater threat of irreparable injury may justify issuance of preliminary relief in a situation with a less certain likelihood of success, and vice versa. *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F.

7

Supp. 3d 604, 635 (M.D. La. 2015), *aff'd sub nom. Planned Parenthood of Gulf Coast, Inc. v. Gee*, 837 F.3d 477 (5th Cir. 2016), *opinion withdrawn and superseded*, 862 F.3d 445 (5th Cir. 2017), and *aff'd sub nom. Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445 (5th Cir. 2017). Mr. Duncan readily satisfies the elements required for issuing an emergency TRO.

### I.   Mr. Duncan Is Likely to Succeed on the Merits of His Claims.

Mr. Duncan raises two (2) of his seven (7) claims (Counts I and IV) in his request for a TRO. If the Court finds he has the likelihood of prevailing on any one claim against any single defendant, a TRO should issue.

***Count I (Effective Right to Vote Violation)***. The Fourteenth Amendment right to vote is a fundamental right safeguarded by the Constitution. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). The vote is the quintessential mechanism "to *express* [one's] political preferences." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). The right to an effective vote is broadly interpreted "as a right of meaningful access to the political process rather than narrowly as a mere right of registration and access to the ballot box." *Smith v. Winter*, 717 F.2d 191, 198 (5th Cir. 1983) (citing *Kirksey v. Board of Supervisors*, 554 F.2d 139, 142 (5th Cir. 1977)). Moreover, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds*, 377 U.S. at 555).

The Fourteenth Amendment protects Mr. Duncan's right to vote. That right is a "substantive right to participate on an equal basis with other qualified voters whenever the State has adopted an electoral process for determining who will represent any segment of the State's population." *Lubin v. Panish*, 415 U.S. 709, 713 (1974). In elections, there is "a concomitant right

8

to have [one's] vote[] counted." *Gamza v. Aguirre*, 619 F.2d 449, 452 (5th Cir. 1980) (collecting cases). "[T]he first amendment protects the marketplace of ideas," and "such protection extends not just to the right to speak, but to the right to elect representatives sympathetic to a given group or viewpoint." *Hatten v. Rains*, 854 F.2d 687, 695 (5th Cir. 1988) (citing *Morial v. Judiciary Commission of Louisiana*, 565 F.2d 295, 302 (5th Cir. 1977) (en banc), *cert. denied*, 435 U.S. 1013 (1978)). Where laws operate "to exclude candidates of an identifiable group or viewpoint," those laws "have been invalidated on constitutional grounds." *Morial*, 565 F.2d at 302 (collecting cases).

Regulations that "burden a relevant constitutional right, such as the [Fourteenth Amendment] right to vote or the First Amendment rights of *free expression* and association," yet "primarily regulate the mechanics of the electoral process, as opposed to core political speech," trigger an analysis under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 138 (3d Cir. 2022) (emphasis added). Under *Anderson-Burdick*, "the court 'must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.'" *See La Union del Pueblo Entero v. Abbott,* 167 F.4th 743, 760-62 (5th Cir. 2026) (quoting *Anderson*, 460 U.S. at 789) (denying relief but applying *Anderson-Burdick* as the operative legal test). Then "the court 'must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule." *Id.* Here, the First and Second Landry Amendments trigger an *Anderson-Burdick* analysis.

### *Anderson-Burdick* Prong 1: Magnitude of the Injury

Mr. Duncan avers in his Complaint that the Landry Amendments together operate to deny his freedom of speech as it pertains to his right to vote—a dire unconstitutional injury. *See Duncan v. Poythress*, 657 F.2d 691, 703–05 (5th Cir. 1981) (holding due process clause of the Fourteenth

Amendment protects against the disenfranchisement of a state electorate in violation of state election law).

As an initial matter, the Landry Bill creates a new office by extinguishing the prior clerk of court offices, thereby altering the character and core duties of the new clerk of court position. *See* La. Const. Art. V § 32 (specifically identifying clerks of the civil and criminal district courts as distinct positions that continue in operation under the current constitution unless changed by law, suggesting the change is one of significance that alters the status quo); *see also State ex rel. Holmes v. Wiltz*, 11 La. Ann. 439, 441–46 (La. 1856) (discussing statutory interpretation methods to determine whether a legislative act creates a new office). Louisiana courts have long distinguished between statutes that merely recognize an existing office and those that abolish one office and substitute a materially different one. *See State ex rel. Garland v. Guillory*, 166 So. 94, 103–04 (La. 1935) (where an act rearranges jurisdiction, duties, or constituency such that the prior office no longer exists, the resulting position is treated as a new office).

Where a new, elected office is created, Louisiana law requires that it be filled by election, not appointment. *State ex rel. Sanchez*, 4 So. 2d at 597 (holding that "a newly created office becomes ipso facto vacant when it is created and remains vacant until it is filled by an incumbent" because "no such office can come into existence until an election is held to fill it, and there can be no vacancy in an office [that can be filled via appointment] that has not come into existence); *Russell v. McKeithen*, 257 La. 225, 244 (1970) (holding that part of Act that created a new judgeship was unconstitutional insofar as it provided for interim appointment by Governor prior to special election, and stating that "'[w]here the Constitution has provided the method of filling offices, the Legislature may not provide for filling them in any other manner'" (citation omitted)).

10

Here, the First and Second Landry Amendments together operate to completely unseat Mr. Duncan post-election. That maneuvering is unconstitutional because it disenfranchises him as a voter and overrides the outcome of a completed election by bypassing electoral processes for the upcoming term completely. *Duncan*, 657 F.2d at 704; *see also Phillips v. Snyder*, No. 2:13–CV–11370, 2014 WL 6474344, at *8 (E.D. Mich. Nov. 19, 2014) ("[I]f the right to vote is to mean anything, certainly it must provide that the elected official wields the powers attendant to their office") (denying violation of fundamental right when, unlike the present case where the intent is to unseat the elected official entirely, emergency managers were taking over duties held by elected officials). Unlike recall or removal procedures initiated through established electoral mechanisms, the injury here arises from legislative action eliminating an office after a completed, certified election. *See* Compl. at ¶ 1 (citing Exh. A).

The timing and structure of the Landry Amendments demonstrate that they were designed not to address administrative necessity, but to ensure, above all else, that Mr. Duncan never assumes office. *See* Compl. at ¶¶ 193–200.[3] These Amendments shock the conscience and constitute "patent and fundamental unfairness" in the administration of an election. *Duncan*, 657 F.2d at 704. The Landry Amendments cannot operate to unseat the operative Criminal District Court Clerk by bypassing a legally-required election for a new office in favor of a legislative appointment (couched as a simple transfer of files that just happen to occur on the day that Mr. Duncan was elected to be seated in office). *See State ex rel. Sanchez*, 4 So. 2d at 597.[4]

---

[3] The status quo is otherwise largely being maintained by virtue of the Landry Bill's text, which provides that no Criminal District Court staff "may be discharged from employment by the [new] clerk before January 15, 2027, except for good cause [. . .][.]" La. R.S.13:1211.1(B) (as amended by SB 256).

[4] *See also Smith v. Sells*, 156 Tenn. 539, 541 (Tenn. 1927) (holding it was not permissible for that state to change structure of local offices "for the purpose of putting one set of men out of office and another set in office" (citation omitted)); *State ex rel. Mattson v. Kiedrowski*, 391 N.W.2d 777, 783 (Minn. 1986) (halting the transfer of powers and authorities from elected State Treasurer office to an appointed Commissioner of Finance office partly on the

11

### *Anderson-Burdick* **Prong 2: State's Interest**

"[I]n pursuing [a substantial state interest], the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity [because] [s]tatutes affecting constitutional rights must be drawn with 'precision,' "and must be tailored to serve their legitimate objectives." *Dunn,* 405 U.S. at 343 (citation omitted). While not every election irregularity rises to the level of a constitutional violation, federal courts may intervene where state officials deliberately nullify a completed election in violation of governing law, resulting in "patent and fundamental unfairness." *Duncan*, 657 F.2d at 703–04. Retrospective interference with a completed election may thus give rise to constitutional injury under the Fourteenth Amendment. *Id.* at 704–05.

Here, the First and Second Landry Amendments serve no legitimate purpose and amount to unconstitutional retrospective interference by the state with a completed election. The Amendments together aim to nullify the election for Criminal District Court Clerk by abolishing that office nearly immediately before Mr. Duncan takes it, *see* Compl. at ¶ 1 (citing Exh. A). The Amendments extinguish the vote for Criminal District Court Clerk (but curiously not the vote for the Civil District Court Clerk, who ran unopposed and, as such, did not appear on the ballot) by

---

basis that doing so would violate the will of the people, stating "[t]he individual, however, was duly elected by the people of this state in accordance with Article V of our state constitution"); *Powers v. State*, 318 P.3d 300, 323 (Wyo. 2014) (holding bill removing authorities from state's elected Superintendent of Public Instruction and transferring those authorities to a newly formed and appointed office was unconstitutional, stating it "impermissibly transfers the power of general supervision from the elected constitutional office of Superintendent to the statutory office of Director of the Department of Education who is appointed by the Governor"); *Saunders v. Haynes*, 13 Cal. 145, 153–54 (Cal. 1859) ("An election is the deliberate choice of a majority or plurality of the electoral body. This is evidenced by the votes of the electors. But if a majority of those voting, by mistake of law or fact, happen to cast their votes upon an ineligible candidate, it by no means follows that the next to him on the poll should receive the office. If this be so, a candidate might be elected who received only a small portion of the votes and who never could have been elected at all but for this mistake. The votes are not less legal votes because given to a person in whose behalf they cannot be counted; and the person who is the next to him on the list of candidates does not receive a plurality of votes because his competitor was ineligible.").

immediately creating and filling a new office—the Orleans Clerk of Court—with duties materially different from those of the prior Civil and Criminal District Court Clerks. *Id.* at ¶¶ 71–74, 133–136. The Amendments cannot lawfully do this because Louisiana law does not allow for this type of legislative maneuvering where (a) the state constitution calls for an election; and (b) the definition of clerk of court was fixed as of the date of the election at issue.

First, both the Louisiana Constitution and the Bill require that clerks of court be elected by the voters of the parish they serve. La. Const. Art. V § 28(A) (mandating election for Clerk of Court); La. R.S. 13:1211.1(A) (as amended in SB 256) (same, but for the First and Second Landry Amendments, which are in tension with the provision that electors will vote for the new clerk of court). Where, as here, a new office is created, it must be filled through an election, not by legislative appointment. *See State ex rel. Sanchez*, 4 So.2d at 595 (holding that "a newly created office becomes ipso facto vacant when it is created and remains vacant until it is filled by an incumbent" because "no such office can come into existence until an election is held to fill it, and there can be no vacancy in an office [that can be filled via appointment] that has not come into existence); *Russell*, 225 La. at 244 (holding that part of Act that created a new judgeship was unconstitutional insofar as it provided for interim appointment by Governor prior to special election, and stating that "'[w]here the Constitution has provided the method of filling offices, the Legislature may not provide for filling them in any other manner'" (citation omitted)); *see also* La. R.S. 18:402(E)(1) (discussing special elections to fill newly-created offices). Together the Landry Amendments fundamentally undermine the fairness and integrity of the electoral process, rendering them unconstitutional. *Duncan*, 657 F.2d at 703–05 (holding due process clause of the Fourteenth Amendment protects against the disenfranchisement of a state electorate in violation of state election law).

13

Additionally, the Second Landry Amendment founders because the revised definition for "clerk of court" in the Landry Bill cannot operate to alter the meaning of that term as it was in use during the 2025 elections for Civil and Criminal District Court Clerks. Louisiana courts recognize that constitutional protections attach to an elected official at the time of election, not on the designated date one is scheduled to assume office. *See Calogero v. State ex rel. Treen*, 445 So. 2d 736, 739 (La. 1984) (holding that the term of office for Justices of the Supreme Court provided for in constitution in effect at time of election of the Justice determined the length of term of office for such Justice, notwithstanding fact that new constitution with provision for different term of office took effect on same day such Justice assumed office); *Hoag v. Kennedy ex rel. State*, 836 So. 2d 207, 231 (La. Ct. App. 2002) (holding that because Louisiana Constitution protects salaries and benefits of coroners and other elected public officials, those protections attach at the time of election, not assumption of office) (citing *Avoyelles Parish Justice of the Peace v. Avoyelles Par. Police Jury,* 758 So. 2d 161, 167–69 (La. 3rd Cir. 1999) (holding that police jury's post-election resolution reducing pay of justices of the peace, constables, and district attorneys unconstitutional because such constitutional protections attached on election day, not the date of assumption of office). By extension, at the time of Mr. Duncan's election, up and through today, the term "'Clerk of court' or 'clerk' means the clerk of the district court, except that in any parish having a civil district court and a criminal district court, these terms mean the clerk of the criminal district court." La. R.S. 18:2(3). Accordingly, on November 15, 2025, Mr. Duncan was elected to the position of "clerk of court," which included the duty of chief elections officer, La. R.S. 18:422, per the definition in effect at the time. La. R.S. 18:2(3). He should accordingly, on May 4, 2026, take the office to which he was elected.

14

Indeed, it was under this definition of "Clerk of court" that Mr. Duncan carried the vote of tens of thousands of Orleans Parish voters. Understandably, because she was never on the ballot, not a single vote was affirmatively cast for Ms. Napoleon who, in any event, was not running for chief elections officer of the parish, or any other duties that at the time fell within the jurisdiction of the criminal court clerk. Mr. Duncan's Commission Certificate (issued to him on April 20, 2026), which identifies him as the "Clerk, Criminal District Court, Parish of Orleans," can thus be read to encompass the definition of "clerk of court," which was in operation on the date of his election. Compl. at ¶ 1 (citing Exh. A); La. R.S. 18:2(3).

For the foregoing reasons, Mr. Duncan is likely to succeed on his effective right to vote claim. In the end, if the Second (but not the First) Landry Amendment is stayed, absent (or until such a time as) a legally-required new election has been completed, it follows that either (a) Mr. Duncan and Ms. Napoleon should take their respective seats; or (b) Mr. Duncan (not Ms. Napoleon), who at the time of the 2025 election was best understood to be the Orleans Clerk of Court, should take the newly-created seat. Either way, Mr. Duncan should be seated in office with his attendant commission on May 4, 2026.

***Count IV (First Amendment Retaliation)***. "A plaintiff pursuing a First Amendment retaliation claim must show, among other things, that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive.'" *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (holding that the First Amendment limits government reactions to protected speech) (quoting *Nieves v. Barlett* 587 U.S. 391, 400 (2019). The Fifth Circuit applies a three-part test when assessing First Amendment retaliation. The plaintiff must show (1) he "engaged in constitutionally protected activity"; (2) the retaliator's action caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from

15

continuing to engage in that activity"; and (3) those "adverse actions were substantially motivated against [a plaintiff's] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

Mr. Duncan satisfies the First Amendment Retaliation test. *First*, there is no question that he engaged in constitutionally protected speech—namely, advocacy concerning his wrongful conviction, exoneration, and attendant critiques of Louisiana's non-unanimous jury system and the Criminal District Court Clerk's Office's record-keeping failures. Compl. ¶ 60. This political speech is protected. *Bond v. Floyd*, 385 U.S. 116, 136 (1966) (explaining that speech "criticizing public policy and the implementation of it must" be protected for freedom of expression).

*Second*, the Landry Amendments aim to injure Mr. Duncan by preventing him from taking the office to which he was duly elected, commissioned, and sworn in. Such action has the intention of "chill[ing] a person of ordinary firmness from continuing to engage in [speech] activity." *Keenan,* 290 F. 3d at 258. It has the direct effect of chilling Mr. Duncan's speech as an elected official because it strips him of his official title, thereby barring him from serving in the very seat that would have provided him with an official platform from which to speak. Compl. ¶¶ 163–164. If Mr. Duncan is not allowed to take office as Clerk of the Criminal District Court, he will necessarily be barred from continuing to engage in protected speech as a duly elected official. Such an effort to punish an elected official for his speech "impinges on the liberal discourse essential to democratic processes." *Rash-Aldridge v. Ramirez*, 96 F.3d 117, 119 (5th Cir. 1996) (denying relief for being too distinguishable from *Bond*). This "implicate[s] not only the speech of an elected official, it also implicate[s] the franchise of his constituents. And [refusing to seat an elected official] involve[s] not just counter speech from colleagues but exclusion from office." *Houston Cmty. Coll. Sys*., 595 U.S. at 481 (explaining *Bond* and its import). Mr. Duncan has explained that

16

he feels personally "targeted" by the First and Second Landry Amendments, just as he was targeted for his public speech. Compl. at ¶ 90.

*Finally*, the Landry Amendments were substantially motivated by an intent to ensure Mr. Duncan would not be allowed to speak as a public official. The chronology and nature of the events at issue provide "sufficient evidence that the defendants' actions were substantially motivated as a response to the plaintiffs' exercise of protected conduct." *Keenan*, 290 F.3d at 261. In *Keenan*, the Fifth Circuit reviewed a First Amendment Retaliation claim from two Texans who spoke out concerning wrongdoing by a government official (there, a constable). *Id.* After the citizens reported the wrongdoing to a district attorney and a local television station (which aired a critical television news report), the citizens were subjected to a purportedly unlawful traffic stop. *Id.* In denying summary judgment for the officers, the Fifth Circuit pointed out that, because the injury "followed a few months after the [television] report [of misconduct] was aired," the record showed sufficient evidence that the injury was "substantially motivated as a response" to the plaintiffs' protected conduct. *Id.*

Here, as in *Keenan*, the sequence of events is straightforward:

- While campaigning, Mr. Duncan spoke repeatedly about his exoneration and the failures of the Criminal District Court Clerk's Office, Compl. ¶¶ 46-47;

- In October, Defendant Murrill, who represents the Governor, threatened further state action if Mr. Duncan did not cease speaking in a manner at cross-purposes with elected officials in the State, *id.* at ¶¶ 59-60;

- Mr. Duncan refused and won the election in November, *id.* at ¶ 68; and

- In response, the Governor directed Senator Morris to introduce SB 256 in February with an Amendment added in April, ensuring the Bill takes effect before Mr. Duncan takes office in May, *id.* at ¶¶ 69–78, 94. Morris stated plainly on the floor of the Louisiana Senate that the First Landry Amendment was brought at the behest of the Governor who sought "[t]o go ahead and get [the Bill passed into law] before Mr. Duncan takes office." *id.* at ¶¶ 77–78, 94. On April 23, 2026, to ensure

17

the First Landry Amendment took effect without a hitch, the Second Landry Amendment was introduced and passed the House. *Id.* at ¶ 94. It passed the Senate on April 29, 2026. *Id.*

This timeline (outlining events that happened between Mr. Duncan's expressive conduct and the injury effectuated by passage of the Landry Amendments) demonstrates that Defendant Jeff Landry's actions were "substantial[l]y motivated as a response" to Mr. Duncan's protected speech. *Keenan*, 290 F.3d at 261; *see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 250–51 (1936) (holding that otherwise facially neutral Louisiana tax was an unconstitutional, "deliberate and calculated device" whose "plain purpose" was to punish plaintiff-publishers critical of Huey Long). It is thus likely that Mr. Duncan will succeed on the merits of his First Amendment retaliation claim against Defendant Landry.

**II. Mr. Duncan Will Suffer Irreparable Harm Absent a TRO.**

Mr. Duncan satisfies the irreparable harm requirement for injunctive relief. Constitutional violations like those threatened here "cannot be undone through monetary remedies," and therefore are necessarily irreparable. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). Furthermore where, as here, "an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 296 (5th Cir. 2012) (citation omitted); *see also Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F.Supp.3d 511, 529 (S.D. Tex. 2020) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.") (quoting *Killebrew v. City of Greenwood, Mississippi*, 988 F. Supp. 1014, 1016 (N.D. Miss 1997). In deciding whether a party has shown irreparable harm, courts may consider both the harm to the parties and the harm to the public.

18

*Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F.Supp. 2d 627, 638–39 (E.D. La. 2010) (*citing In re Nw. Airlines Corp.*, 349 B.R. 338, 384 (S.D.N.Y. 2006)).

Here, once the Governor signs the Landry Bill into law, decisive injury to Mr. Duncan—perfected through the Landry Amendments—will be complete. Those Amendments will have the effect of denying Mr. Duncan the seat the law now provides he will take on May 4, 2026. Compl. ¶¶ 77–81; La. R.S. 13:1371.2(A) (setting date for taking office). Once the Landry Amendments go into effect, Mr. Duncan's right to the Criminal District Court Clerk Office and right to vote for the newly-constituted Clerk of Court position will have been lost. That harm is irreparable.

### III.    The Balance of Equities and the Public Interest Tilt in Mr. Duncan's Favor.

The balance of equities greatly favors Mr. Duncan because a TRO would merely preserve the status quo—protecting Mr. Duncan's constitutional rights while causing Defendants no cognizable injury. *See Deep S. Today v. Murrill,* 779 F.Supp.3d 782, 829 (M.D. La. 2025) (granting injunctive relief where plaintiffs showed imminent "irreparable harm absent" injunctive relief). The effect of the Landry Amendments is to chill Mr. Duncan's speech immediately, erase his vote for Criminal District Court Clerk that he cast in the November 2025 election, and prevent him from voting for the newly-constituted Clerk of Court position. The restraining order sought here prevents these irreparable injuries from taking place, and only minimally affects Defendants (as it calls only the First and Second Landry Amendments into question to allow litigation to proceed on the other counts in the Complaint).[5]

---

[5]    The status quo is largely being maintained in any event by virtue of the Bill's text, which provides that no Criminal District Court staff "may be discharged from employment by the [new] clerk before January 15, 2027, except for good cause [. . .][.]" La. R.S. 13:1211.1 (B) (amended by the Senate Bill).

This short-term injunction simply ensures that Mr. Duncan takes his rightful seat on May 4, 2026, the date his term commences by law and to which his commission and oath attach. *See* La. R.S. 13:1371.2(A) (setting commencement date of his term); Compl. ¶ 1 (citing Exh. A); La. R.S. 42:141(B) (authorizing a public officer to take the oath of office at any time after receiving his commission certificate, with the oath deemed effective as of the term's commencement date). Mr. Duncan received his commission on April 20, 2026 and took his oath on April 21, 2026. A TRO would do nothing more than preserve the status quo by allowing Mr. Duncan, in accordance with his commission and the will of the voters, to take his seat on May 4, 2026.

**IV. A TRO Will Serve the Public Interest.**

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted). The public interest is served by "maintaining the status quo pending a full trial on the merits" to make a final determination as to the constitutionality of a law or action. *United States v. State of Tex.*, 508 F.2d 98, 101 (5th Cir. 1975). "[N]either [the State] nor the public has any interest in enforcing a regulation that violates federal law." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) (citation omitted).

Here, the Landry Amendments intend to ignite "unconstitutional" actions, "[and] so the public interest [is] not disserved by an injunction preventing [its] implementation." *Ingebretsen on Behalf of Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). Protecting the public interest here is critical to preserving the democratic electoral process for voters in Orleans Parish, like Mr. Duncan. *Robinson v. Ardoin*, 37 F.4th 208, 230 (5th Cir. 2022) ("It is axiomatic that injunctions in voting-rights cases burden the defendants. But the question, under *Purcell*, is [. . .] whether that burden is intolerable—that is, whether the defendants cannot bear it 'without

20

significant cost, confusion, or hardship.'") (quoting *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring)). Allowing Mr. Duncan to take the office to which he was elected in a landslide runoff, and to which he was commissioned and sworn in, is not controversial. All the TRO does is maintain the status quo, thereby preserving the will of the voters, which is in the public interest.

**V. The Court Should Not Require Security Prior to Issuing Injunctive Relief.**

Courts may waive the bond requirement provided for in Federal Rule of Civil Procedure 65(c) when appropriate. *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (not requiring positing of bond where "plaintiffs were engaged in public-interest litigation"); *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978) (holding that the requirement of security is a matter of the trial court's discretion). Doing so here would be appropriate because Mr. Duncan's relief is tailored to protecting his constitutional rights as an elected official and voter, which are both in the public interest. *Id.*

CONCLUSION

For the foregoing reasons, Mr. Duncan respectfully asks this Court to issue a TRO providing for his assumption of the Office of Orleans Parish Criminal District Court Clerk on May 4, 2026 at 12:00 a.m. Such an order would operate to temporarily stay the effects of the First and Second Landry Amendments until further order of the Court.

Dated: April 29, 2026                          Respectfully submitted,

                                               */s/ Sarah Whittington*
                                               Sarah Whittington, La. Bar No. 36725
                                               *Nora Ahmed, NY Bar No. 5092374
                                               Malcolm Lloyd, La. Bar No. 41573
                                               Andrew Perry, La. Bar No. 40906
                                               Ashley Fox, La. Bar No. 41748

21

ACLU Foundation of Louisiana
1340 Poydras St., Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
swhittington@laaclu.org
nahmed@laaclu.org
mlloyd@laaclu.org
aperry@laaclu.org
afox@laaclu.org

William P. Quigley, La. Bar No. 07769
Professor Emeritus of Law
Loyola University College of Law
7214 St. Charles Avenue
New Orleans, LA 70118
Tel: (504) 710-3074
Fax: (504) 861-5440
quigley77@gmail.com

Ronald L. Wilson, La. Bar No. 13575
Attorney at Law
701 Poydras Street, Suite 4100
New Orleans, LA  70139
Tel: (504) 525-4361
Fax: (504) 525-4380
cabral2@aol.com

*Adina Marx-Arpadi
*Kayla Vinson
Center for Constitutional Rights
666 Broadway, 7 Fl.
New York, NY 10012
Tel: (212) 614-6464
amarxarpadi@ccrjustice.org
kvinson@ccrjustice.org

*Attorneys for Plaintiff*
*Pro hac vice application forthcoming*

22

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2026, I electronically filed the foregoing Motion for a Temporary Restraining Order with the Clerk of the Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Sarah Whittington*
Attorney for Plaintiff

23