**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

CALVIN DUNCAN, in his official capacity
as Clerk-Elect of Orleans Parish Criminal
District Court, and in his personal capacity
as an Orleans Parish voter

                                       **CIVIL ACTION**

**VERSUS**

                                       **NO. 26-460-JWD-SDJ**

JEFFREY LANDRY, in his official capacity
as Governor of the State of Louisiana, ET
AL.

## RULING AND ORDER

This matter comes before the Court on the *Emergency Motion for Temporary Restraining Order* ("*Motion for TRO*") (Doc. 2) filed by Plaintiff, Calvin Duncan, in his official capacity as Clerk-Elect of Orleans Parish Criminal District Court, and in his personal capacity as an Orleans Parish voter ("Plaintiff" or "Duncan"). Defendants Governor Jeffrey Landry ("Governor" or "Jeff Landry"), Secretary of State Nancy Landry ("Secretary of State" or "Nancy Landry"), and Attorney General Elizabeth Murrill ("Murrill" or "AG") (collectively, "Defendants"), all in their official capacities, oppose the motion. (Doc. 10.) Plaintiff has filed a reply. (Doc. 12.) The Court held a status conference on April 30, 2026, and heard brief argument on the motion. (Doc. 9.) Further argument is not necessary. The Court has considered the law, the facts in the record (including those contained in the *Verified Complaint for Declaratory and Injunctive Relief* ("*Complaint*") (Doc. 1)), and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Plaintiff's *Motion for TRO* is granted.

I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

   A.  Factual Background

      1.  *Plaintiff's Exoneration*

Plaintiff was convicted in 1985 of first-degree murder. (*Compl.* ¶¶ 25–26, Doc.1; *see also* Doc. 1 at 52 (Plaintiff's *Verification Statement*).) He remained in Louisiana State Penitentiary for more than 28 years. (*Id.* ¶ 27.)

Plaintiff asserts that, while in prison, he "became a self-taught jailhouse lawyer" to prove his innocence. (*Id.* ¶¶ 28–31.) Part of these efforts involved a number of attempts to access his case files in the Orleans Parish Criminal Court Clerk's Office from that clerk. (*Id.* ¶¶ 30–31.) Plaintiff avers that he was thwarted by that office's mismanagement of records. (*Id.*) Plaintiff states that he was ultimately proven innocent, freed in 2011, and exonerated in 2021. (*Id.* ¶¶ 32–33, 43.)

Plaintiff filed suit in 2023 against the state seeking $330,000 for his wrongful conviction. (*Id.* ¶ 46.) According to Plaintiff, the AG threatened to challenge Plaintiff's ability to practice law if he didn't dismiss his suit. (*Id.*) This led Duncan to withdraw his claim. (*Id.*)

      2.  *The Election*

In 2025, Duncan decided to run for Orleans Parish Criminal District Court Clerk. (*Id.* ¶¶ 48–49.) During a debate on September 23, 2025, Plaintiff made statements critical about the office's management of records. (*Id.* ¶ 51.)

Plaintiff claims that "[i]n the lead up to the October 2025 primary," the AG "publicly attack[ed] and threaten[ed] retaliation against [Plaintiff] if he continued to promote his exonerated status during the course of his campaign, in an attempt to prevent him from taking office." (*Id.* ¶ 58.) Murrill's efforts included sending Plaintiff a letter demanding Plaintiff cease representing himself to the public as "exonerated." (*Id.* ¶ 59.) She did so despite "acknowledg[ing] that

2

"criminal court records confirmed that Mr. Duncan's conviction was vacated in 2021." (*Id.* ¶ 61.) Plaintiff alleges that Murrill's conduct led his opponent to seek a temporary restraining order against him barring his using the word "exonerated," but Plaintiff's opponent later withdrew the petition. (*Id.* ¶¶ 63–64.) Days after the first letter, on October 1, 2025, Murrill purportedly again threatened "further action" against Plaintiff if he did not comply, but he was undeterred. (*Id.* ¶¶ 65–66.)

On November 15, 2025, Plaintiff was elected Clerk of Court of Orleans Parish Criminal District Court earning 68% of the vote. (*Id.* ¶¶ 1, 21, 54.) Equally important for purposes of this motion, Plaintiff is an Orleans Parish Voter. (*Id.* ¶¶ 1, 21.)

On April 20, 2026, Plaintiff received his Commission Certificate, which was signed by the Governor and Secretary of State. (*Id.* ¶ 1.) He also received his Criminal District Clerk of Court identification badge and Oath of Office forms. (*Id.*) He was sworn into office on April 21, 2026. (*Id.* ¶ 2.) He is scheduled to assume office and his duties on May 4, 2026. (*Id.* ¶ 2.) *See also* La. R.S. 13:1371.2(A) (stating that one elected to this position "shall take office and begin his term on the first Monday in May following election.").

### 3. Senate Bill 256

#### a. The Bill Generally

The *Complaint* alleges that the Governor "gave clear direction to legislators that they should act swiftly to implement his agenda," including "trying to unseat [Plaintiff] after he was duly elected." (*Compl.* ¶ 68, Doc. 1.) Accordingly, on March 31, 2026, Senator Morris of Monroe introduced Senate Bill 256 ("SB 256") "at the Governor's behest." (*Id.* ¶ 69.) Plaintiff states that Monroe "is 200 miles away from New Orleans" and that Morris's constituents have "no . . . interest

3

in the administration of Orleans Parish criminal courts." (*Id.*) Morris "admitted that [SB 256] lacked any supportive studies or data to back it, but [Morris] introduced it nonetheless." (*Id.*)

According to the *Complaint*, "SB 256 stands to merge the Orleans Parish Clerk of Criminal District Court with the Orleans Parish Clerk of Civil District Court, eliminating those positions entirely and creating one new position: Orleans Clerk of Court." (*Id.* ¶ 70.) "The position of Civil District Court Clerk is currently held by Ms. Chelsey Richard Napoleon, who ran unopposed and in the absence of any election. Ms. Napoleon never appeared on the October or November ballots." (*Id.* ¶ 71.)

Throughout his *Complaint*, Plaintiff primarily objects to two main parts of SB 256. (*See, e.g., id.* ¶ 7.) According to Plaintiff, both of these amendments violate La. Const. Art. V. § 28, which provides in relevant part: "In each parish a clerk of the district court *shall be elected* for a term of four years." La. Const. Art. V, § 28 (emphasis added). (*See also Compl.* ¶¶ 81, 130–131, Doc. 1.) The Court will take up the text and legislative history of each of these amendments in turn.

### b.   SB Amendment 1's Text and History

Amendment No. 4 of the Senate Floor Amendments ("SB Amendment 1") provides:

> Section 3. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided by Article III, Section 18 of the Constitution of Louisiana. If vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval.

(Doc. 2-4.)

Plaintiff alleges that this provision "seek[s] for the Bill to go into effect upon gubernatorial signature" and "aims to ensure immediate success of Defendants' conspiratorial plan." (*Compl.*

4

¶ 74, Doc. 1.) That is, according to Plaintiff, the "specific intent of [SB Amendment 1] was to ensure [SB 256] would become law before [Plaintiff] takes office on May 4, 2026." (*Id.* ¶ 75.) Indeed, Morris said on the Senate Floor that this amendment "was brought at the behest of the Governor who sought '[t]o go ahead and get [the Bill passed into law] before Mr. Duncan takes office." (*Id.* ¶ 76.)

According to the *Complaint*, Morris was questioned on why this amendment was sought, and Morris emphasized, "[O]therwise, we'd probably have to pay him for the next four years in a job that is gonna be eliminated. So, it would make him an immediate lame duck." (*Id.* ¶ 77.) Morris was also asked whether he had consulted with the AG about potential litigation arising from SB Amendment 1, and Morris "acknowledged that he understood the state constitution prevented shortening an official's term once he took office and thereby confirmed that [this amendment] was designed to ensure Mr. Duncan never took office as Clerk of the Criminal District Court." (*Id.* ¶ 78.)

Another senator "pressed" Morris "as to the suspicious timing, given the already widespread and publicly voiced fears of retaliation by the Governor against Mr. Duncan: 'If we needed to consolidate the offices so badly, why wasn't this Bill brought last year?'" (*Id.* ¶ 79.) "Senator Morris stated candidly that he was following the Governor's directives: 'Well. I don't know. I didn't think about bringing it last year. And this is in *the Governor's package*. So maybe it's something *got his attention as well*.'" (*Id.* ¶ 80 (emphasis in original).)

Again, Plaintiff claims this amendment violates the Louisiana Constitution's requirement that Clerks of Court be elected. (*Id.* ¶ 81.) "The constitutional requirements are clear: voters deserve the opportunity to exercise their rights in electing their candidate of choice to the new Office of Orleans Parish Clerk of Court." (*Id.* ¶ 82.) "That Office cannot be filled by the current

Clerk of Civil District Court because that position did not even appear on the ballot in 2025—indeed, Ms. Napoleon was seated because she was unopposed." (*Id.* ¶ 83.)

Plaintiff alleges that Ms. Napoleon joined in the conspiracy and "appeared before the legislature to testify." (*Id.* ¶ 84.) Moreover, even before SB 256 was passed, and even before the second amendment at issue "was introduced, Ms. Napoleon began touring the Office of the Criminal District Court Clerk in preparation for taking that newly created role on May 4, 2026." (*Id.* ¶ 85.)

On April 16, 2026, "when pressed about how the Bill would operate in practice, Senator Morris did not provide answers. Instead, he noted that he anticipated litigation over [SB 256]." (*Id.* ¶ 90.)

c.   SB Amendment 2's Text and History

On April 23, 2026, the House passed SB 256. (*Id.* ¶ 94.) This occurred after Duncan received his Commission Certificate, identification badge, and Oath of Office forms, and after he was sworn into office. (*Id.* ¶¶ 92–93.)

However, before that, on the same day SB 256 made it through the House, House Representative Dixon McMakin added a "late-breaking amendment," which the House passed "at the Governor's behest[.]" (*Id.* ¶ 94.) Amendment No. 23 of the House Floor Amendments ("SB Amendment 2") provides:

> Section 4. The provisions of this Act shall not reduce the current term of office of the clerk of criminal district court for the Parish of Orleans on the effective date of this Act. The office of clerk of criminal district court for the Parish of Orleans shall be abolished at the end of May 3, 2026 and before the term of any other criminal clerk of court begins. Immediately thereafter, the authority, functions, duties, and responsibilities of the office of clerk of criminal district court for the Parish of Orleans, and all of the books, papers, records, monies, actions, and other property of every kind and description, movable and immovable, real and personal,

6

possessed, controlled, or used by the office of the clerk of criminal district court for the Parish of Orleans shall be transferred and owned, possessed, controlled, and used by the clerk of the civil district court for the Parish of Orleans, who shall thereafter be referred to as the clerk of court for the Parish of Orleans.

Section 5. Whenever the clerk of the criminal district court for the Parish of Orleans is referred to or designated by law, rule, or regulation on and after the date that office is abolished, such reference or designation shall be deemed to apply to the clerk of civil district court for the Parish of Orleans or hereafter "clerk of court for the Parish of Orleans".

(Doc. 2-5 at 4–5.) Thus, according to the *Complaint*, this "amendment . . . explicitly acknowledges that the sitting Civil District Court Clerk will assume by legislative appointment the new position of Orleans Clerk of Court for the upcoming term[.]" (*Compl.* ¶ 94, Doc. 1.) This is "despite the position being one that requires an election[.]" (*Id.* ¶ 72) *See also* La. Const. Art. V. § 28.

## B. Procedural Background

On April 29, 2026, Plaintiff filed suit against Defendants. (*Compl.*, Doc. 1.) In sum, Plaintiff claims that Defendants are conspiring to enact SB 256 "to illegally obstruct" him from assuming office "by retroactively redefining the meaning of 'clerk of court' that existed on November 15, 2025—the date of Mr. Duncan's election." (*Compl.* ¶ 3, Doc. 1.) Plaintiff also claims Defendants retaliated against him for a number of reasons, including (1) his "outspoken claims that the criminal legal system in Orleans is unjust and frequently discriminatory against Black people;" and (2) his statements on the campaign trail that he was "a nationally recognized exoneree," a fact which, Plaintiff says, prompted a threat by Murrill to take legal action against him. (*Id.* ¶¶ 3–4; *see id.* ¶¶ 3–7.)

"Against this backdrop, [Plaintiff] asks this Court to maintain the status quo by allowing him to take his seat as Criminal District Court Clerk on May 4, 2026." (*Id.* ¶ 15.) Plaintiff states that:

> Ruling [against Plaintiff] would deny [him], in his personal capacity, his right to vote for the newly-created Orleans Clerk of Court position and unlawfully nullify his vote for the Orleans Parish Criminal District Court position. It would further bless Defendants' violation of the Bill of Attainder Clause, their retaliatory attack on Mr. Duncan for his speech, and the conspiracy intended to deprive him of his civil rights.

(*Id.* ¶ 16.)

Also on April 29, 2026, Plaintiff filed the instant *Motion for TRO*. (Doc. 2.) He concisely summarizes his position as follows:

> In a nutshell, state law requires the holding of an election to fill the new and now-vacant Orlans Parish Clerk of Court seat created by [SB 256]. Until then, the elected Clerk of the Criminal Court and the unopposed Clerk of the Civil Court should take the positions to which they were elected (Duncan) and ran unopposed ([Napoleon]).

(*Id.* at 2.) Plaintiff argues that the goal of SB 256 Amendments 1 and 2 is to prevent him from assuming office at the designated time. (*Id.*)

> Duncan asks this Court to issue an order duly authorizing him to assume the Office of Orleans Parish Criminal District Court, at 12:00 a.m. on May 4, 2026, thereby staying the effects of [SB 256 Amendments 1 and 2] (at least until this Court has had time to consider the serious allegations in Mr. Duncan's complaint).

(*Id.*)

On Thursday, April 30, 2026, the Governor signed SB 256 into law. *See* 2026 La. Sess. Law Serv. Act 15 (S.B. 256). For the sake of simplicity, the Court will continue to refer to Act 15 as "SB 256," as SB Amendments 1 and 2 are contained in Act 15 with only minor and inconsequential typographical changes. *Compare* SB Amendments 1 and 2, (Doc. 2-4, Doc. 2-5 at 4–5), *with* Act 15, §§ 4, 5, 7.

Also on April 30, 2026, the Court held a status conference. (Doc. 9.) The Court noted that, because Plaintiff is due to assume the office and duties of Clerk of Court of Orleans Parish Criminal District Court on Monday May 4, 2026, at 12:00 a.m., the Court's deadline to rule on the

pending *Motion for TRO* is before 11:59 p.m. on Sunday, May 3, 2026—about three (3) days from the conference. (*Id.* at 2.) The Court asked both parties whether they would be amenable to delaying action for thirty (30) days to give the parties adequate time to brief the issues and to give the Court sufficient time to consider them. (*Id.*) Specifically, the Court asked if Plaintiff would delay assuming office and if Defendants would delay implementation of SB 256. (*Id.*)

Neither side agreed to the delay. (*Id.*) The Court gave Defendants until noon the next day (Friday, May 1, 2026) to file a response, and the Court allowed Plaintiff until 8:00 a.m. the following day (Saturday) to reply. (*Id.*) The Court said it would issue a ruling before the end of the day on Sunday, May 3, 2026. (*Id.*) And so the Court issues this decision in accordance with that extraordinarily truncated and expedited timeline.

## II.   DEFENDANTS' JURISDICTIONAL CHALLENGE

### A.  Rule 12(b)(1) Standard

Defendants raise in their opposition certain jurisdictional challenges. (Doc. 10 at 5.) Specifically, Defendants argue: "(1) sovereign immunity bars the claims against these State Defendants; (2) Plaintiff lacks standing; and (3) the requested TRO would violate *Pennhurst* by compelling compliance with Plaintiff's view of state law." (Doc. 10 at 5.) The Court will address each of these in turn below.

The Court construes these parts of Defendants' brief as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). For such motions, a party may raise the defense of lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d

281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). But, "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010; *see also Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss.* with approval).

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "A facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of the State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. 2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson*, 644 F.2d at 523.

Conversely, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted). "[N]o

10

presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* When a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

### B. Sovereign immunity

#### 1. Parties' Arguments

Defendants argue that, to satisfy *Ex parte Young*, the state official "must have some connection with the enforcement of the law being challenged." (Doc. 10 at 5 (citation omitted).) That official's authority must go "beyond the general duty to see that the laws of the state are implemented[;] . . . instead, [they] must have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." (*Id.* (cleaned up).)

Defendants contend that they cannot "compel or constrain anyone with respect to [SB 256]." (*Id.* at 6.) "The Act does not mention the Attorney General at all. And its limited references to the Governor and Secretary of State concern recall elections." (*Id.* (citation omitted).) Defendants cannot "cause the prosecution" of a violator or "apply for an injunction." (*Id.* (citations omitted).) They are also not responsible for adopting or implementing rules and regulations, and they cannot direct other officials to carry out SB 256's transition provisions. (*Id.* (citations omitted).) Indeed, Plaintiff's prayer shows how lacking the Defendants' enforcement authority is. (*Id.* at 6–7 (citation omitted).) "[N]o Defendant has any enforcement authority regarding [SB 256]'s abolition of the criminal clerk-of-court office, nor can any Defendant stop [SB 256's] operation of law. Because no Defendant enforces [the act] (or could be enjoined from not enforcing [the act]), sovereign immunity plainly bars this suit." (*Id.* at 7.)

Plaintiff replies that *Ex parte Young* is no bar to this action because these state officials have "a direct connection with the enforcement of an unconstitutional law or portion thereof[.]" (Doc. 12 at 2.) As to the right to vote claim, Plaintiff highlights that the Governor and Secretary of State are responsible for providing newly elected officials with a commission. (*Id.* (citing La. R.S. 18:513(A)(5)).) "Thus, Ms. Napoleon's Civil District Court commission, signed by Defendants [Jeff] Landry and [Nancy] Landry, is either the operative document that permits her to take over the new seat, or Defendants will provide her with a new commission by virtue of that new title." (*Id.*) "Either way, Defendants have some connection with the enforcement of the act in question." (*Id.* (cleaned up).)

Plaintiff also contends that the Governor has enforcement power from his signing SB 256 and from his efforts to ensure the act's passage. (*Id.* at 3.) All of this qualifies as the "scintilla of enforcement" required to overcome sovereign immunity. (*Id.*) Moreover, the Governor has demonstrated a willingness to exercise his duty "when he signed it and made it law." (*Id.*)

Plaintiff next asserts:

> [T]he Secretary is implicated in the unlawful enforcement of [SB 256] because her role is tied to ensuring (1) elections are not wrongly nullified, and (2) elections required by the Louisiana Constitution are held. *See* . . . La. R.S. 18:18 (she is departmental head responsible for conduct of Louisiana elections, and is responsible for public officials' oaths of office in accordance with La. R.S. 42:162). She may not fail to uphold her duties in administering and issuing commissions for newly elected offices. *See* La. R.S. 18:602 (duties of secretary in event of vacancy). Hence, sovereign immunity does not bar a claim against her.

(*Id.* at 4.)

Plaintiff then turns to the First Amendment retaliation claim (*Id.* at 4.) Here, Plaintiff focuses on the Governor and AG. (*Id.*) Because the Court is deciding this motion on the basis of the right to vote claim only, *see infra*, the Court defers this discussion until a later time.

12

## 2.  Applicable Law: Sovereign Immunity and Ex parte Young

"Generally, 'sovereign immunity bars private suits against nonconsenting states in federal court.'" *Book People, Inc. v. Wong*, 91 F.4th 318, 334 (5th Cir. 2024) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019)). "This bar also applies to suits . . . 'against state officials or agencies that are effectively suits against a state.'" *Id.* (quoting *Paxton*, 943 F.3d at 997). "Under the *Ex parte Young* exception to sovereign immunity, however, a plaintiff can seek prospective injunctive relief 'against individual state officials acting in violation of federal law.'" *Id.* (quoting *Paxton*, 943 F.3d at 997 (citation omitted)). "These state officials must 'have some connection with the enforcement of the allegedly unconstitutional law.'" *Id.* (quoting *United States v. Abbott*, 85 F.4th 328, 337 (5th Cir. 2023) (internal quotation marks and citation omitted)).

"To satisfy the required enforcement connection, the state official must have a duty beyond 'the general duty to see that the laws of the state are implemented.'" *Id.* at 335 (quoting *Paxton*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014))). "Rather, the official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Id.* (quoting *Paxton*, 943 F.3d at 1000 (quoting *Morris*, 739 F.3d at 746)). "This analysis is 'provision-by-provision': The officer must enforce 'the particular statutory provision that is the subject of the litigation.'" *Id.* (quoting *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020))). "We have defined 'enforcement' as 'compulsion or constraint,' so if the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* (cleaned up).

However, "Plaintiffs need only show a 'scintilla of enforcement by the relevant state official.'" *Id.* (quoting *Tex. Democratic Party,* 978 F.3d at 179 (internal quotation marks and

13

citation omitted)). The Fifth Circuit has "noted that the Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the official under the *Ex parte Young* exception." *Id.* (cleaned up).

Additionally, "the inquiry into whether a suit is subject to the *Young* exception does not require an analysis of the merits of the claim." *Paxton*, 943 F.3d at 998 (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002)). "Rather, 'a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."'" *Id.* (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (alteration in original) (quoting *Verizon*, 535 U.S. at 645)).

For instance, in *Book People*, the Commissioner of the state agency that administered the book-rating system argued that he was entitled to sovereign immunity. *Book People*, 91 F.4th at 334–35. The state argued that the commissioner's "only enforcement authority is over school districts and, if Plaintiffs are compelled to or constrained from doing anything, it is by school districts, not the State." *Id.* at 335. The Fifth Circuit rejected this argument:

> True, the enforcement here "is not the same type of direct enforcement found in *Ex Parte Young*, for instance, where the attorney general threatened civil and criminal prosecution." [*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017)]. But "such enforcement is not required." [*Id.*; *see also City of Austin*, 943 F.3d at 1001.] Plaintiffs have identified specific actions that this court can enjoin: Commissioner Morath is ultimately responsible for collecting and posting the vendors' lists of ratings, reviewing those ratings to determine whether a corrected rating is required, notifying vendors when their ratings are overridden, and posting lists of noncompliant vendors on TEA's website. And he is responsible for ensuring that school districts comply with READER's prohibition on buying material from vendors that violate this statute. [*See also supra* Part III.A.2; *Air Evac EMS*, 851 F.3d at 513–14 ("[T]here is significant overlap between standing and Ex Parte Young's applicability.").]

14

> We agree with Plaintiffs that these acts "compel[ ] them to submit ratings with which they disagree," and "constrain[ ] them from continuing to do business with school districts if they fail to submit the required ratings or decline to acquiesce in the State's revised ratings." That Commissioner Morath enforces the law through the school districts doesn't change our analysis.

*Id.* at 335–36.

### 3.   *Analysis*

Preliminarily, the Court notes that Plaintiff makes no argument that the AG has any enforcement power with respect to Plaintiff's right to vote claim. (*See* Doc. 12 at 2–4.) As a result, Murrill is entitled to sovereign immunity with respect to this claim. However, she will not be dismissed from this action because of the limited scope of this ruling.

Turning to the heart of the matter, the key question is whether Plaintiff has demonstrated a "scintilla of enforcement by the relevant state official[s,]" namely, the Governor and Secretary of State. In short, the Court finds that he has.

Most relevant, Plaintiff points to the duty of these Defendants to certify an election and issue a commission. Specifically, La. R.S. 18:513 provides, in relevant part:

> **A. Certification of candidates elected for a full term.** Within thirty days after the date on which a general election is scheduled to be held, *the secretary of state shall certify the name of each candidate elected for a full term to the appropriate official in the following manner: . . .*
>
> (5) The name of a candidate elected to any other office . . . *shall be certified to the governor, who shall issue a commission to the elected official on the date the term begins as provided by law or the home rule charter or plan of government.* If the date the term begins for an official of a municipality elected in accordance with R.S. 18:402 is not provided for, the term shall begin July first following the election. If the date the term begins for any other elected official is not provided by law or home rule charter or plan of government, the governor shall issue a commission: [within certain dates]

La. R.S. 18:513(A)(5) (emphasis added).

15

Thus, as in *Book People*, while this is not the kind of "direct enforcement found in *Ex Parte Young*, . . . such enforcement is not required." 91 F.4th at 335 (cleaned up). "Plaintiff[ ] [has] identified specific actions that this court can enjoin:" namely, Nancy Landry's certification of Ms. Napoleon's appointment as the newly-created Clerk of Orleans Parish and Jeff Landry's issuance of a commission to her. *See id.* Without Court intervention, Defendants would "constrain" Plaintiff from exercising his right to vote and would otherwise violate his constitutional rights. *See id. and infra*.

Moreover, the Governor and Secretary of State have demonstrated a willingness to enforce these laws. These Defendants already exercised their duties by signing Plaintiff's Commission Certificate and by the Secretary of State's office sending it to Plaintiff, (*see Compl.* ¶¶ 1, 91–92, Doc. 1), and there is no reason to doubt that they will not continue to fulfill these duties with the newly-created Clerk of Orleans Parish position, particularly in light of the Governor's extensive efforts to ensure SB 256's passage, (*see id.* ¶¶ 73, 76, 80, 93–94).

Again, "Plaintiff[ ] need only show a scintilla of enforcement by the relevant state official," and "the Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the official under the *Ex parte Young* exception." *Book People*, 91 F.4th at 335 (cleaned up). For all the above reasons, and for those described below in the standing section, the Court finds that Plaintiff has satisfied the requirements of the *Ex parte Young* exception and therefore the Governor and Secretary of State's motions are denied.

## C. Standing

### 1. Parties' Arguments

Defendants assert, "[w]hatever Plaintiff's generalized voter injury, it is neither traceable to these State Defendants nor redressable by the relief he seeks." (Doc. 10 at 7.) "The State Defendants have nothing to do with the 'enforcement' of [SB 256], which is currently in effect and will consolidate the clerks' offices by operation of law come Monday." (*Id.* at 8.) "[N]o Defendant has any role in [SB 256]'s operation of law. That is a textbook traceability and redressability problem, as no order by this Court as to these [ ] Defendants could redress any purported injury to Plaintiff." (*Id.*) Further, Defendants maintain that the Court cannot order Plaintiff's desired relief of authorizing him to assume the office he seeks, as (a) that office will be nonexistent, and (b) Plaintiff cannot "enjoin challenged laws themselves." (*Id.* at 9 (cleaned up).)

Plaintiff replies that he has standing. (Doc. 12 at 5.) As to traceability, "[h]ere, Plaintiff's injury . . . is premised on how the criminal court clerk's office is being abolished (Count I) and why (Count IV)." (*Id.* (citation omitted).) "His injury stems directly from the Amendments, which unlawfully nullify a prior election and avoid a legally required future one, all in an attempt to unlawfully appoint Ms. Napoleon to an elected office that she did not run for." (*Id.* (citing *Compl.* ¶ 138, Doc. 1).) The SB Amendments fail to comply with the law, which mandates, *inter alia*, "a new and vacant seat to be filled by election." (*Id.*) Plaintiff's "requested relief would bar the unconstitutional and immediate abolition of his office, demonstrating that the injury of which he complains is traceable to Defendants, who by virtue of their role in issuing commissions validate and seat elected officials." (*Id.*)

As to redressability, Plaintiff asserts that the relief he seeks would prevent Defendants from issuing a commission to Ms. Napoleon for the newly-made Orleans Parish clerk position. (*Id.* at

17

6.) This would "prevent Defendants from somersaulting over the 1st and 14th Amendments by avoiding a legally required election." (*Id.*) Caselaw supports the position that Plaintiff has standing to challenge unconstitutional laws. (*Id.*)

### 2. *Applicable Law on Standing Generally*

"A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue.'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1985–86 (2024) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019)). A plaintiff "must show that [he or] she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* at 1986 (cleaned up). "These requirements help ensure that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant [his or her] invocation of federal-court jurisdiction.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

"The plaintiff 'bears the burden of establishing standing as of the time [he or she] brought th[e] lawsuit and maintaining it thereafter.'" *Murthy*, 144 S. Ct. at 1986 (first alterations by this Court; second by *Murthy*) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). The Plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan*, 504 U.S. 555, 561). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks and alterations omitted)). "At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that [he or]

18

she is 'likely' to establish each element of standing." *Murthy*, 144 S. Ct. at 1986 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis deleted)). "Where . . . the parties have taken discovery, the plaintiff cannot rest on 'mere allegations,' but must instead point to factual evidence." *Id.* (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks omitted)).

Additionally, "standing is not dispensed in gross." *Id.* at 1988 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). "That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Id.* (quoting *TransUnion*, 594 U.S. at 431). Thus, "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Id.*

### 3. Traceability

To establish traceability, a plaintiff must show "that there is 'a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court[.]'" *Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). "Standing exists where the purported injury is connected to allegedly unlawful government conduct." *Id.* (citing *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 520 (5th Cir. 2014)). Further, "[c]ausation . . . isn't precluded where the defendant's actions produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Inclusive Cmtys. Project, Inc. v. Dep't of Treas.*, 946 F.3d 649, 655 (5th Cir. 2019) (quoting *Bennett*, 520 U.S. at 169). "Even though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Id.* (quoting *Bennett*, 520 U.S. at 169).

Having carefully considered the matter, the Court finds that Plaintiff has established that his injuries are traceable to the Governor and Secretary of State. Specifically, his injuries are traceable to the Governor's efforts to enact SB 256 and, most importantly, the appointment of Ms. Napoleon to the newly-created office without a constitutionally-mandated election. As stated above, the Governor's and Secretary of State's certification of Ms. Napoleon's appointment and issuance of a commission to her will directly cause the loss of his rights. Thus, Plaintiff has satisfied the traceability requirement at this time.

*Book People* supports Plaintiff's position. There, the law in question ("READER") "require[d] school book vendors who want to do business with Texas public schools to issue sexual-content ratings for all library materials they have ever sold (or will sell), flagging any materials deemed to be 'sexually explicit' or 'sexually relevant' based on the materials' depictions of or references to sex." *Book People*, 91 F.4th at 324. "The State admit[ted] that the Agency Commissioner [in question] [was] empowered to enforce the Act against school districts, which mean[t] the school districts' purchasing decisions are determined or coerced by the State through READER." *Id.* at 331. The Fifth Circuit concluded that the First Amendment violations were fairly traceable to the Commissioner. *Id.* at 332–33. The Fifth Circuit cited as reasons:

> To enforce READER, Commissioner Morath is required to collect ratings from vendors and post them on the Agency's website. He has discretion to review vendors' ratings, and if he does, he must notify vendors of the updated ratings and their duty to conform their rating to the Agency's. He must then post the names of the vendors that don't accept the Agency's updated ratings on the Agency's website.

*Id.* Further, the Commissioner had "the authority to enforce § 35.003(d), which prohibit[ed] school districts from purchasing books from vendors who are on the noncompliance list, through a special investigation and sanctions." *Id.* at 333. The appellate court concluded,

20

> Because Commissioner Morath oversees the challenged process and because his actions are among those that would contribute to Plaintiffs' harm, Plaintiffs' injuries can be traced to the Commissioner's enforcement of READER. If Commissioner Morath is enjoined, he cannot prohibit school districts from purchasing books from any vendors, either because the vendors did not initially provide ratings or because they refused to accept the Agency's updated ratings. . . . [E]njoining the Commissioner from enforcing READER would free Plaintiffs from the injurious dilemma that READER creates: either submit unconstitutionally compelled ratings to the Agency at great expense or refuse to comply and lose customers and revenue.

*Id.* (cleaned up). The Fifth Circuit ultimately affirmed the district court's preliminary injunction prohibiting the Commissioner from enforcing specific sections of READER. *Id.* at 328, 341.

The same reasoning applies here. Plaintiff has shown, through his extensive allegations and reference to statutory duties (including the certification of the appointment and issuance of the commission), how the Governor and Secretary of State will have a role to play in enforcing SB 256, which will directly lead to constitutional violations. *See Book People*, 91 F.4th at 332–33. He has thus satisfied this element of standing, particularly given the fact that "the injury must be *fairly* traceable to the challenged action of the defendant[s]," *Reule*, 114 F.4th at 367 (emphasis added), but it need not rise to the level of "proximate cause" or be the "very last step in the chain of causation," *Inclusive Cmtys.*, 946 F.3d at 655 (citation omitted).

### 4. Redressability

"To satisfy redressability, a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.' " *Reule*, 114 F.4th at 368 (quoting *Inclusive Cmtys.*, 946 F.3d at 655 (emphasis in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000))). But, plaintiffs are "not required to show that their requested relief would *certainly* redress their injuries; rather, they are required to show that their requested relief would *likely* (or substantially likely) redress their

21

injuries." *Hancock Cnty.*, 487 F. App'x at 197 (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *Lujan*, 504 U.S. at 561). "Moreover, the proper focus of the redressability inquiry is not whether the relief is likely to be granted; rather, the focus is whether, assuming that the requested relief is granted, that relief will likely redress the plaintiffs' injuries." *Id.* (citing *Adar v. Smith*, 639 F.3d 146, 150 (5th Cir. 2011) (en banc); *Rogers v. Brockette*, 588 F.2d 1057, 1063 (5th Cir. 1979) ("There must be a substantial probability that, if the court affords the relief requested, the plaintiffs' legal injuries will be remedied.") (internal quotation marks and ellipses omitted)). Moreover, "[t]he relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Inclusive Cmtys.*, 946 F.3d at 655 (citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)). But, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).

Having considered the matter, the Court finds that the redressability requirement is easily satisfied, for the reasons largely given by Plaintiff. A favorable ruling would prevent the Governor and Secretary of State from issuing a commission to Ms. Napoleon. This in turn would prevent her from assuming office without a constitutionally required election. And this in turn would prevent Defendants from violating Plaintiff's constitutional rights, as demonstrated below.

For these reasons, the Court finds that the "requested relief would *likely* (or substantially likely) redress [Plaintiff's] injuries." *Hancock Cnty.*, 487 F. App'x at 197. As a result, Plaintiff has standing for his right to vote claim against the Governor and Secretary of State.

22

### D.  *Pennhurst*

#### 1.  *Parties' Arguments*

Defendant contends that "[t]he requested TRO independently runs headlong into the Supreme Court's command in *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124–25 (1984)." (Doc. 10 at 9.) "On Plaintiff's own telling, he demands relief that would bring [SB 256] into compliance with state law. . . . So even if Plaintiff were right about state law (he is not [ ]), the requested injunction thus necessarily 'largely overlap[s]' with what state law requires." (*Id.* at 10 (quoting *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020)).)

Plaintiff replies that Defendants "misread and misapply *Pennhurst*." (Doc. 12 at 6 (cleaned up).) "*Ex Parte Young* directly provides a carve out for suits like Plaintiff's that challenge the constitutionality of state law, which *Pennhurst* explicitly recognizes." (*Id.* (citing *Pennhurst*, 465 U.S. at 102).) "Here, Plaintiff seeks only to preserve his rights under the 1st and 14th Amendments with a narrow stay of the Landry Bill's violative effects—without which he will suffer irreparable harm." (*Id.* at 6–7.) In sum, "*Pennhurst* is inapplicable because Plaintiff's claim arises under the U.S. Constitution, not state law." (*Id.* at 7.)

#### 2.  *Law and Analysis*

In short, the Court rejects Defendant's argument. Granted, "[u]nder the Eleventh Amendment, federal courts cannot tell state officials 'how to conform their conduct to state law'—for one can hardly imagine 'a greater intrusion on state sovereignty.'" *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 450 (5th Cir. 2022) (quoting *Pennhurst*, 465 U.S. at 106). "Letting a federal court tell state officials how to act under state law would conflict directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* (cleaned up).

However, "*Ex parte Young* is a necessary exception to sovereign immunity, preventing state officials from using their state's sovereignty as a shield to avoid compliance with federal law." *Id.* at 451 (cleaned up). So, for instance, "[a]n injunction ordering [a department] to provide the protections guaranteed by the federal Due Process Clause and heed the requirements of the Equal Protection Clause does not order the [d]epartment to conform to state law in violation of *Pennhurst*." *Id.* at 453 (citing *Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989) ("Under *Pennhurst*, however, the determinative question is not the relief ordered, but whether the relief was ordered pursuant to state or federal law."). *See also id.* at 452–53 (finding that "plaintiffs have established federal jurisdiction for purposes of a Rule 12(b)(1) motion" because, *inter alia*, the "complaint allege[d] that Planned Parenthood [was] entitled to a license under Louisiana law and that the Department's 'constructive denial' of their license application occurred 'without sufficient procedural protections.'"). As the Fifth Circuit stated:

> "[T]he constitutional procedural standards of the due process clause are . . . wholly and exclusively federal in nature." *Stern v. Tarrant Cnty. Hosp. Dist.*, 778 F.2d 1052, 1059 (5th Cir. 1985) (*en banc*). "[A] violation of state law is neither a necessary nor a sufficient condition for a finding of a due process violation." *Id.; see also Snowden v. Hughes*, 321 U.S. 1, 11 [ ] (1944) ("Mere violation of a state statute does not infringe the federal Constitution.").

*Id.* at 453.

The same reasoning applies here. As will be amply demonstrated *infra*, Plaintiff's relief will be ordered based on the United States Constitution's guarantee of his right to vote and denial of Constitutional right of due process. The Court will order relief pursuant to *federal* law, not state law. Accordingly, the Court denies Defendants' motion to dismiss on this issue.

*Valentine*, relied upon by Defendants, does not change the Court's analysis. *Valentine* was about Texas' "response to COVID-19." 956 F.3d at 799. The district court had issued a preliminary

24

injunction against the executive director of the prison system and one of its wardens regulating "in minute detail" a number of protections that went beyond CDC protection. *Id.*

Defendants sought a stay of the injunction pending appeal, and the Fifth Circuit agreed. *Id.* at 801, 806. The appellate court analyzed the state's "likelihood of success on appeal" and whether Plaintiff had shown a substantial risk of serious harm in violation of the Eighth Amendment. *Id.* at 801–02. The Fifth Circuit found that the district court erred and provided the following limited discussion of *Pennhurst*:

> TDCJ also is likely to succeed on appeal insofar as the district court enjoined the State to follow its own laws and procedures. In *Pennhurst*[, 465 U.S. 89,] . . . , a plaintiff class brought suit under *inter alia* the Eighth Amendment and state law to challenge the conditions at a state facility for people with mental disabilities. *See id.* at 92 [ ]. The Supreme Court held that the Eleventh Amendment prohibits federal courts from enjoining state facilities to follow state law. *See id.* at 103–23 [ ]. Here, however, the district court acknowledged that its injunction "largely overlap[ped] with TDCJ's COVID-19 policy requirements and recommendations." D. Ct. Op. at 23. In the district court's view, this was a virtue not a vice because its injunction would "promote compliance" with TDCJ's own policies. *Id.* at 24. *Pennhurst* plainly prohibits such an injunction.

*Id.* at 802.

*Valentine* is wholly consistent with *Phillips*. The *Valentine* court found no likelihood of success because the claims arose from state law; conversely, *Phillips* properly recognized that claims arising from *federal* law are not barred by *Pennhurst*.

For these additional reasons, the Court rejects Defendants' position and finds jurisdiction. The Court will now turn to the merits of the *Motion for TRO*.

### III.    RULE 65 STANDARD

Federal Rule of Civil Procedure 65 provides:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific

> facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).

The four requirements for a temporary restraining order are the same for a preliminary injunction: "the plaintiff must show 1) that there is a substantial likelihood that it will succeed on the merits, 2) that there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest." *W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 789 (M.D. La. 2018) (deGravelles, J.) (citing *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993)); *see also June Med. Servs., LLC v. Caldwell*, No. 14-525, 2014 WL 4296679, at *5 (M.D. La. Aug. 31, 2014) (deGravelles, J.) (describing four requirements for temporary restraining order (citations omitted)), *abrogated on other grounds Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), *as recognized by June Med. Servs. LLC v. Phillips*, 640 F. Supp. 3d 523 (M.D. La. 2022) (deGravelles, J.).

"Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *PASI*, 334 F. Supp. 3d at 789–90 n.201 (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). "Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the temporary restraining order or preliminary injunction." *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006) (emphasis in original) (quoted with approval by *PASI*, 334 F. Supp. 3d at 790).

IV.    DISCUSSION ON *MOTION FOR TRO*

A.  Likelihood of Success on the Merits

1.  *Parties' Arguments*

a.    Plaintiff's Original Memorandum (Doc. 2-1)

Plaintiff asserts seven separate counts in his *Complaint*. (*See Compl.* ¶¶ 178–251, Doc. 1.)

However, the *Motion for TRO* focuses only on two specific challenges:

(a)  Defendants' attempt to "unlawfully nullify [his] vote as an Orleans Parish voter for the Clerk of Criminal District Court seat by attempting to retroactively invalidate a completed election;" and

(b)  Defendants' efforts to "illegally abolish the Criminal District Court Clerk seat in retaliation for [Plaintiff's] political speech on the campaign trail."

(Doc. 2-1 at 5.) The Court finds the first issue dispositive, so it will focus its attention there and pass on any discussion of retaliation.[1]

Plaintiff argues that the right to vote is fundamental and a key way citizens express their political preferences. (*Id*. at 12 (citations omitted).) That is, the right to vote is a matter of accessing the political process, and that right can be denied by debasing or diluting the weight of a vote and not simply by denying it outright. (*Id.* (citations omitted).)

Plaintiff's right to vote is protected by the Fourteenth Amendment and First Amendment. (*Id.* at 12–13.) Plaintiff asserts:

> Regulations that "burden a relevant constitutional right, such as the [Fourteenth Amendment] right to vote or the First Amendment rights of *free expression* and association," yet "primarily regulate the mechanics of the electoral process, as opposed to core political speech," trigger an analysis under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 138 (3d Cir. 2022) (emphasis added).

---

[1] The Court will take this issue up (and possibly others) at a hearing on a motion for preliminary injunction.

(*Id.* at 13.) Plaintiff maintains that SB Amendments 1 and 2 trigger and fail the *Anderson/Burdick* framework. (*Id.*)

As to the first prong—the magnitude of the injury—these amendments deny Plaintiff's "freedom of speech as it pertains to his right to vote—a dire unconstitutional injury." (*Id.* (citing *Duncan v. Poythress*, 657 F.2d 691, 703–05 (5th Cir. 1981).) Plaintiff maintains that SB 256 "creates a new office by extinguishing the prior clerk of court offices, thereby altering the character and core duties of the new clerk of court position." (*Id.* at 14 (citing, *inter alia*, La. Const. Art. V § 32; and then citing *State ex rel. Garland v. Guillory*, 166 So. 94, 103–04 (La. 1935)).) Since a new office was created, "Louisiana law requires that it be filled by election, not appointment." *Id.* (citing, *inter alia*, *Russell v. McKeithen*, 257 La. 225, 244, 242 So. 2d 229, 236 (1970) ("[w]here the Constitution has provided the method of filling offices, the Legislature may not provide for filling them in any other manner" (citations omitted)).)

Thus, says Plaintiff, the SB Amendments 1 and 2 "together operate to completely unseat [Plaintiff] post-election. That maneuvering is unconstitutional because it disenfranchises him as a voter and overrides the outcome of a completed election by bypassing electoral processes for the upcoming term completely." (*Id.* at 15 (citing, *inter alia*, *Duncan*, 657 F.2d at 704).) The "timing and structure" of these amendments demonstrate that they were intended to ensure Plaintiff "never assumes office." (*Id.*) These amendments cannot "bypass[ ] a legally-required election for a new office in favor of a legislative appointment (couched as a simple transfer of files that just happen to occur on the day that [Plaintiff] was elected to be seated in office)." (*Id.* (collecting cases).)

As to the second part of the *Anderson/Burdick* analysis, Defendants have no legitimate purpose. (*Id.* at 16.) Rather, the SB Amendments seek to nullify the election by abolishing the office of Criminal District Court Clerk before Plaintiff can take it. (*Id.*) "The Amendments cannot

28

lawfully do this because Louisiana law does not allow for this type of legislative maneuvering where (a) the state constitution calls for an election; and (b) the definition of clerk of court was fixed as of the date of the election at issue." (*Id.* at 17.)

As to the first, Plaintiff again points to La. Const. Art. V § 28(A) and reiterates that the office of clerk of court must be filled with an election. (*Id.* (citing, *inter alia*, *Russell*, 225 La. at 244; and then citing La. R.S. § 18:402(E)(1)).) The SB Amendments "fundamentally undermine the fairness and integrity of the electoral process," and that makes them unlawful under the Fourteenth Amendment and *Duncan*. (*Id.*)

As to the second, "Louisiana courts recognize that constitutional protections attach to an elected official at the time of election, not on the designated date one is scheduled to assume office." (*Id.* at 18 (citing, *inter alia*, *Calogero v. State ex rel. Treen*, 445 So. 2d 736, 739 (La. 1984); and then citing *Hoag v. Kennedy ex rel. State*, 836 So. 2d 207, 231 (La. Ct. App. 2002)).) "Accordingly, on November 15, 2025, [Plaintiff] was elected to the position of 'clerk of court,' which included the duty of chief elections officer, La. R.S. 18:422, per the definition in effect at the time. La. R.S. 18:2(3). He should accordingly, on May 4, 2026, take the office to which he was elected." (*Id.*) Conversely, Ms. Napoleon was never on the ballot, did not receive a single vote, and did not run for the office associated with any of the duties of Clerk of Criminal District Court. (*Id.* at 19.)

For all these reasons, Duncan claims he is "likely to succeed on his effective right to vote claim." (*Id.* at 19.) Plaintiff prays either that (a) he and Ms. Napoleon are allowed to take their respective seats, or (b) Duncan himself becomes the sole Orleans Clerk of Court. (*Id.*) "Either way, Mr. Duncan should be seated in office with his attendant commission on May 4, 2026." (*Id.*)

b.  Defendants' Opposition (Doc. 10)

Defendants maintain that "Plaintiff's *Anderson-Burdick* theory will fail on its own terms." (Doc. 10 at 10.) According to Defendants, Plaintiff advances two arguments about SB 256: (1) it "overrid[es] the outcome of a completed election," and (2) "den[ies] him a vote in a supposed vacancy election for the consolidated clerk office." (*Id.*) But Defendants say that *Anderson/Burdick* applies only to "a state election rule [that] directly restricts or otherwise burdens an individual's First Amendment rights." (*Id.*) Defendants say SB 256 "does not control the mechanics of the electoral process" and "does not regulate ballot access, candidate qualifications, vote counting, election timing, or voter eligibility." (*Id.* at 10–11 (citations omitted).)

Defendants say that Plaintiff's reliance on the Fifth Circuit's decision in *Duncan* "fares no better." (*Id.* at 11.) *Duncan* "cabined itself to 'rare, but serious, violations of state election laws that undermine the basic fairness and integrity of the democratic system.'" (*Id.* at 11 (quoting *Duncan*, 657 F.2d at 699).)

> This case is nowhere near a cataclysmic breakdown of democracy. Abolishing a state office is a quintessential sovereign power of the State. *Newton v. Mahoning Cnty. Comm'rs,* 100 U.S. 548, 559 (1879) ("The legislative power of a State, except so far as restrained by its own constitution, is at all times absolute with respect to all offices within its reach."). That is why "public officers do not have a property interest in the positions they occupy." *Houchens v. Beshear*, 441 F. Supp. 3d 508, 517 (E.D. Ky. 2020) (citing *Taylor v. Beckham*, 178 U.S. 548 (1900)); *accord Hoag v. State ex rel. Kennedy*, 2001-1076 (La. App. 1 Cir. 11/20/02), 836 So. 2d 207, 220–21 (same under state law), *writ denied*, 2002-3199 (La. 3/28/03), 840 So. 2d 570. The Louisiana Constitution, moreover, even expressly vests in the Legislature the power to abolish "clerks of the civil and criminal district courts" in Orleans Parish with a "change by law." *See* La. Const. art. V, § 32. Plaintiff's demand via Duncan to be seated in an office the Legislature has abolished is therefore a nonstarter.

(*Id.* at 11–12.)

30

Defendants argue that the "alternative theory" that he was denied his right to vote also fails. (*Id.* at 12.) Defendants assert:

(1) SB 256 "does not call a vacancy into being" but rather "consolidates the authority, functions, duties, responsibilities, records, funds, and property of the criminal clerk's office into the civil clerk's office, whose holder is then referred to as the clerk of court for Orleans Parish[,]" and

(2) Article V, § 32 provides that the Clerk of Criminal Court continues to operate but is "subject to change by law, . . . notwithstanding any other contrary provision of this Constitution."

(*Id.*.) Thus, Defendants say, "Plaintiff is just wrong that the Louisiana Constitution requires a new election every time the Legislature exercises its express authority to change Orleans Parish's clerk offices by law." (*Id.*)

### c.  Plaintiff's Reply (Doc. 12)

Plaintiff replies that the *Anderson/Burdick* analysis is appropriate because, here, the issue is the "failure to follow a state election rule[.]" (Doc. 12 at 7.) Specifically, the SB Amendments "aim[ ] to control the 'mechanics of the electoral process.'" (*Id.*) Plaintiff then lists all the ways the SB Amendments do so. (*Id.*)

Further, Defendants argue that the Constitution does not require that states organize governments in a particular way and does not prohibit states from abolishing offices. (*Id.* at 7–8.) But Plaintiff responds that this rule is not absolute, particularly when, as here, the Louisiana Constitution expressly requires an election for the Clerk of Court seat. (*Id.*)

Moreover, *Duncan* prohibits Defendants from appointing a clerk when the state constitution requires an election. (*Id.* at 8.) "In sum, because Defendants fail to offer any legitimate state interest that would justify nullifying a completed election and bypassing constitutionally required electoral processes, Plaintiff is likely to succeed on his voting rights claim." (*Id.* at 9.)

31

### 2. *Anderson/Burdick Framework Generally*

"'Where a state election rule directly restricts or otherwise burdens an individual's First Amendment rights, courts apply a balancing test derived from two Supreme Court decisions' amalgamated as the '*Anderson/Burdick* balancing test.'" *La Union del Pueblo Entero v. Abbott*, 167 F.4th 743, 760 (5th Cir. 2026) (quoting *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013); then citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983); and then citing *Burdick v. Takushi*, 504 U.S. 428 (1992)).

"Under the test, 'the court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate."'" *La Union*, 167 F.4th at 760 (quoting *Voting for Am.*, 732 F.3d at 387 (quoting *Anderson*, 460 U.S. at 789)). Next, "the court 'must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule.'" *Id.* (quoting *Voting for Am.*, 732 F.3d at 387 (quoting *Anderson*, 460 U.S. at 789)). "The court must then weigh these factors." *Id.* (citing *Voting for Am.*, 732 F.3d at 387).[2]

"If a statute imposes 'a severe burden on First Amendment rights' it 'must be "narrowly drawn to advance a state interest of compelling importance."'" *Id.* at 761 (quoting *Voting for Am.*, 732 F.3d at 388 (quoting *Burdick*, 504 U.S. at 434)). However, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth

---

[2] As *Anderson* stated:

> In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. . . . The results of this evaluation will not be automatic; as we have recognized, there is no substitute for the hard judgments that must be made.

*Anderson*, 460 U.S. at 789–90 (cleaned up).

32

Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788)).

### 3. *Application of the Anderson/Burdick Analysis*

#### a. Character and Magnitude of Injury

Again, under the *Anderson/Burdick* balancing test, "the court 'must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.'" *Id.* at 760. Having carefully considered the matter, the Court finds that SB Amendments 1 and 2 impose "severe" and discriminatory restrictions under this test.

*Anderson* itself supports this conclusion. In *Anderson*, the Supreme Court looked at the impact of a state's "early filing deadline . . . for having [a candidate's] name placed on the ballot for the general election. . . ." *Anderson*, 460 U.S. at 782. In examining the nature of the injury, the Court found that the restriction "may have a substantial impact on independent-minded voters." *Id.* at 790. The challenged statute not only "totally exclude[d] any candidate who ma[de] the decision to run for President as an independent after the March deadline" but "[i]t also burden[ed] the signature-gathering efforts of independents who decide to run in time to meet the deadline[,]" making it "more difficult . . . to recruit and retain . . . volunteers" and "to secure . . . media publicity and campaign contributions. . . ." *Id.* at 792.

The High Court also found that "the March filing deadline places a particular burden on an identifiable segment of Ohio's independent-minded voters." *Id.* The Supreme Court noted that it has "upheld generally-applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson*, 46- U.S. at 788 n.9 (citations omitted).

Likewise, the High Court has "upheld restrictions on candidate eligibility that serve legitimate state goals which are unrelated to First Amendment values." *Id.* (citations omitted).

However, *Anderson* also recognized that "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Id.* at 793. For instance, in ballot access cases, "[t]he inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity." *Id.* (cleaned up). *Anderson* then found:

> A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties. By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas.

*Id.* at 793–94 (cleaned up).

The same reasoning applies here. The *Complaint* demonstrates that Plaintiff had and campaigned on a set of specific political opinions, and he received 68% of the vote advancing those positions. (*See, e.g., Compl.* ¶¶ 3–7, 50–54, 58–66, Doc. 1) However, Defendants here attempt to keep Plaintiff from taking office by appointing Ms. Napoleon without affording 68% of Orleans Parish voters the opportunity to vote to fill that newly-created office with the candidate of their choice. This is not the kind of "generally-applicable and evenhanded restriction[ ] that protect[s] the integrity and reliability of the electoral process itself" that the Supreme Court has upheld. *Anderson*, 460 U.S. at 788 n.9 (citations omitted) This is not the kind of "restriction[ ] on candidate eligibility that serve[s] legitimate state goals which are unrelated to First Amendment values" which the Supreme Court has upheld. *Id.* (citations omitted). Rather, the law discriminates

against an "identifiable political group whose members share a particular viewpoint," and therefore Defendants have "unfairly or unnecessarily burden[ed] the availability of [their] political opportunity[.]" *Id.* at 793. Thus, under *Anderson*, SB Amendments 1 and 2 carry a severe and discriminatory burden.

*Duncan* also reflects by implication the magnitude and character of Plaintiff's injuries. While *Duncan* predated *Anderson*, the Court finds it highly relevant to the instant analysis.

In *Duncan*, "[s]everal registered voters of Georgia" filed suit "claiming that the refusal of state officials to call a special election to fill a position on the Georgia Supreme Court violated their constitutionally protected right to vote." 657 F.2d at 693. A state justice had resigned, the Governor had accepted his resignation, and the Governor had appointed a replacement. *Id.* at 693. He did so even though (a) the Georgia Constitution provided for "the popular election of justices on the state's highest Court," *id.* (citing Ga. Const. art. 6, s 2, P3); and (b) state law provided, "whenever any person elected to public office shall . . . withdraw prior to taking office . . . then (state officials) shall thereupon call a special . . . election to fill such position[,]" *id.* (quoting Ga. Code s 34-1514).

The district court "held that the due process clause of the fourteenth amendment offers protection against the disenfranchisement of an entire state electorate through the refusal of public officials to call a special election as required by law." *Id.* at 695. "The [district] court therefore declared that the Georgia electorate had been deprived of a constitutionally protected right to vote." *Id.* "The district court ordered the calling of a special election to choose [the justice's] successor, and it enjoined [the appointed justice] from running in this election as an incumbent." *Id.*

The Fifth Circuit explained that a key question before it was "whether the due process clause of the fourteenth amendment offers protection against those rare, but serious, violations of

35

state election laws that undermine the basic fairness and integrity of the democratic system." *Id.* at 699. The Fifth Circuit held that "the due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process." *Id.* at 700.

However, while precedent "confirm[ed] that voting rights are, at bottom, federally protected, it [was] a closer question whether the actions of Georgia officials amounted to a constitutional violation entitled to a section 1983 remedy in a federal court." *Id.* at 700–01. The Court reviewed a number of out-of-circuit cases that reflect this, including one that recognized that "states enjoy broad authority to dispense with the elective process and provide by law that judicial vacancies shall be filled by gubernatorial appointment rather than popular election." *Id.* at 701–02 (citations omitted). "Despite this broad authority enjoyed by the states over the scope and conduct of elections, the federal courts have not hesitated to interfere when state actions have jeopardized the integrity of the electoral process." *Id.* at 702 The Court again looked at other authority and explained:

> The challenge brought in this case resembles that in [*Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978),] since it implicates the very integrity of the electoral process. If the Georgia officials denied the Georgia electorate the right granted by state statute to choose a replacement for Justice Bowles, then we are faced with "patent and fundamental unfairness" in the electoral process. Griffin, 570 F.2d at 1077. The Georgia voters are not asking the federal courts to count ballots or otherwise "enter into the details of the administration of (an) election." 570 F.2d at 1078. Their request is far simpler and more basic: they ask for the election itself, as required by state law.
>
> \* \* \*
>
> The Georgia voters may complain of a far more serious legal wrong than that established in Griffin . . . because the entire state electorate has been deprived of the right to participate in an election. The district court stated that it "can conceive of no more fundamental flaw in the electoral process than the deprivation of the right to vote

> altogether." We likewise can imagine no claim more deserving of constitutional protection than the allegation that state officials have purposely abrogated the right to vote, a right that is fundamental to our society and preservative of all individual rights. Just as the equal protection clause of the fourteenth amendment prohibits state officials from improperly diluting the right to vote, the due process clause of the fourteenth amendment forbids state officials from unlawfully eliminating that fundamental right. The United States Constitution protects against complete deprivation as well as invidious discrimination. It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law so that they may fill the seats of government through the power of appointment. We therefore hold that such action violates the due process guarantees of the fourteenth amendment.

*Id.* at 703–04. The appellate court also found that defendants' authority was not controlling,

explaining:

> Neither [of Defendants'] case[s] involved fundamentally unfair election practices or purposeful conduct which threatened the democratic system. [Defendants' cases] thus fall in the line of cases holding that the constitution offers no guarantee against insubstantial election irregularities. Reading the language of these cases in the context of their facts, we conclude that neither case precludes our granting of federal relief when public officials disenfranchise an entire electorate in violation of state law. * * * [A different one of Defendant's cases gave the appellate court] no hesitation in holding that one of those guarantees is the right to be free from the purposeful decision of state officials to deny the citizens of a state the right to vote in an election mandated by law.

*Id.* at 704–05. *Duncan* concluded:

> We reject each of the three arguments advanced in this appeal. First, we find no abuse of discretion in the refusal of the district court to abstain from hearing this section 1983 claim. Second, we hold that the due process clause of the fourteenth amendment affords protection against the disenfranchisement of a state electorate in violation of state election law. Third, we agree with the district court that the plain meaning of Georgia's special election statute, Ga. Code s 34-1514, requires the calling of a special election under the circumstances of this case. The decision of the district court is affirmed.

*Id.* at 708.

The Court finds *Duncan* directly controlling. Indeed, it is completely in line with Louisiana law. *See Russell v. McKeithen*, 257 La. 225, 244, 242 So. 2d 229, 236 (1970) ("Where the Constitution has provided the method of filling offices, the Legislature may not provide for filling them in any other manner." (quoting *Bloomfield v. Thompson*, 136 La. 519, 67 So. 352 (1915); and then comparing *Higginbotham v. City of Baton Rouge*, 190 La. 821, 183 So. 168 (1938)).

Here, Louisiana law specifically requires that, "In each parish a clerk of the district court *shall be elected* for a term of four years." La. Const. art. V, § 28 (emphasis added). Likewise, "*Special elections to fill newly created offices* or vacancies in office *shall be held* on dates fixed by the appropriate authority in the proclamation issued in accordance with law." La. R.S. 18:402(E)(1). Thus, as in *Duncan*, Louisiana law requires that (a) clerks "shall be elected" and (b) "[s]pecial elections to fill newly created offices . . . shall be held."

Moreover, *Duncan* recognized that this injury is substantial. "It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law so that they may fill the seats of government through the power of appointment." *Duncan*, 657 F.2d at 704. That is why *Duncan* held "that such action violates the due process guarantees of the fourteenth amendment." *Id.*

At the status conference, Defendants asserted two related arguments for disregarding *Duncan*'s clear holding. First, Defendants say that SB Amendments 1 and 2 did not "create" a new office, and second, that Ms. Napoloean was "elected" by the voters by winning unopposed in the race for Clerk of Civil District Court. In briefing, Defendants offer these arguments and add that their conduct is authorized by La. Const. art. V, § 32. (Doc. 10 at 12.)

The Court disagrees. Again, SB Amendment 2 provides:

38

> Section 4. The provisions of this Act shall not reduce the current term of office of the clerk of criminal district court for the Parish of Orleans on the effective date of this Act. *The office of clerk of criminal district court for the Parish of Orleans shall be abolished at the end of May 3, 2026 and before the term of any other criminal clerk of court begins.* Immediately thereafter, the authority, functions, duties, and responsibilities of the office of clerk of criminal district court for the Parish of Orleans, and all of the books, papers, records, monies, actions, and other property of every kind and description, movable and immovable, real and personal, possessed, controlled, or used by the office of the clerk of criminal district court for the Parish of Orleans *shall be transferred and owned, possessed, controlled, and used by the clerk of the civil district court* for the Parish of Orleans, *who shall thereafter be referred to as the clerk of court for the Parish of Orleans.*
>
> Section 5. Whenever the clerk of the criminal district court for the Parish of Orleans is referred to or designated by law, rule, or regulation on and after the date that office is abolished, such reference or designation shall be deemed to apply to the clerk of civil district court for the Parish of Orleans or *hereafter "clerk of court for the Parish of Orleans".*

(Doc. 2-5 at 4–5 (emphasis added).)

Defendants are correct that SB Amendment 2 does involve a transfer of power, but they miss that the amendment specifically calls for the creation of a new position, with a new title, with new custody and ownership, with new employees, and with new duties. Under the circumstances, the Court finds that, even if the Court assumes that Ms. Napoleon was elected as Clerk of Civil Court, she is to be appointed to a new office which did not previously exist—the "clerk of court for the Parish of Orleans." (*See id.*)

Likewise, Article V, § 32 provides Defendants with no relief. This section states:

> Except for provisions relating to terms of office as provided elsewhere in this Article, and notwithstanding any other contrary provision of this constitution, the following courts and officers in Orleans Parish are continued, subject to change by law; . . . the clerks of the civil and criminal district courts . . . .

La. Const. art. V, § 32. On the one hand, the Court agrees with Defendants that this section allows

Defendants to abolish the Clerk of Orleans Criminal Court by legislative act.

However, this misses the point. As Plaintiff says:

> This [*Motion for TRO*] is not about whether the legislature can create the Orleans Clerk of Court seat. Arguably, if the legislature follows the law, they can create a new seat. But what Defendants cannot do through the legislature is fill that newly-created clerk of court seat, which requires an election, themselves. That is the problem at issue—the targeted and concerted attempt to [ ] unlawfully nullify Plaintiff Calvin Duncan's vote as an Orleans Parish voter for the Clerk of Criminal District Court seat by attempting to retroactively invalidate a completed election . . . .

(Doc. 2-1 at 5.)

The Court agrees and finds that, for all the above reasons, this part of the *Anderson/Burdick*

analysis weighs strongly in favor of Plaintiff. The Court now turns to the next part of the analysis.

### b.   State's Interest and Burden Imposed by Rule

Under the next step of the *Anderson/Burdick* framework, "the court 'must identify and

evaluate the precise interest put forward by the State as justifications for the burden imposed by

its rule.'" *La Union*, 167 F.4th at 760–61 (quoting *Voting for Am.*, 732 F.3d at 387 (quoting

*Anderson*, 460 U.S. at 789)). "The court must then weigh these factors." *Id.* at 761 (citing *Voting*

*for Am.*, 732 F.3d at 387). Again, if, as here, "a statute imposes 'a severe burden on First

Amendment rights' it 'must be "narrowly drawn to advance a state interest of compelling

importance."'" *Id.* (quoting *Voting for Am.*, 732 F.3d at 388 (quoting *Burdick*, 504 U.S. at 434)).

Defendants do briefly articulate certain interests which SB 256 purportedly advances. (*See*

*Def. Opp.*, Doc. 10 at 4 (discussing how SB 256 "reflects a broader court-reform effort by the

Legislature" and "fits a long-running legislative pattern of streamlining Orleans Parish's unusually

fragmented court system," but largely citing legislative efforts from 2006 to 2016).

40

However, the Court finds that the current record before the Court shows that the state has a minimal interest in passing SB 256, and that the stated interests are, likely, pretextual. To recap:

- Morris "admitted that [SB 256] lacked any supportive studies or data to back it, but [Morris] introduced it nonetheless." (*Compl.* ¶ 69, Doc. 1.)

- Morris said on the Senate Floor that SB Amendment 1 "was brought at the behest of the Governor who sought '[t]o go ahead and get [the Bill passed into law] before Mr. Duncan takes office." (*Id.* ¶ 76.)

- Morris' answer for why the amendment was sought was, "[O]therwise, we'd probably have to pay him [Duncan] for the next four years in a job that is gonna be eliminated. So, it would make him an immediate lame duck." (*Id.* ¶ 77.)

- "Morris acknowledged that he understood the state constitution prevented shortening an official's term once he took office and thereby confirmed that [this amendment] was designed to ensure Mr. Duncan never took office as Clerk of the Criminal District Court." (*Id.* ¶ 78.)

- When pressed about "the suspicious timing," (*id.* ¶ 79), "Senator Morris stated candidly that he was following the Governor's directives: 'Well. I don't know. I didn't think about bringing it last year. And this is in *the Governor's package*. So maybe it's something *got his attention as well*.'" (*id.* ¶ 80)

- On April 16, 2026, "when pressed about how the Bill would operate in practice, Senator Morris did not provide answers. Instead, he noted that he anticipated litigation over [SB 256]." (*Id.* ¶ 90.)

- On April 23, 2026, SB 256 was passed, yet on that day the "late-breaking amendment" was "brought at the Governor's behest" to "explicitly acknowledge[ ] that the sitting Civil District Court Clerk will assume by legislative appointment the new position of Orleans Clerk of Court for the upcoming term," . . . "despite the position being one that requires an election[.]" (*Id.* ¶¶ 72, 93–94.) *See also* La. Const. Art. V. § 28.

- SB Amendment 2 specifically provides, "The office of clerk of criminal district court for the Parish of Orleans shall be abolished *at the end of May 3, 2026 and before the term of any other criminal clerk of court begins*," (Doc. 2-5 at 4), and, as stated above, this was done so that it could take effect "before Mr. Duncan takes office[.]" (*Compl.* ¶ 159, Doc. 1).

Thus, the Court finds that, at the very least, the state interests involved here are not "of compelling importance." *La Union*, 167 F.4th at 761. Moreover, those interests certainly do not outweigh the

41

extraordinary burden placed on the rights of Orleans Parish voters like Plaintiff, whose federal constitutional rights are being violated. *See Anderson*, 460 U.S. at 806 ("We began our inquiry by noting that our primary concern is not the interest of candidate Anderson, but rather, the interests of the voters who chose to associate together to express their support for Anderson's candidacy and the views he espoused. Under any realistic appraisal, the 'extent and nature' of the burdens Ohio has placed on the voters' freedom of choice and freedom of association . . . unquestionably outweigh the State's minimal interest in imposing a March deadline."); *Duncan*, 657 F.2d at 700 ("the due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process.").

Nevertheless, even assuming Defendants were advancing their purported interests, SB 256 is certainly not "narrowly drawn to advance [that] state interest of compelling importance.'" *La Union*, 167 F.4th at 761. Defendants could have taken any number of more narrow options which would not have disenfranchised Plaintiff and other Orleans Parish voters, including most significantly, holding a special election, which would comply with the law and not violate the above constitutional provision requiring the election of Clerks of Court. For this additional reason, the injury to Plaintiff's rights outweighs the interests advanced by the State.

For all these reasons, the Court finds that Plaintiff has shown a substantial likelihood of success on his *Anderson/Burdick* claim.

c.    Defendants' Overall Objection to *Anderson/Burdick*

Defendants argue that *Anderson/Burdick* analysis has no place here. (Doc. 10 at 10–11.) Defendants say SB 256 "does not regulate ballot access, candidate qualifications, vote counting, election timing, or voter eligibility." (*Id.* at 10.)

The Court disagrees. As the Fifth Circuit explained:

42

> *Anderson/Burdick* review applies to "all First and Fourteenth Amendment challenges to state election regulations." *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 949 (7th Cir. 2019) (Barrett, J.). While *Anderson/Burdick* does not apply to "pure speech," it applies whenever the regulation in question "control[s] the mechanics of the electoral process." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 [ ] (1995).

*La Union*, 167 F.4th at 761. *See also Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 138 (3d Cir. 2022) (explaining that *Anderson/Burdick* applies (1) when "the law must burden a relevant constitutional right, such as the [Fourteenth Amendment] right to vote or the First Amendment rights of free expression and association[,]" and (2) when "the law must primarily regulate the mechanics of the electoral process, as opposed to core political speech."). And as the Third Circuit explained:

> The Supreme Court's case law . . . [has] appl[ied] *Anderson-Burdick* to a wide range of electoral-process regulations. These include the time, place, and manner of elections, such as notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns. * * *
>
> The Courts of Appeals have followed suit, scrutinizing under *Anderson-Burdick* laws regulating, *e.g.*, . . . *the counting of ballots . . . Even beyond laws governing the voting process itself*, the appellate courts regularly apply *Anderson-Burdick* to regulations affecting candidates, including the qualifications of elected and appointed officers, *the filling of vacancies and special elections*, term limits, and even the expulsion of elected officials. Though each of these regulations necessarily implicated speech and association to some degree, each was nonetheless primarily directed at regulating specific mechanics of the electoral process.

*Mazo*, 54 F.4th at 140–42 (emphasis added) (cleaned up).

Here, the Court finds that SB 256 regulates the electoral-process and not "pure speech." As shown above, the core issue here is whether Plaintiff's due process rights were violated in the electoral process of how the office of "clerk of court for the Parish of Orleans" is to be appointed

43

under SB Amendment 2 on the effective date of SB 256. This case has far more in common with those decisions applying *Anderson/Burdick* than those declining to apply it. *See Mazo*, 54 F.4th at 140–42. *See also La Union*, 167 F.4th at 761. As Plaintiff argues:

> Nullifying an election, while also failing to call another as required by law, is quintessential regulation of "ballot access" because access to the ballot is being denied outright, both by virtue of nullification and in failing to call a required election. Moreover, "candidate qualifications" are being erased due to the complete lack of a qualification round for a required upcoming election. As for "vote counting," it is being wholly abandoned through the nullification of nearly 40,000 votes and the failure to count votes concerning the required new election. Regarding "election timing," that too is being eroded because no election is being called for the new seat. Finally, as for voter eligibility, that has been wholesale thrown out because voters are being cheated out of the new election with no recourse as to the nullification of their votes in the prior election.

(Doc. 12 at 7 (citation omitted).) The Court agrees. As a result, the Court rejects Defendants' argument and finds that the *Anderson/Burdick* framework applies.

In addition, it is absolutely clear to the Court that Plaintiff is entitled to relief under *Duncan*, which predated *Anderson/Burdick*. *Duncan* is binding authority that also directly controls this case. As a result, even if *Anderson/Burdick* did not apply, Plaintiff would still prevail under *Duncan*

For all these reasons, the Court finds that Plaintiff has established a substantial likelihood of success on the merits. As a result, the Court turns to the other requirements for injunctive relief.

### B. Other Requirements for Injunctive Relief

#### 1. Parties' Arguments

Plaintiff contends that he satisfies the other requirements for a temporary restraining order. (Doc. 2-1 at 22–25.) As to irreparable harm, Plaintiff says these constitutional damages cannot be undone through monetary damages, and, in any event, a constitutional injury itself usually suffices to show irreparable harm. (*Id.* at 22–23.) Plaintiff asserts that a "short-term injunction simply

44

ensures that Mr. Duncan takes his rightful seat on May 4, 2026, the date his term commences by law and to which his commission and oath attach." (*Id.* at 24.) As to the other two requirements, the State and Public have no "interest in enforcing a regulation that violates federal law," but, rather, the public is served by preventing such a law and "preserving the democratic electoral process for voters in Orleans Parish, like [Plaintiff]." (*Id.* (citations omitted).) "Allowing Mr. Duncan to take the office to which he was elected in a landslide runoff, and to which he was commissioned and sworn in, is not controversial. All the TRO does is maintain the status quo, thereby preserving the will of the voters, which is in the public interest." (*Id.* at 25.)

Defendants respond that "the equities favor the state." (Doc. 10 at 14 (cleaned up).) First, Plaintiff has no viable claim, so he suffered no irreparable harm. (*Id.*) Second, the State has an interest in enforcing its laws. (*Id.*) And third, Plaintiff seeks mandatory injunctive relief which goes beyond maintaining the status quo. (*Id.*)

Plaintiff replies: "Defendants miss the mark in failing to acknowledge that an Act (or portion thereof) that violates the Constitution does not favor enforcement. The transition plan outlined in Act 15 is unconstitutional because legislative appointment to an elected office violates the 1st and 14th Amendment." (Doc. 12 at 10.) "So while Plaintiff is not arguing here that Act 15 may not create a new position, he is arguing that, in doing so, it cannot bypass an election." (*Id.*) Moreover, Plaintiff seeks to preserve the status quo, not disrupt it. (*Id.*) Thus, says Plaintiff, the equities favor granting his motion. (*Id.*)

### 2. *Law and Analysis*

In sum, the Court finds that the other requirements for an injunction have been satisfied. As to the second requirement, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People*, 91 F.4th

45

at 340–41 (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012)); *see also* 11A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed. 2026) (same). Here, Plaintiff has shown a clear constitutional violation, so no further showing is needed.

As to the third and fourth requirements, "Plaintiff['s] risk of irreparable harm must be weighed against any injury the State would sustain. Where the State is appealing an injunction, its interest and harm merge with the public interest." *Book People*, 91 F.4th at 341 (citations omitted). On the one hand, "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Id.* (citations omitted). But "neither [the State] nor the public has any interest in enforcing a regulation that violates federal law." *Id.* (citation omitted).

Here, the Court agrees with Plaintiff—the State has no interest in enforcing its unconstitutional conduct. Moreover, the public (particularly Orleans Parish) has a significant interest in ensuring that their votes are not nullified and that they have an opportunity to vote for a newly created clerk of court office. As a result, the Court finds these requirements satisfied as well.

### C. Security

Plaintiff argues that the Court should not require security before issuing injunctive relief. (Doc. 2-1 at 25.) Defendants do not address this in their opposition. (*See* Doc. 10.)

"[T]he amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court . . . .'" *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).

> Accordingly, the judge usually will fix security in an amount that
> covers the potential incidental and consequential costs as well as

46

> either the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained.

WRIGHT & MILLER, *supra*, at § 2954.

"Indeed, it has been held that the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant." *Id.* Likewise, the Fifth Circuit has ruled that "the court 'may elect to require no security at all.'" *Kaepa*, 76 F.3d at 628 (quoting *Corrigan Dispatch*, 569 F.2d at 303).

Considering the important constitutional issues involved, the Court will require nominal security in the amount of $100.

### D. Closing Note

The Court emphasizes in closing the limited nature of its holding. The Court is not ruling that the state lacks the authority to abolish an agency or office writ large. Rather, the Court is simply holding that, in doing so in the manner in which Louisiana did here with SB 256—that is, abolishing this particular office, creating a new office to replace it, and then appointing someone for that office, all when the Louisiana Constitution requires an election—Defendants have violated the Plaintiff's federally protected constitutional rights to due process and to vote. As a result, the Court holds that SB 256 is unconstitutional. *See Anderson*, 460 U.S. at 806 ("our primary concern is not the interest of [this particular] candidate . . . , but rather, the interests of the voters who chose to associate together to express their support for [his] candidacy and the views he espoused. Under any realistic appraisal, the 'extent and nature' of the burdens [the State] has placed on the voters' freedom of choice and freedom of association . . . unquestionably outweigh the State's minimal interest in imposing" the restriction at issue); *Duncan*, 657 F.2d at 700 ("the due process clause of

47

the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process.").

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Emergency Motion for Temporary Restraining Order* (Doc. 2) filed by Plaintiff Calvin Duncan, in his official capacity as Clerk-Elect of Orleans Parish Criminal District Court, and in his personal capacity as an Orleans Parish voter is **GRANTED IN PART AND DENIED IN PART.** The motion is **GRANTED** in that the Court finds that Senate Bill 256, Act No. 15, is **UNCONSTITUTIONAL.** As a result, Defendants Governor Jeff Landry and Secretary of State Nancy Landry are **ENJOINED** from (1) enforcing SB 256; (2) certifying the appointment of the Clerk of Civil District Court for the Parish of Orleans as the Clerk of Court for the Parish of Orleans; and (3) issuing the Clerk of Civil District Court a commission for the position of Clerk of Court for the Parish of Orleans.

[*continued on next page*]

**IT IS FURTHER ORDERED** that the *Motion for TRO* is **DENIED** in that Plaintiff's Count I (Effective Right to Vote Violation) against Defendant Attorney General Liz Murrill is **DISMISSED WITHOUT PREJUDICE**, due to sovereign immunity.

**IT IS FURTHER ORDERED** that Plaintiff shall post nominal security in the amount of $100.

**IT IS FURTHER ORDERED** that this order shall remain effective for fourteen (14) days from the day and time it was issued.

**IT IS FURTHER ORDERED** that a status conference is hereby set on **Monday, May 4, 2026, at 2:00 p.m., by Zoom video conference,** to discuss issues associated with a preliminary injunction.

Signed in Baton Rouge, Louisiana, on May 3, 2026.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**