**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| CALVIN DUNCAN, in his official capacity as Clerk of Orleans Parish Criminal District Court, and in his personal capacity as an Orleans Parish voter,<br><br>*Plaintiff*,<br><br>v.<br><br>JEFFREY LANDRY, in his personal capacity and official capacity as Governor of the State of Louisiana, NANCY LANDRY, in her official capacity as Louisiana Secretary of State, and ELIZABETH MURRILL, in her personal capacity and official capacity as Attorney General for the State of Louisiana,<br><br>*Defendants*. | Case No. 3:26-cv-00460<br><br>Judge John W. deGravelles<br><br>Magistrate Judge Scott D. Johnson<br><br>*Jury Trial Demanded* |

## VERIFIED AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

## INTRODUCTION

1. For months now, high-powered Louisiana state officials have been engaged in a radical and unconstitutional campaign to deprive Plaintiff Calvin Duncan of his office as Clerk of Orleans Parish Criminal District Court and to unconstitutionally nullify the votes of Mr. Duncan and the Orleans Parish electorate that elected him to that position.

2. Mr. Duncan was duly elected as Clerk of Criminal District Court by overwhelming popular vote on November 15, 2025; received his Commission Certificate (signed by Defendants

Governor Jeffrey Landry and Secretary of State Nancy Landry), identification badge, and Oath of Office forms for the position on April 20, 2026;[1] was sworn into office on April 21, 2026.

3. But Defendants had a different plan—a naked power-grab at odds with bedrock constitutional law, the will of the Orleans Parish electorate, and Mr. Duncan's assumption of office. That is, Defendants conspired to illegally obstruct Mr. Duncan's term by eliminating his office *after* he had already been elected to the position.

4. Defendants purported to abolish the elected office of Clerk of the Orleans Parish Criminal District Court on the eve of Mr. Duncan's term and transfer its authority, functions, and duties to the Clerk of the Orleans Parish Civil Court, thereby denying the voters of New Orleans the effect of the votes they cast and installing an unelected officeholder in defiance of their electoral decision.

5. Defendants undertook this coordinated effort both because of who Mr. Duncan is—a Black man and an exoneree—and to punish his outspoken criticism of the Orleans Parish criminal legal system as unjust and frequently discriminatory against Black people. Defendants seek to prevent Mr. Duncan from being in a position of elected authority in order to prevent him from implementing reforms to protect the rights of criminal defendants in the Orleans Parish criminal legal system, the same system that wrongfully convicted and imprisoned him for over 28 years.

6. Defendants' campaign against Mr. Duncan began well before Governor Landry signed the legislation challenged here—Senate Bill 256 ("SB 256"), enacted as Act 15 of the 2026 Regular Session (the "Landry Act"). Early in Mr. Duncan's candidacy for Clerk of Criminal District Court, Defendant Attorney General Elizabeth Murrill—the State's chief legal officer and Governor Landry's legal emissary—threatened Mr. Duncan for his constitutionally protected political

---

[1] *See* Ex. A.

speech. In September 2025, she demanded that Mr. Duncan stop describing himself as "exonerated" and threatened "further action" against him if he continued. Mr. Duncan refused to self-censor, as was his First Amendment right, and the voters of Orleans Parish elected him not in spite of but *because* of who he is and his outspoken advocacy, by a decisive margin.

7. In response, and exactly as the Attorney General had forewarned, Governor Landry retaliated for the very speech that won Mr. Duncan the election. At the Governor's direction, the Legislature passed SB 256, abolishing the office of the Clerk of the Orleans Parish Criminal District Court. The bill was specifically drafted to make the Act effective immediately upon the Governor's signature—rather than months later in the ordinary course—so that it would take effect before Mr. Duncan's term began. It also transferred the abolished office's authority and duties to the sitting Clerk of the Civil District Court, Chelsey Napoleon, installing her in the consolidated office without any election. At bottom, SB 256 was designed for the express purpose of ensuring that Mr. Duncan never served the term Orleans Parish voters (including Mr. Duncan himself) chose him to hold. Nor was there any doubt that this was all to target Mr. Duncan: SB 256 was introduced only *after* Mr. Duncan had already been elected as Clerk of the Orleans Criminal District Court.

8. Defendants have not relented. In both state and federal litigation, they have pressed to install the civil clerk as Orleans Parish Clerk of Court for the 2026 term without any election. And when the New Orleans City Council moved to appoint an interim clerk and call a special election, Attorney General Murrill threatened the Council members, the Mayor, the District Attorney, and the appointed interim clerk with civil suit, forfeiture of their own offices, and criminal exposure. Defendants' continuing enforcement and opposition to even a special election for the combined

clerk position confirm that their objective is not administrative efficiency but ensuring that Mr. Duncan never serves.[2]

9. As enacted and enforced, the Landry Act violates the United States Constitution several times over. It denies Mr. Duncan and the voters of Orleans Parish the due process and equal protection of the laws by stripping a completed, certified election of its legal effect. It retaliates against Mr. Duncan for his protected political speech, and burdens his future speech, in violation of the First Amendment. And by singling out a single, identifiable individual for punishment without trial, it operates as a bill of attainder forbidden by Article I, Section 10. Defendants pursued these unconstitutional ends through a coordinated effort among themselves and others, including the Orleans Parish Civil District Court Clerk Chelsey Napoleon and former Criminal District Court Clerk Darren Lombard.

10. The Landry Act's message is unmistakable: if a candidate the Governor and Attorney General oppose wins an election on a platform they dislike, the office itself can be abolished and

[2] When Attorney General Murrill was indicted on criminal charges for public intimidation and retaliation by an Orleans Parish grand jury for this conduct, she and Governor Landry unsurprisingly responded only with more threats. Governor Landry said he would have the state police investigate not only the prosecutor and circumstances behind the indictment, but also members of the grand jury. The Mayor also said that her office had heard warnings that some state leaders may try to target the City's finances. Eventually, the Mayor, Council members, District Attorney, and interim clerk wrote to the special prosecutor requesting that the charges be dropped—with the Mayor and Council members stressing the budgetary cuts the State had already made and that "extended and escalating conflict carries real consequences for the people [they] serve." Ex. I; *see also* John Stanton, *As Louisiana high court stays Murrill indictment, New Orleans officials brace for retaliation*, Gambit (July 3, 2026), https://www.nola.com/gambit/news/politics_elections/as-louisiana-high-court-stays-murrill-indictment-new-orleans-officials-brace-for-retaliation/article_f8647524-817f-4544-b306-c41749b537b9.html. Following receipt of these letters, the special prosecutor dropped the charges. Governor Landry has since said that he will not meet with the Major until she turns over records related to the indictment of Attorney General Murrill. *See* WVUE FOX 8 New Orleans, *Landry's Silent Treatment Tied to 'Definite' Cuts to New Orleans City Services*, YouTube (Aug. 5, 2026), https://www.youtube.com/watch?v=LMu1Iv5iXHA.

the Governor and Attorney General's preferred candidate installed without election. Left unchecked, that threat chills not only Mr. Duncan's ability to carry out his platform from the office he won, but the political speech of every future candidate who would seek office on a platform contrary to the preferences of State officials like Defendants here.

11. This lawsuit seeks to vindicate a most basic democratic principle: the winner of a free and fair election takes office. The remedy for a disfavored election result is to challenge the winner in the next election, or to campaign against them—not to retroactively abolish the office itself. Mr. Duncan asks this Court to declare the Landry Act unconstitutional as applied to him, to restore him to the office to which the voters of Orleans Parish elected him, and to award damages against Governor Landry and Attorney General Murrill for their individual conduct in depriving him of his constitutional rights.

12. On June 1, 2026, the Louisiana Supreme Court, exercising its plenary supervisory jurisdiction in *Crockett v. State*, upheld the Landry Act as a valid exercise of the Legislature's authority under Article V, Section 32 of the Louisiana Constitution. That decision resolved only questions of Louisiana state law; it does not dictate the outcome of Mr. Duncan's distinct federal constitutional claims, which were not litigated in that matter—to which Mr. Duncan was not a party.

## **JURISDICTION**

13. Mr. Duncan brings this civil rights action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and Article I, § 10 of the U.S. Constitution. The Court has equitable power to enjoin the Defendants' unlawful acts taken under color of law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

14. Mr. Duncan seeks prospective declaratory and injunctive relief against Defendants in their official capacities to remedy ongoing violations of federal law, and such relief is not barred

by the Eleventh Amendment. *Ex parte Young*, 209 U.S. 123 (1908). Each Defendant has a particular connection to the enforcement of the Landry Act: the Secretary of State certifies elected officials and issues commissions, La. Rev. Stat. § 18:513(A)(5) (2025); the Governor confirms qualifications and commissions officeholders, wields the "usurper" enforcement power, and fills offices declared forfeited by appointment, *id.* §§ 42:72–76; and the Attorney General is required to prosecute "usurper" actions, *id.* § 42:76.

15. Mr. Duncan also seeks compensatory, punitive, and nominal damages pursuant to 42 U.S.C. § 1983 against Defendants Governor Landry and Attorney General Murrill in their personal capacities for their individual, non-legislative enforcement conduct in depriving him of his constitutional rights. As executive and enforcement acts, neither absolute legislative immunity nor the Eleventh Amendment bars personal-capacity damages claims against them. *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991). Nor does qualified immunity shield that conduct, because the rights at issue—to be free from retaliation for protected political speech and from the post-election nullification of a completed election—were clearly established at the time Defendants acted. Punitive damages are available under § 1983 where an official's conduct is motivated by evil motive or intent or involves reckless or callous indifference to federally protected rights, *Smith v. Wade*, 461 U.S. 30, 56 (1983), and nominal damages are appropriate to vindicate a constitutional deprivation, *Carey v. Piphus*, 435 U.S. 247, 266 (1978).

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights cases).

17. Declaratory and injunctive relief are authorized by Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## VENUE

18. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district, specifically East Baton Rouge Parish, and Defendants conduct business in this district. 28 U.S.C. § 98.

## PARTIES

19. Plaintiff Calvin Duncan is a Black 63-year-old lawyer, prisoners' rights activist, criminal justice reform advocate, author, researcher, and exoneree. He is domiciled in the State of Louisiana; is a resident of New Orleans, Louisiana; and is a registered and eligible voter in Orleans Parish. He voted for himself in both the October 11, 2025 open primary election and the November 15, 2025 runoff election for Clerk of Criminal District Court, and his votes (together with those of the approximately 38,681 Orleans Parish voters who elected him in the runoff) were stripped of all legal effect by the Landry Act. He was elected to the position of Clerk of Criminal District Court in Orleans Parish on November 15, 2025. As such, he is currently the rightful Clerk of Criminal District Court in Orleans Parish. He brings this action in both his personal capacity as an Orleans Parish voter and his official capacity as Clerk of Orleans Parish Criminal District Court.

20. Defendant Jeffrey Landry is the Governor of the State of Louisiana. As Governor, Defendant Jeffrey Landry is the State's chief executive. He serves as both the gatekeeper to any person's assumption of office and the enforcement mechanism behind any assumption of office. As the gatekeeper, Governor Landry must confirm that any elected official certified by the Secretary of State "possesses the legal qualifications to hold the office to which he was elected," *Dupuy v. Jones*, 15 So. 2d 528, 529 (La. Ct. App. 1943), and issue the individual a commission, La. Rev. Stat. § 18:513(A)(5). Only then can the individual "take the oath of office prescribed by law." La. Rev. Stat. § 42:141(A). As the enforcement mechanism, Governor Landry is authorized by law to take action against any "public officer who . . . in any manner recognizes the authority

of any usurper" and thus "forfeits" his or her office. *Id.* § 42:72–76. And if a court "declares that any public officer, whose office is established by the constitution, has forfeited his office," Governor Landry "shall fill such office by appointment." *Id.* § 42:75. He is sued in his official and personal capacities.

21. Defendant Nancy Landry is the Secretary of State for the State of Louisiana. As Secretary of State, Defendant Nancy Landry oversees the state's election process, including qualifying candidates, certifying commissions, and overseeing the administration of elections, including tabulating, verifying, and certifying election results. She is legally responsible for administering all elections in Orleans Parish, including those involving Mr. Duncan in his personal capacity as a registered voter and in his official capacity as Clerk of Criminal District Court in Orleans Parish. Under La. Rev. Stat. 18:513(A)(5), she must certify the name of any elected official to the Governor before that official may receive a commission and take office. She is sued in her official capacity.

22. Defendant Elizabeth Murrill is the Attorney General of the State of Louisiana. As Attorney General, she is the Chief Legal Officer for the State of Louisiana and represents the legal interests of the Governor of Louisiana. She is legally responsible for protecting and upholding the Constitutional rights of every Louisianian, enforcing the laws of Louisiana as they are written, and ensuring compliance with the Constitution of the United States and the Louisiana Constitution. Louisiana law expressly requires Attorney General Murrill or the appropriate District Attorney to bring an action in the name of the state against any person who "usurps, intrudes into, or unlawfully holds or exercises or attempts to remain in possession of any public office or franchise within th[e] state," and separately authorizes Governor Landry to do the same. La. Rev. Stat. § 42:76. Attorney General Murrill is sued in her official and personal capacities.

## FACTUAL BACKGROUND

### A. The Orleans Parish Clerks' Offices and Governing Law

23. Defendants' conduct cannot be understood apart from the Louisiana law governing the office of Clerk of Criminal District Court for Orleans Parish, the distinct structure of the Orleans Parish clerks' offices, and the Louisiana and Orleans Parish's long history of racial disenfranchisement.

#### *1. Applicable Louisiana Law*

24. The Louisiana Constitution requires that clerks of the district court be elected. "In each parish a clerk of the district court shall be elected for a term of four years." La. Const. art. V, § 28(A). Rather than a single clerk, Orleans Parish long had two separate elected clerks, one for the Civil District Court and one for the Criminal District Court. *Id.* § 32.

25. Louisiana district court clerks served two primary roles: chief record custodian and chief election officer. *Id.* § 28; La. Rev. Stat. § 13:901–13:918; La. Rev. Stat. § 18:422. In Orleans Parish, only the Clerk of Criminal District Court served as the Parish chief elections officer. The Louisiana Revised Statutes defined the term "[c]lerk of court" or "clerk" to mean "the clerk of the district court, *except* that in any parish having a civil district court and a criminal district court, [it] mean[s] the *clerk of the criminal district court*." La. Rev. Stat. § 18:2(3) (emphases added). Accordingly, when Mr. Duncan was elected on November 15, 2025, he was elected to the office of "clerk of court," carrying with it the duty of chief elections officer.

26. As indicated above, Louisiana law also prescribes how a duly elected official assumes office. The Secretary of State must certify the name of any elected official to the Governor. La. Rev. Stat. § 18:513(A)(5). The Governor, in turn, confirms the individual "possesses the legal qualifications to hold the office to which he was elected," *Dupuy*, 15 So. 2d at 529, and issue the

individual a commission. La. Rev. Stat. § 18:513(A)(5). Only then may the individual "take the oath of office prescribed by law." *Id.* § 42:141(A).

27. Louisiana backs this framework with its "usurper" statutes. A person who "assumes or pretends to be a public officer without the authority of an election, or without the authority of a commission from the governor when a commission is required," is deemed a usurper subject to both criminal penalties, La. Rev. Stat. § 42:71, and civil suit, *id.* § 42:76. The Attorney General or the appropriate District Attorney is required to sue usurpers, and the Governor is separately authorized to do the same. *Id.* § 42:76. The Governor may also act against any public officer who recognizes the authority of a usurper and thereby forfeits his office and may fill by appointment any office a court declares forfeited. *Id.* §§ 42:72–76.

***2. Orleans Parish Clerks of Court***

28. Until the Landry Act's enactment, Orleans Parish had separate civil and criminal courts and, accordingly, separate elected clerks for each. La. Const. art. V, § 32. The Clerk of Criminal District Court and the Clerk of Civil District Court were distinct offices, each with their own jurisdiction, powers, duties, staff, and records, and each requiring a separate oath of office and a separate commission certificate.

29. The two offices were not interchangeable. The Clerk of Criminal District Court—the position to which Mr. Duncan was elected—received criminal filings and evidence, served subpoenas, and maintained the records of the Criminal Court, and was the only clerk that served as the chief elections officer for the Parish.

30. Unlike civil records, records in criminal cases frequently involve physical evidence—such as fingerprints taken in connection with convictions—requiring indefinite preservation. These criminal-records and election-administration duties were never assigned to the Civil Clerk,

no voter ever cast a ballot for the Civil Clerk to perform them, and when she assumed office the Civil Clerk never swore an oath to fulfill them.

### *3. Every Prior Consolidation Effort Preserved Elected Officials' Terms*

31. Since this two-court system was established, there have been several legislative efforts (some successful, some not) to consolidate offices, judgeships, and the like in Orleans Parish. But prior consolidation efforts used phased, multi-year implementations specifically designed to avoid constitutional infirmity by never depriving an elected official of their term—or their electorate of an electoral voice.

32. For example, in 2006, the Louisiana Legislature passed Act 621 to reorganize the Orleans Parish criminal legal system to address strained judicial resources in the wake of Hurricanes Katrina and Rita. Although not every aspect of the law was ultimately implemented, Act 621 sought to consolidate the courts into a single 41st Judicial District, reduce the number of judgeships, merge the civil and criminal sheriffs, and consolidate the civil and criminal clerks' offices. When Act 621 passed, Arthur Morrell had been elected Criminal Clerk of Court but had not yet begun his term.

33. Act 621 acknowledged the complexity of the process and that change should occur over time: "[t]he constitution prohibits decreasing the terms of judges and other elected officials during their terms of office, and accordingly, some of the provisions of this Act will not effect a consolidation until 2009, 2010, and 2015, respectively. The legislature declares, however, that the process must begin now so that the elected officials covered by this Act as well as their employees and the citizens of New Orleans can plan for the future[.]" Act 621, § 1, 2006 La. Reg. Sess.

34. Act 621 provided that the clerks' consolidation would take effect by 2010, four years later, after which no election would be held for separate civil and criminal district court clerks. As written, Act 621 ensured that Mr. Morrell could serve the full term to which he was elected, that

no clerk would assume duties for which they had not been elected, and that no clerk would find himself in the position Mr. Duncan finds himself today.

35. Likewise, Act 621 consolidated the Orleans Parish civil and criminal sheriff offices effective for the 2010 term, allowing the recently elected sheriffs to serve the full terms to which they had been elected and permitting an election to fill the new consolidated office. Act 621 §§ 1, 23, 2006 La. Reg. Sess.

36. In 2008, Act 873 delayed many of Act 621's reforms, pushing the clerks' consolidation back to January 1, 2015.

37. In 2012, Act 474 abandoned the restructuring begun by Act 621, repealing the provision consolidating the two clerks. Its preamble recounted the failed consolidation attempts and the Legislature's decision to abandon them "despite the efforts made to accomplish the consolidation and reorganization" because "the complexity of the issues involved prevented such a reorganization." Act 474 § 1, 2012 La. Reg. Sess.

38. The Legislature took the same measured approach with other Orleans Parish courts that were ultimately consolidated. Passed in 2014, Act 845 merged the Orleans Parish municipal and traffic courts. Act 845 took effect in 2017, nearly three years after its passage, to allow an appropriate implementation window and to protect the elected terms of sitting judges. Likewise, when the Legislature passed Act 631 in 2016 to reduce the number of Orleans Parish Municipal and Traffic Court judgeships, the Legislature again avoided constitutional problems by using a multi-year implementation window, making Act 845 "effective at midnight on December 31, 2020" (four years later), so sitting officials could serve out their elected terms. *See* Act 845, 2014 La. Reg. Sess. (courts); Act 631, 2016 La. Reg. Sess. (judges).

39. In fact, in the 2026 legislative session, all but one judicial-reform bill followed the phased, multi-year implementation approach used since at least 2006.

40. SB 217 (introduced in the same term) proposes to reduce the number of criminal court judges beginning January 1, 2027, and provides that "[n]o qualifying shall be opened for any successor to a judgeship that is abolished pursuant to this Subsection, and no election shall be held for any judgeship abolished pursuant to this Subsection." This language specifically ensures that no election is held for a judicial position that will be abolished and guards against the very scenario Mr. Duncan and New Orleans now face.

41. Another bill introduced and passed in the same session, SB 197, reduces the number of judges on the Louisiana Fourth Circuit Court of Appeal while ensuring that sitting judges serve out their elected terms and that no election will be held for seats slated to be cut.

42. Likewise, the structure of HB 911 protects judges from having their terms cut short, proposing to merge the Orleans Parish civil and criminal district clerks only *after* the clerks elected in 2025 would first serve their terms.

43. As noted above and discussed further below, the only outlier was SB 256—the bill that would become the Landry Act.

## B. By contrast, Defendants Targeted Mr. Duncan To Prevent Him From Serving His Elected Term

44. Defendants' campaign to strip Mr. Duncan of his office is best understood by considering who Mr. Duncan is, the platform on which he was elected, and the protected advocacy that made him a target.

***1. Mr. Duncan Spent More Than 28 Years in Prison for a Crime He Did Not Commit.***

45. In 1982, Mr. Duncan was wrongly accused of first-degree murder.[3] In 1985, an Orleans Parish jury issued a unanimous jury verdict wrongly convicting him of that crime.[4] After spending three years awaiting trial at the Orleans Parish jail, he was sentenced to life in prison at the Louisiana State Penitentiary at Angola, where he remained for about 25 years.[5]

46. Innocent of the crime for which he was convicted, Mr. Duncan fought to prove that innocence throughout his time in prison.[6] Albeit confined within the largest maximum-security prison in the country, Mr. Duncan's quest to prove his innocence never wavered. He became a self-taught jailhouse lawyer and spent years writing letters to the Orleans Parish Clerk of Criminal District Court, desperate to secure access to his own case files—the very files he knew contained evidence of his innocence.[7]

47. Unfortunately for Mr. Duncan, his decades-long attempts to secure access to his own case files fell flat in large part because of the failure of the Criminal District Court Clerk's Office to respond to any of Calvin's inquiries.[8]

48. In 2004, the Innocence Project of New Orleans ("IPNO") (now known as Innocence and Justice Louisiana) took on Mr. Duncan's case.[9] IPNO's nearly seven years of tireless work not only called Mr. Duncan's conviction into question but developed clear evidence of his

---

3 *Calvin Duncan*, Nat'l Registry of Exonerations (Jan. 31, 2023), https://exonerationregistry.org/cases/13478; *Calvin Duncan, Post-Conviction Innocence Client*, Innocence & Just. La., https://justicelouisiana.org/clients/calvin-duncan/ (last visited Aug. 13, 2026).

4 *Id.*

5 *Id.*; Ex. B, Exoneration Documents for Calvin Duncan.

6 *Hearing on S.B. 256 Before the S. Comm. on Judiciary A*, at 05:04:01–05:06:48, 52nd Reg. Sess. (La. Mar. 31, 2026) ("Mar. 31 Senate Hearing") (testimony of Calvin Duncan), https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2026/03/0331_26_juda2.

7 *Id.* at 05:04:01–05:06:48, 05:15:05–05:16:20.

8 *Id.*; Nat'l Registry of Exonerations, *supra* note 3.

9 Innocence & Just. La., *supra* note 3.

innocence.[10] But the judge in Mr. Duncan's case refused to consider his evidence of innocence, ruling that Calvin was procedurally barred from presenting new evidence because of the age of his case. Consequently, in 2011, prosecutors presented Mr. Duncan with a coercive Hobson's Choice—either plead guilty to murder and accept a time-served sentence, by which he could secure his immediate freedom, or decline the offer and remain in prison during the course of all future attempts to prove his innocence.[11]

49. Unsurprisingly, faced with the option of obtaining his immediate freedom or an uncertain fight for his innocence while continuing to serve a life sentence, Mr. Duncan accepted the deal.[12]

***2. Once Free, Mr. Duncan Became an Outspoken Critic of Louisiana's Criminal Legal System and Proved his Innocence***

50. Having secured his liberty, Mr. Duncan did not fade into the background quietly. Instead, Mr. Duncan spoke out repeatedly against Louisiana's deeply flawed criminal legal system that repeatedly and disproportionately convicted innocent people—and especially Black people—at the behest of non-unanimous juries.[13]

51. In 2013, following Mr. Duncan's release from prison, he founded The Light of Justice Program (now affiliated with Loyola University New Orleans School of Law), which facilitates access to records and legal materials to incarcerated people.[14]

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] Mar. 31 Senate Hearing, *supra* note 6, at 05:04:01–05:16:20.

[14] *Light of Justice*, Jesuit Soc. Rsch. Inst., https://jsri.loyno.edu/programs/light-justice (last visited Aug. 13, 2026); Lily Bordelon, *The Light of Justice Program Shines Bright with New JSRI Grant*, Loyola New Orleans Maroon (Sept. 5, 2025), https://loyolamaroon.com/10045309/news/campus/the-light-of-justice-program-shines-bright-with-new-jsri-grant/; Press Release, Open Soc. Founds., *Foundations Announce 2013 Soros Justice Fellow* (May 14, 2013), https://www.opensocietyfoundations.org/newsroom/foundations-announce-2013-soros-justice-fellows.

52. Mr. Duncan enrolled at Tulane University, eventually earning a bachelor's degree in paralegal studies.[15]

53. Mr. Duncan also played a significant part in ending the unconstitutional and racist practice of using non-unanimous juries to secure criminal convictions in Louisiana and across the country. Indeed, Mr. Duncan's research and advocacy was a driving force behind *Ramos v. Louisiana*, 590 U.S. 83 (2020), the United States Supreme Court decision that struck down non-unanimous jury convictions, a practice widely understood as a legacy of slavery and Jim Crow segregation.[16]

54. Mr. Duncan knew that, without access to their criminal records, incarcerated people who had been convicted by nonunanimous juries would not be able to benefit from the *Ramos* decision, make their appeals, and meet other legal deadlines. Because New Orleans had not yet begun digitizing records, Mr. Duncan started bringing his scanner to the District Attorney's office to scan records for people who were incarcerated, to help them to meet their filing deadlines.[17]

55. Separately, Mr. Duncan continued to fight for his own formal exoneration, which he ultimately secured in 2021,[18] when an Orleans Parish criminal court judge ruled that Mr. Duncan

---

15 *Calvin Duncan, Adjunct Lecturer*, Tulane Univ. Sch. of Pro. Adv., https://sopa.tulane.edu/about-sopa/advisors-faculty-staff/calvin-duncan (last visited Aug. 13, 2026); Alicia Jasmin, *Tulane SoPA plays vital role in alum's journey from prison to JD*, Tulane Univ. Sch. of Pro. Adv. (June 1, 2023), https://sopa.tulane.edu/news/tulane_sopa_alum_calvin_duncan_earns_jd.

16 Adam Liptak, *A Relentless Jailhouse Lawyer Propels a Case to the Supreme Court*, NY Times (Aug. 5, 2019), https://www.nytimes.com/2019/08/05/us/politics/supreme-court-nonunanimous-juries.html; Nick Chrastil, *DA's office agrees to vacate 22 non-unanimous jury convictions*, Lens Nola (Feb. 26, 2021), https://thelensnola.org/2021/02/26/das-office-agrees-to-vacate-22-non-unanimous-jury-conviction; Mark Sherman, *Supreme Court: Criminal juries must be unanimous to convict*, Assoc. Press (Apr. 20, 2020), https://apnews.com/article/a4f065037299491913827b7d8eda9023.

17 Eve Abrams, *He spent decades in prison for a crime he didn't commit. Now he's an elected official*, NPR (Nov. 19, 2025), https://www.npr.org/2025/11/19/nx-s1-5611459/he-spent-decades-in-prison-for-a-crime-he-didnt-commit-now-hes-an-elected-official.

18 Nat'l Registry of Exonerations, *supra* note 3. In 2021, the Louisiana Legislature passed a law allowing defendants (who had previously pled guilty to crimes they did not commit) to challenge their convictions in circumstances where evidence of their innocence was wrongfully withheld by the prosecution.

had been unjustly convicted.[19] The judge's ruling was clear: Mr. Duncan presented evidence of his actual innocence, pursuant to La. Code Crim. P. art. 926.2, his convictions were vacated, and the District Attorney's office dismissed his indictment with prejudice.[20]

56. Then, in 2023, Mr. Duncan earned his law degree from Lewis and Clark Law School.[21]

57. Mr. Duncan never ceased speaking out about his years in prison when the Criminal District Court Clerk's office in Orleans Parish failed him.[22] He repeatedly underscored that improper recordkeeping at the Criminal District Court Clerk's office leads to wrongful convictions and how wrongful convictions disproportionately impact Black people as crime victims and criminal defendants.[23]

58. In 2023, Mr. Duncan sought to obtain $330,000 through Louisiana's statutory process for compensation for wrongful conviction.[24] Governor Landry was the Attorney General at the time, and opposed Mr. Duncan's wrongful conviction suit. Once Jeff Landry became Governor, Defendant Murrill took over as Attorney General and continued to oppose Mr. Duncan's wrongful conviction suit. In order to gain advantage in this civil matter, Defendant Murrill threatened to criminally prosecute Mr. Duncan and to challenge his moral character and fitness during his application to the Louisiana Bar if he did not drop his claim for damages.[25] Weighing the

---

19 *Id.*

20 Ex. B, Exoneration Documents for Calvin Duncan.

21 *Incoming Student Profile: Jailhouse Lawyer Who Brought Case to Supreme Court*, Lewis & Clark L. Sch. (May 12, 2020), https://law.lclark.edu/live/news/43521-incoming-student-profile-jailhouse-lawyer-who.

22 Abrams, *supra* note 17; *Man who had murder conviction tossed wins election as New Orleans chief criminal court record keeper*, CBS News (Nov. 17, 2025), https://www.cbsnews.com/news/calvin-duncan-murder-conviction-tossed-wins-new-orleans-chief-record-keeper.

23 Abrams, *supra* note 17; *Man who had murder conviction tossed wins election as New Orleans chief criminal court record keeper*, *supra* note 22.

24 Jack Brook, *A New Orleans candidate's murder conviction was tossed but the state still challenges his past*, Assoc. Press (Oct. 8, 2025), https://apnews.com/article/new-orleans-election-calvin-duncan-exonerated-murder-73d617069d9d66daffc7576bdb2b6350.

25 *Id.*

significance of the threat, and concerned about Defendant Murrill's likely ability to prevent him from practicing law, Mr. Duncan reluctantly withdrew his damages claim so that his ability to practice law would not be imperiled. This threat to Mr. Duncan's livelihood—and willingness to brazenly violate Louisiana's code of legal ethics—foreshadowed the escalated campaign of intimidation and retaliation Defendant Murrill would wage once Mr. Duncan became a candidate for office.[26]

59. In 2025, Loyola University School of Law awarded Mr. Duncan an honorary degree and invited him to deliver the commencement address to its law school class.[27]

***3. Mr. Duncan's Campaign, Platform, and Election Success***

60. In 2025, Mr. Duncan ran for and won the very office that had failed him for decades prior.

61. In July 2025, qualifying opened for the position of Orleans Parish Clerk of Criminal District Court.[28]

62. Mr. Duncan decided he was the best positioned candidate to run for that office. Indeed, he knows better than most what is at stake when criminal court records are mismanaged.[29]

63. On September 23, 2025, during a debate against then-incumbent Darren Lombard, Mr. Duncan told voters directly: "I stayed in prison for 28 and a half years . . . try[ing] to get my records

---

[26] *Id.*; *see also* La. Rules of Prof;l Conduct R. 8.4(g) ("It is professional misconduct for a lawyer to . . . [t]hreaten to present criminal or disciplinary charges solely to obtain an advantage in a civil matter.").

[27] Press Release, Loyola Univ. New Orleans, *Tech Entrepreneur Tom Gruber, Major General Angela Salinas, and Justice Advocate Calvin Duncan to Speak, Receive Honorary Degrees at 2025 Loyola University Commencement Ceremonies* (Apr. 9, 2025), https://www.loyno.edu/news/apr-09-2025_tech-entrepreneur-tom-gruber-major-general-angela-salinas-justice-advocate-calvin.

[28] Erin Lowrey, *Orleans Parish Oct. 11 Open Primary Election results*, WDSU (Oct. 11, 2025), https://www.wdsu.com/article/new-orleans-oct-11-election-results/67963033; Mar. 31 Senate Hearing, *supra* note 6, at 05:06:51–05:07:10.

[29] *Calvin Duncan, Clerk-Elect*, https://web.archive.org/web/20260504184406/https://calvinforclerk.com/platform (last visited Aug. 14, 2026); Mar. 31 Senate Hearing, *supra* note 6, at 05:04:01–05:06:48, 05:15:05–05:16:20.

. . , . I don't ever want it to happen to nobody else."[30] He continued: "I know the consequence[s] of getting it wrong, I know the consequence[s] of [why,] when records are not properly stored and not properly secured, . . . victims cannot get the justice they deserve."[31]

64. New Orleans voters responded to Mr. Duncan's message, earning him 47% of the votes across all precincts in Orleans Parish during the October election.[32]

65. Because no candidate earned over 50% of the October vote, a November run-off was scheduled between Mr. Duncan and Darren Lombard, the incumbent Clerk of Criminal District Court.

66. In the November 2025 runoff election, Mr. Duncan triumphed with more than 68 percent of the vote. Approximately 38,681 New Orleans residents decided to elect Mr. Duncan to represent them as their Clerk of Criminal District Court.[33]

67. Mr. Duncan's defeat of an incumbent has since been hailed as one of the most decisive electoral victories in Orleans Parish history.[34]

68. Mr. Duncan ran and won on a platform championing criminal justice reform, for which he has now been targeted and punished. Given the disproportionate impact of mass incarceration

---

[30] Sula Kim, *Orleans Parish clerk of criminal court race heats up ahead of runoff* (Video), at 00:36–00:46, WDSU (Nov. 11, 2025), https://www.wdsu.com/article/orleans-parish-clerk-of-criminal-court-race-heats-up-runoff/69384944#:~:text=%2C%22%20said%20Lombard.-,Duncan%20highlighted%20the%20importance%20of%20proper%20record%20storage%2C%20stating%2C%20%22,get%20the%20justice%20they%20deserve.%22; WDSU, *Hot Seat: Orleans Clerk of Criminal District Court* 01:02–02:05 (Sept. 23, 2025), https://www.youtube.com/watch?v=JWcZL7o42rg.

[31] Kim, *supra* note 30.

[32] Robert Stewart, *'Jailhouse lawyer' Calvin Duncan leads clerk vote as 'Fair Chance' amendment passes*, WWNO (Oct. 11, 2025), https://www.wwno.org/politics/2025-10-11/jailhouse-lawyer-calvin-duncan-leads-clerk-vote-as-fair-chance-amendment-passes.

[33] Greg LaRose, *Former 'prison lawyer' wins Orleans clerk of court election*, La. Illuminator (Nov. 15, 2025), https://lailluminator.com/2025/11/15/duncan-clerk.

[34] *Id.*

on Black people in this country, advocates for criminal justice reform are, by their very nature, advocates for racial justice.[35]

69. In Louisiana, 66% of people incarcerated in prison are Black, despite Black people making up only 32% of the general population. By contrast, 34% of Louisiana's prison population is white (non-Hispanic), despite making up 58% of the general population.[36] The Louisiana State Penitentiary is located on land that was originally an 8,000-acre plantation in West Feliciana Parish named Angola Plantation, in reference to the imagined homeland of the Black people enslaved there. Today colloquially referred to as "Angola," the Louisiana State Penitentiary, where Mr. Duncan was incarcerated for over two decades, is 74% Black.[37]

70. In addition, 84% of the overall wrongful convictions in Louisiana concern Black people, and 96% of wrongful imprisonments lasting over 25 years concern Black people. One-hundred (100) percent of wrongfully convicted children in Louisiana were Black.[38] Nationally, 61% of all exonerations in 2024 involved Black people, according to the National Registry of Exonerations' 2025 Report.[39]

71. Mr. Duncan's reform efforts—specifically, to ensure federal and state constitutional rights are available to all—would have the natural effect of addressing those disparities. As a jailhouse lawyer at Angola, Mr. Duncan helped hundreds (if not thousands) of incarcerated people access their records and file motions in court for post-conviction relief and to overturn wrongful

---

[35] Liptak, *supra* note 16.

[36] *Louisiana Profile*, Prison Pol'y Initiative, https://www.prisonpolicy.org/profiles/LA.html (last visited Aug. 13, 2026) (comparing Louisiana's resident and incarcerated).

[37] Am. C.L. Union & Univ. of Chi. L.Sch. Glob. Hum. Rts. Clinic, *Captive Labor: Exploitation of Incarcerated Workers* 34 (June 15, 2022), https://www.aclu.org/publications/captive-labor-exploitation-incarcerated-workers.

[38] *Wrongful Convictions in Louisiana*, Innocence & Just. La., https://justicelouisiana.org/criminal-justice-issues/wrongful-convictions/ (last visited Apr. 19, 2026).

[39] Nat'l Registry of Exonerations, *2025 Annual Report* 2 (Apr. 6, 2025), https://exonerationregistry.org/sites/exonerationregistry.org/files/documents/2025Exonerations.pdf.

convictions.[40] Given that Angola's population is majority Black, these efforts overwhelmingly benefitted Black people in prison. Mr. Duncan, for his part, has regularly emphasized the racialized nature of Louisiana's criminal legal system.

72. Mr. Duncan co-founded the Visiting Room Project, which interviews men serving life without parole at Angola, the majority of whom are Black.[41]

73. As described *supra* ¶¶ 50–54, Mr. Duncan played a pivotal role in ending Louisiana's practice of conviction by non-unanimous juries, which are often referred to by advocates for criminal justice reform as "Jim Crow Juries."[42] The practice of non-unanimous jury convictions became law in 1898 when it was enshrined in the Louisiana Constitution with the explicit purpose of "establish[ing] the supremacy of the white race in the state."[43]

74. As a candidate for Clerk of the Criminal District Court, Mr. Duncan pledged that he would properly preserve case records and evidence, understanding that failing to do so can lead to wrongful convictions, which disproportionately impact Black New Orleanians.[44] He pledged to make it easier for incarcerated people, the majority of whom are Black, to exercise their rights by giving them easier access to their court records.[45]

75. Mr. Duncan's platform also centered on public-facing communications about elections, voting rights, and the court: providing the community clear and accurate information on how elections work and how to register and vote; standing against political interference and protecting

---

40 Liptak, *supra* note 16.

41 *About Angola*, Visiting Room Project, https://www.visitingroomproject.org/about/?about=2 (last visited Aug. 13, 2026).

42 *Id.*

43 Jessica Rosgaard & Wallis Watkins, *The History of Louisiana's Non-Unanimous Jury Rule*, WWNO (Oct. 22, 2018), https://www.wwno.org/politics/2018-10-22/the-history-of-louisianas-non-unanimous-jury-rule.

44 *Calvin Duncan, Clerk-Elect*, *supra* note 29.

45 *Id.*

against any attempts at election interference or political intimidation; and providing useful information to help everyday people navigate the court system in person and online.

#### ***4. The Attorney General Threatened Mr. Duncan for His Protected Speech During the Campaign***

76. Defendants' coordinated effort to prevent Mr. Duncan from serving as Clerk of Criminal District Court of Orleans Parish began well before his election. Indeed, Defendants coordinated to intimidate and threaten Mr. Duncan on the campaign trail.

77. In the lead up to the October 2025 primary, Defendant Murrill, the highest-ranking attorney in the State who represents all state actors in their line of duty, including Defendants Landry and Landry, took the extraordinary and unprecedented step of using her official office to publicly attack and threaten retaliation against Mr. Duncan if he continued to speak about his exonerated status during the course of his campaign, in an attempt to prevent him from winning the election.

78. On September 30, 2025, Defendant Murrill sent Mr. Duncan a letter demanding that he "cease representing to the public that [he was] 'exonerated' to avoid further action from this office."[46]

79. The Attorney General shockingly claimed that Mr. Duncan's exoneration—already documented in court records, the National Registry of Exonerations, recognized by a sitting judge of the state, and acknowledged by the Orleans District Attorney's Office—was improper.[47]

80. She wrote that the circumstances surrounding the vacatur of his conviction caused her "grave concern about abuse and manipulation of the justice system," even though she

---

[46] *See* Ex. C.

[47] Travers Mackel, *AG Elizabeth Murrill questions the past of New Orleans political candidate*, WDSU (Oct. 2, 2025), https://www.wdsu.com/article/calvin-duncan-murrill-williams-letter/68162121.

acknowledged that "criminal court records confirmed that Mr. Duncan's conviction was vacated in 2021."[48]

81. There is no question that, in an attempt to discourage voters from electing Mr. Duncan into office, her letter sought to interfere with an election, by not only publicly casting doubt on the legitimacy of Mr. Duncan's innocence during the course of his campaign, but also implicitly threatening State retaliation if he managed to secure the office for which he was running.[49]

82. The following day, then-incumbent Lombard took up the coordinated state officials' strategy by pursuing a temporary restraining order ("TRO") against Mr. Duncan seeking to prevent him from (among other things) using the word "exonerated," telling the truth that "the Orleans Parish Clerk of Criminal Court denied him access to the records he needed to challenge his wrongful conviction," and publicly stating that Mr. Duncan "was in prison for a crime he did not commit[.]"[50] The request for a temporary restraining order was built on the Attorney General's letter and public statements and directly challenged Mr. Duncan's innocence.[51]

83. Notably, the sworn and notarized verification of the complaint, signed by Mr. Lombard, is dated September 29, 2025—*one day prior* to Attorney General Murrill's letter to Mr. Duncan. And yet, the complaint includes lengthy excerpts from the letter, suggesting, perhaps, that Mr.

---

48 *Id.*; Sophie Kasakove & James Finn, *Elizabeth Murrill accuses New Orleans criminal clerk candidate of misrepresenting his case*, Times Picayune (Oct. 2, 2025), https://www.nola.com/news/politics/liz-murrill-calvin-duncan/article_3025f33e-fd02-4a2d-b287-7f35f5b9fcbd.html; John Simerman, *AG Murrill stands by criticism of criminal clerk candidate, who fires back*, Times Picayune (Oct. 2, 2025), https://www.nola.com/news/new-orleans-criminal-clerk-candidate-defends-exoneration-claim/article_65f7f444-9405-49cc-b0d9-42faf1867169.html; James Finn, *New Orleans criminal clerk race gets heated as incumbent attacks challenger's record*, Times Picayune (Sept. 26, 2025), https://www.nola.com/news/politics/clerk-calvin-duncan-darren-lombard/article_3fea6199-7ea9-4e53-a85e-45791a16592e.html.

49 *Id.*

50 Katy Reckdahl, *'I'll fight for your rights like I fought for my own freedom'*, Lens Nola (Oct. 10, 2025), https://thelensnola.org/2025/10/10/ill-fight-for-your-rights-like-i-fought-for-my-own-freedom.

51 *Id.*

Lombard was aware the letter would be sent prior to Mr. Duncan, and was in possession of the letter or its text before it was transmitted to Mr. Duncan and published to the public.

84. Mr. Lombard later withdrew the petition, having been denied the TRO for failure to comply with the legal requirements of seeking a restraining order under the Election Code.

85. Also on Wednesday, October 1, 2025, the day after she sent her initial letter, Defendant Murrill doubled down on the State's quest to retaliate against Mr. Duncan if he continued to talk about his status as an exonerated person: "Lombard can do whatever he wants with my letter because it's a public record. I sent the letter to Duncan because Duncan is improperly representing that he was 'exonerated,' when he was not."[52] Defendant Murrill vowed to take "further action" against Mr. Duncan if he did not stop calling himself exonerated.[53]

86. In response to Defendant Murrill's threats, more than 100 attorneys issued a widely disseminated statement defending Mr. Duncan, writing that the facts, the law, and the procedural history were clear: "Calvin Duncan was wrongly convicted, he has proved his innocence, and he is now fully exonerated."[54]

87. Despite Defendant Murrill's attempt to implement the first step of the conspiracy to prevent Mr. Duncan from taking office, *i.e.*, to cause him to lose the election, Mr. Duncan won.

88. By April 20, 2026, Mr. Duncan had received his Commission Certificate, Criminal District Clerk of Court identification badge, and Oath of Office forms from the Secretary of State's

---

52 Mackel, *supra* note 47.

53 *Id.*; Simerman, *supra* note 48.

54 Legal Professionals' Statement on Calvin Duncan's Innocence and Exoneration, https://docs.google.com/document/d/1wJive9dA-PRgRXDERE4PvrOfBz3zN9yC59hHP_0v9j4 (last visited Aug. 13, 2026); Reckdahl, *supra* note 50; Jack Brook & Sarah Cline, *Louisiana GOP races to eliminate an elected office won by an exonerated man*, Assoc. Press (Apr. 9, 2026),https://apnews.com/article/new-orleans-criminal-clerk-calvin-duncan-exonerated-d247677aa601a85cac604645d50fc739.

Office.[55] On April 21, 2026, Mr. Duncan was sworn into office, as authorized by La. Rev. Stat. § 42:141(B),[56] and was thus set to take office at midnight on May 4, 2026.

***5. At the Governor's Direction, the Legislature Enacted the Landry Act To Prevent Mr. Duncan from Taking Office***

89. Meanwhile, as the 2026 Spring legislative session opened, Governor Landry, who sets the priorities for the legislature, gave clear direction to legislators that they should act swiftly to implement his agenda.[57] Unable to defeat Mr. Duncan through the electoral process, Governor Landry took up the cause of trying to unseat Mr. Duncan after he was duly elected.

90. Senator Morris, a Republican who represents Monroe, a city in the northeast corner of Louisiana over 200 miles away from New Orleans, has no constituent interest in the administration of Orleans Parish criminal courts.[58] And yet, he pre-filed SB 256 on February 26, 2026, at the Governor's behest, and introduced it during a committee hearing on March 31, 2026.[59] During the committee hearing on March 31, he admitted that SB 256 lacked any supportive studies or data to back it but introduced it nonetheless.[60]

91. In fact, SB 256 was never supported by any objective evidence: no study was ever commissioned to identify inefficiencies in Orleans Parish's separate-clerk system, and the fiscal

---

[55] *See* Ex. A.

[56] Alyssa Curtiz, '*A slap in the face': Proposed New Orleans court overhaul could eliminate incoming Clerk Calvin Duncan*, WWL (Mar. 30, 2026), https://www.wwltv.com/article/news/local/local-politics/a-slap-in-the-face-proposed-court-overhaul-in-new-orleans-could-eliminate-incoming-clerk-calvin-duncan/289-431070fb-36e0-49ee-8883-09e70eb50ea7.

[57] Press Release, La. Off. of Governor, *Governor Jeff Landry Opens Third Regular Session* (Mar. 9, 2026), https://gov.louisiana.gov/news/governor-jeff-landry-opens-third-regular-session; Daniel Miller, *Louisiana Republicans push to eliminate an elected office won by exonerated man*, Live Now Fox (Apr. 10, 2026), https://www.livenowfox.com/news/louisiana-gop-eliminate-elected-office-exonerated-man.

[58] *State Senator John C. "Jay" Morris III, District 35*, La. Senate, https://senate.la.gov/smembers?ID=35 (last visited Aug. 13, 2026).

[59] S.B. 256, 52d Reg. Sess. (La. 2026), https://legis.la.gov/legis/BillInfo.aspx?i=250431.

[60] *Id.*

note prepared by the Legislative Fiscal Office was "indeterminate" as to whether SB 256 would reduce costs.

92. The intent of SB 256, in line with Governor Landry's direction, was to prevent Mr. Duncan specifically from serving as Clerk of Criminal District Court during the 2026 term by installing Ms. Napoleon as the new Clerk of Court.[61]

93. To accomplish this goal, SB 256 proposed to merge the Orleans Parish Clerk of Criminal District Court with the Orleans Parish Clerk of Civil District Court, eliminating those positions entirely and creating a new position: the Orleans Parish Clerk of Court.[62]

94. To ensure the bill would become law before Mr. Duncan would take office on May 4, 2026, from early on, SB 256 provided that the Act would take effect immediately upon Governor Landry's signature.[63]

95. On the Senate Floor, Senator Morris made plain that this effective-upon-signature language was included at the behest of the Governor who sought "[t]o go ahead and get [SB 256 passed into law] before Mr. Duncan takes office."[64] Without it, Morris said, "we'd probably have to pay [Mr. Duncan] for the next four years in a job that is gonna be eliminated. So, it would make him an immediate lame duck."[65]

96. Indeed, when asked whether he had consulted with the Attorney General about the potential for legal claims being raised as a result of this language, Senator Morris acknowledged

---

61 Kaylee Poche, *Louisiana GOP Races to Keep an Exonerated Black Man from Taking Office in New Orleans*, Gambit (Apr. 16, 2026), https://www.nola.com/gambit/news/politics_elections/louisiana-house-panel-passes-new-orleans-clerk-of-court-bill/article_638bacdd-b7c7-45b4-a530-75896f2435a5.html.

62 *Id.*; Robert Stewart, *Under bill passed by state Senate, New Orleans' elected court clerk might not be able to take office*, Verite News (Apr. 9, 2026), https://veritenews.org/2026/04/09/senate-bill-256-calvin-duncan-clerk/.

63 S.B. 256, *supra* note 59; Ex. D-1, Unofficial Transcript of April 8, 2026 Senate Floor Debate on SB 256, at 01:46:05–01:48:00.

64 *Id.*

65 *Id.*

that he understood the state constitution prevented shortening an official's term once he took office and thereby confirmed that SB 256 was designed to ensure Mr. Duncan would not serve his term as Clerk of the Criminal District Court.[66]

97. Senator Duplessis pressed Senator Morris as to the suspicious timing, given the already widespread and publicly voiced fears of retaliation by the Governor against Mr. Duncan: "If we needed to consolidate the offices so badly, why wasn't this Bill brought last year?"[67]

98. In response, Senator Morris stated candidly that he was following the Governor's directives: "Well. I don't know. I didn't think about bringing it last year. And this is in *the Governor's package*. So maybe it's something *got his attention as well*."[68]

99. Senator Duplessis proposed an amendment to make the act effective on May 4, 2030—meaning it would not have gone into effect until after Mr. Duncan had served the term to which he was elected, consistent with all prior legislative efforts to change the Orleans Parish court system, including efforts to consolidate the clerks' offices, since 2006, as described *supra* ¶¶ 31–43. The proposed Duplessis amendment would have allowed the voters of Orleans Parish to elect the first Clerk of Court during a general election prior to May 4, 2030. That amendment was rejected.

100. Mr. Duncan told the Senate Judiciary A Committee that the passage of SB 256 is "a sad statement for this committee to send to New Orleans that your vote did not count."[69]

---

66 *Id*. at 01:46:56–01:48:47;0 1:56:31.

67 *Id.* at 01:46:12:19.

68 *Id*. at 01:46:19:00 (emphases added).

69 Mar. 31 Senate Hearing, *supra* note 6, at 05:11:27–05:11:36.

101. Nevertheless, on April 8, following Senator Morris's testimony, the Louisiana Senate voted 25 to 11 to pass SB 256.[70] Not a single Orleans Parish-based senator voted in favor of the bill.[71]

102. SB 256 was then set for a vote before the House Judiciary Committee on April 16, 2026.[72]

103. That day, in committee, prior to the vote, Mr. Duncan and others continued to express concerns. Mr. Duncan stated: "I sincerely and honestly believe I'm being targeted." Republican Representative Kathy Edmonston also expressed her concerns about the impact of SB 256 on voters: "I'm just really concerned with the people's right to vote for who or what they want to vote for. . . . I mean, this doesn't have anything to do with anything else to me but integrity."[73]

104. That same day, when pressed about how SB 256 would operate in practice, Senator Morris did not provide answers. He acknowledged that the integration of the Criminal and Civil Clerks' offices could take a long time, and that he anticipated litigation over SB 256—yet SB 256 was still made to take effect immediately, with no implementation window or plan for such implementation.

105. There was also testimony in committee that, although the assumption seemed to be SB 256 would make Ms. Napoleon the new consolidated Clerk of Court, the bill as then written

---

70 *S. Journal*, La. St. Sen., 52nd Reg. Sess., 14th Day's Proc. 359–60 (Apr. 8, 2026), https://senate.la.gov/Journals/2026/RS/26RS%20-%20SJ%200408%2014.PDF; Bernard Smith, *Louisiana Senate Rejects Amendment to Let Newly Elected Clerk Calvin Duncan Serve His Term*, WWNO (Apr. 9, 2026), https://www.wwno.org/law/2026-04-09/louisiana-senate-rejects-amendment-to-let-newly-elected-clerk-calvin-duncan-serve-his-term.

71 *S. Journal*, La. St. Sen., 2026 Reg. Sess., at 359–6

72 Matt Bruce, *Senate bill to merge Orleans Parish clerks of court clears Louisiana House committee*, Times Picayune (Apr. 16, 2026), https://www.nola.com/news/courts/louisiana-senate-approves-bill-merge-orleans-court-clerks-local-opposition/article_cd064ac9-fb18-41cd-bffa-28c3aec19f40.html.

73 Poche, *supra* note 61 (internal quotation marks omitted).

would likely necessitate a special election because the bill was actually silent as to who the new consolidated Clerk of Court would be.

106. The bill ultimately passed committee with 8 yeas, 5 nays, and 1 abstention.[74]

107. But in a blatant attempt to avoid a special election—which Mr. Duncan could win—on April 23, 2026, House Representative Dixon McMakin introduced an amendment at Governor Landry's behest that explicitly acknowledged that the sitting Civil District Court Clerk would assume, by legislative appointment, the new position of Orleans Clerk of Court for the upcoming term.[75] This last-minute amendment was put forth to satisfy the Governor's agenda to unseat Mr. Duncan, and passed the House that same day, April 23, 2026.

108. On April 29, 2026, the Senate concurred in that amendment, and the legislature sent to the Governor for signature the amended bill, which provided that the Governor's signature would immediately appoint Ms. Napoleon to a vacant office for which no election had been held.

109. The next day, April 30, 2026—just two business days before Mr. Duncan's term was set to begin—the Governor signed SB 256 into law as the Landry Act.

---

[74] Bruce, *supra* note 72.

[75] S.B. 256, *supra* note 59. The text of the Second Landry Amendment reads: "Section 4. The provisions of this Act shall not reduce the current term of office of the clerk of criminal district court for the Parish of Orleans on the effective date of this Act. The office of clerk of criminal district court for the Parish of Orleans shall be abolished at the end of May 3, 2026, and before the term of any other criminal clerk of court begins. Immediately thereafter, the authority, functions, duties, and responsibilities of the office of clerk of criminal district court for the Parish of Orleans, and all of the books, papers, records, monies, actions, and other property of every kind and description, movable and immovable, real and personal, possessed, controlled, or used by the office of the clerk of criminal district court for the Parish of Orleans shall be transferred and owned, possessed, controlled, and used by the clerk of the civil district court for the Parish of Orleans, who shall thereafter be referred to as the clerk of court for the Parish of Orleans."

110. This was no surprise. When asked about SB 256 previously, the Governor had stated: "Not only am I going to sign it, I'm going to absolutely support it and make sure it's passed."[76]

111. The Governor's decision to sign, and the timing of that signature, were deliberate and consequential. Absent the immediate-effective-date amendment, SB 256 would have taken effect in the ordinary course on August 1, 2026; even under the amended text, if the Governor had left the bill unsigned, it would not have taken effect on April 30, 2026. Rather than allow the Act to become effective later, Governor Landry signed it on April 30, 2026, personally accelerating its effective date to the eve of Mr. Duncan's term for the express purpose of ensuring that Mr. Duncan could not serve that term.

***6. Ms. Napoleon's Preparations Confirmed the Plan to Transfer the Office Without an Election***

112. Ms. Napoleon coordinated with Defendants and shared their unlawful objective to install Ms. Napoleon in—and thereby to keep Mr. Duncan out of—the office to which he was elected. As SB 256 made its way through the Legislature, Ms. Napoleon prepared to take office as Clerk of Court, revealing that she understood and acted in furtherance of the plan to transfer the criminal clerk's authority to her without any election for that role.

113. On February 27, 2026, Ms. Napoleon received oath of office forms and took her oath for the office of Clerk of Civil District Court, just one day after SB 256 was pre-filed. Her commission identified her existing Civil District Court office, not any new parish-wide clerk

---

[76] Matt Bruce, *New Orleans criminal clerk-elect Calvin Duncan takes oath of office as legislature weighs axing seat*, NOLA.com (Apr. 21, 2026), https://www.nola.com/news/courts/new-orleans-criminal-court-clerk-calvin-duncan-swearing-in/article_be71c24a-bb9b-4c7d-a9c6-effc04a73965.amp.html.

position. Notably, Ms. Napoleon ran for Civil Clerk of Court unopposed and in the absence of any contested election; her new position did not appear on the ballot in 2025.[77]

114. Unlike Mr. Duncan, who prior to May 4 was barred by his predecessor from touring the Criminal District Court Clerk's Office, Ms. Napoleon was invited to and did tour the Office, in or around the first few weeks of April 2026.

115. Ms. Napoleon also appeared before the Legislature to testify during hearings about SB 256, including about her qualifications for the new role. She later testified that legislators contacted her when SB 256 first appeared and asked her to provide operational and factual information.

**C. <u>Mr. Duncan and the City Challenge the Landry Act as Defendants Enforce It</u>**

116. On April 29, 2026—the same day both houses of the Louisiana Legislature passed SB 256 and sent it to the Governor for signature—Mr. Duncan filed his original verified complaint and an emergency motion for a temporary restraining order in this Court, seeking to assume the office of Clerk of Criminal District Court at 12:00 a.m. on May 4, 2026. *See* Compl., ECF No. 1.

117. The next day, on April 30, 2026, following a status conference before this Court, Governor Landry signed SB 256 into law as the Landry Act, which Defendants contend rendered it effective immediately.

118. On May 3, 2026, this Court issued a 49-page Ruling and Order. Although the Court declined to compel the State to install Mr. Duncan, it enjoined Governor Landry and Secretary of State Nancy Landry from (1) enforcing the Landry Act; (2) certifying the Clerk of Civil District Court as the Clerk of Court for the Parish of Orleans; and (3) issuing that official a commission for the position. *See* Order, ECF 13.

---

[77] *Orleans Parish Civil Clerk of Court*, https://www.orleanscivilclerk.com/ (last visited Aug. 13, 2026).

119. In granting that relief, the Court found that Mr. Duncan had shown a substantial likelihood of success on the merits of his federal claims, concluding that *Duncan v. Poythress*, 657 F.2d 691 (5th Cir. 1981), was "directly controlling" on the facts alleged here.

120. That same night, Defendants sought a writ of mandamus and an emergency stay from the United States Court of Appeals for the Fifth Circuit. Approximately thirteen hours after this Court's order, the Fifth Circuit administratively stayed it, and Defendants have enforced the Landry Act as though it remained in effect ever since. *See In re Landry*, No. 26-30249 (5th Cir. filed May 4, 2026).

121. In the meantime, pursuant to their authority, Defendants have enforced, and intend to continue to enforce, the Landry Act as effectuating the immediate abolition of the office to which Mr. Duncan was elected, certified, and commissioned. And Defendants' willingness to enforce the Landry Act in violation of Mr. Duncan's rights under the U.S. Constitution is clear. They are actively doing so—on multiple fronts, in multiple courts, simultaneously.

122. Defendants are currently using every tool at their disposal to keep Ms. Napoleon in place as the purported clerk of court. They have threatened legal action, including criminal penalties and forfeiture of public office, against the New Orleans City Council for appointing an interim clerk to this post, for which no one had been elected; and they asked the Louisiana Supreme Court to exercise its plenary jurisdiction to "unambiguously declare" Napoleon the Orleans clerk of court.[78]

123. On May 7, 2026, Ms. Napoleon held a press conference announcing her assumption of the new parish-wide Clerk of Court's office, in a transition she said would pose some

[78] *See* Emergency Application for Supervisory Writs of the State of Louisiana & Its Officials for Expedited Consideration, *Crockett v. Louisiana*, No. 2026-CV-594 (La. May 8, 2026).

"challenges." Ms. Napoleon had not been elected to the newly created position, had never appeared on a ballot in connection with it, and had received no commission for it.

124. On the morning of May 8, the New Orleans City Council issued public notice that it would hold a meeting the following Monday to declare a special election for Clerk of Court and appoint an interim clerk.

125. That same day, District Attorney Jason Williams wrote a letter to the New Orleans City Council, urging them to appoint an interim Clerk of Court and hold a special election, warning that "[e]very criminal filing, evidentiary submission, certification, and record maintained by an unlawfully installed Clerk invites future litigation and collateral attack." *See* Ex. F.

126. On May 8, 2026, Mayor Moreno wrote a letter to the Council in support, stating that "New Orleans voters participated in separate elections under the prior legal structure for distinct civil and criminal clerk positions and were never given the opportunity to vote for this novel, consolidated office" and that the matter was "not about politics or personalities" but about "ensuring that the public maintains confidence in our democratic institutions." *See* Ex. G.

127. In response, Defendant Murrill sent a letter to the City Council President that same day urging the Council not to call a special election, threatening civil action if it proceeded, and stating that she would seek the Louisiana Supreme Court's intervention to confirm Ms. Napoleon as the lawful clerk.

128. On May 11, 2026, the New Orleans City Council held a special meeting and, after public comment and debate, adopted Resolution R-26-194 calling a special election for November 3, 2026 (with a runoff for December 12, 2026) and Resolution R-26-195 appointing retired Judge Calvin Johnson as interim Clerk of Court. The Council acted pursuant to Louisiana's Election Code, La. Rev. Stat. §§ 18:602(A), 18:402(E), which provides that when a vacancy occurs in an

elected office in Orleans Parish, the governing authority is responsible for filling the vacancy on an interim basis within twenty days. Judge Johnson was a qualified and well-respected jurist with no interest in qualifying for the special election.

129. Two days later, on May 13, 2026, Defendant Murrill sent a letter to each City Council member who voted in favor of the resolutions, as well as to Mayor Moreno, District Attorney Williams, and Judge Johnson. *See* Ex. H.

130. In her letters, Defendant Murrill asserted that the Council's actions "trigger serious consequences under Louisiana's usurper statutes, including the possible forfeiture of your own office," and demanded that they "immediately rescind or suspend implementation of [the resolutions] as well as officially retract your support for this usurpation of Chelsey Richard Napoleon's office and take no further action supporting or recognizing the fictional new office or Judge Johnson's appointment to it." Defendant Murrill threatened that Governor Landry would remove the Mayor, the District Attorney, and the five Council members and appoint their replacements.

131. As to Judge Johnson, whom Defendant Murrill acknowledged was "an innocent bystander to the Council's ultra vires action," she warned that he "would face personal exposure for fines or imprisonment." These threats were made even though the Council had acted under authority of the Louisiana Election Code, in reliance on legal guidance, and despite Defendant Murrill's own prior recognition that the legal landscape was uncertain absent guidance from the Louisiana Supreme Court.

132. Meanwhile, on May 8, 2026, pro se plaintiff Gary Crockett obtained a preliminary injunction in state court in the 19th Judicial District Court ("JDC") prohibiting further "physical consolidation" of the clerks' offices. That same day, Defendant Murrill filed an emergency

application in the Louisiana Supreme Court in Crockett's case, bypassing ordinary appellate procedure and asking the Court to exercise its plenary supervisory jurisdiction to dissolve the injunction and to "declare that Ms. Napoleon is the lawful Orleans clerk of court."[79]

133. On May 10, 2026, the Louisiana Supreme Court stayed the proceedings in *Crockett*. After the Council appointed Judge Johnson on May 11, 2026, Ms. Napoleon filed her own lawsuit the next day in the 19th JDC against Council President Morrell, Mayor Moreno, and Judge Johnson, seeking a declaration that she is the lawful clerk, a temporary restraining order, preliminary and permanent injunctions, and quo warranto relief. Her request for a TRO was denied, and the court set a hearing for May 18, 2026.

134. On May 14, 2026, the Louisiana Supreme Court issued a special order assuming plenary supervisory jurisdiction over both the *Crockett* and *Napoleon* cases—to which Mr. Duncan was not a party—staying all lower court proceedings, enjoining Judge Johnson from executing any duties, and enjoining all officials from interfering with Ms. Napoleon's exercise of her duties under the Landry Act pending further orders. The Court ordered expedited briefing on whether the Landry Act violated the federal or state constitutions and whether it created a vacancy authorizing the City's actions, and on June 1, 2026, issued a decision upholding the Landry Act as a valid exercise of the Legislature's authority under Article V, Section 32 of the Louisiana Constitution. *See Crockett v. State*, 2026-CD-00594 (La. June 1, 2026).

135. In its June 1, 2026 per curiam opinion, the Louisiana Supreme Court addressed two questions: (1) whether the Landry Act violated the Louisiana Constitution, and (2) whether the Act created a vacancy requiring a special election.[80] On the first, the Court held that Article V, Section

[79] *See id.* at 9.

[80] Opinion, *Crockett*, No. 2026-CV-594 (La. June 1, 2026) (per curiam).

32's grant of plenary authority to the Legislature to "change by law" the Orleans Parish clerks' offices was dispositive, and that the Act did not violate any provision of the Louisiana Constitution.[81] On the second, the Court held that the "clear language of Act 15 unequivocally demonstrates it did not create a new office"; rather, the Legislature had merely expanded the civil clerk's duties, renamed the office, and abolished the criminal clerk's office, and Ms. Napoleon continued in the same office to which she was elected.[82]

136. Critically, the *Crockett* Court did not address Mr. Duncan's federal constitutional claims. Indeed, he was not a party to those proceedings. Although the Court stated that "nothing in the United States Constitution shields a state office from abolition by its own legislature," and that elected officials have no federally protected right to their offices, it did not consider whether the Landry Act was enacted to retaliate against Mr. Duncan for his protected speech, whether it constitutes a bill of attainder, whether it works a post-election nullification in violation of the Equal Protection Clause, or whether it denies the voters of Orleans Parish the due process protections that attach to a completed election. In short, Mr. Duncan was not a party to *Crockett*, he did not brief any issue therein, and the federal claims he raises in this action were neither litigated nor decided.

137. The Louisiana Supreme Court set a June 5, 2026 deadline for rehearing and thereafter denied all requests for rehearing without opinion.

---

81 *Id.* at 5–7.

82 *Id.* at 7.

**D. The Landry Act Perpetuates Louisiana's Historical Racial Disenfranchisement**

138. Unfortunately, the adoption and implementation of the Landry Act does not exist in a vacuum. Its targeting of a Black politician to disenfranchise primarily Black voters is part of a larger pattern.

139. Mr. Duncan was elected to serve the predominantly African American residents of Orleans Parish.[83] Orleans Parish voters understood that he—as both a Black man and exoneree directly impacted by Orleans Parish's poor criminal recordkeeping practices—is uniquely equipped to improve criminal-court recordkeeping, particularly given that 80% of those arrested in New Orleans are Black despite comprising only 54% of the population.[84]

140. These disparities are historic and lasting. Orleans Parish is a majority-minority jurisdiction that federal courts have recognized as such, acknowledging its history of racial segregation, voting discrimination, and discriminatory gerrymandering.[85]

141. By contrast, the legislature that overrode the will of Orleans Parish voters is overwhelmingly white and Republican.

142. Opposing SB 256 on the Senate floor, Senator Duplessis noted this history of racial disenfranchisement, drawing a parallel to John Willis Menard—a Black man elected in 1868 to represent Louisiana's 2nd Congressional District after the Civil War, who was likewise barred from the office to which he had been duly elected.[86]

---

[83] U.S. Census Bur., Quick Facts: New Orleans, Louisiana, https://www.census.gov/quickfacts/fact/table/neworleanscitylouisiana/PST045225 (last visited Aug. 14, 2026).

[84] Michelle Liu, *New Orleans police say their use of force data shows no racial disparities. We checked the numbers*, Verite News (Oct. 31, 2024), https://veritenews.org/2024/10/31/nopd-consent-decree-force-racial-disparity/.

[85] *See Bush v. Orleans Parish Sch. Bd.*, 138 F. Supp. 336 (E.D. La. 1956) (striking down legally mandated racial segregation in New Orleans public schools); *Chisom v. Roemer*, 501 U.S. 380 (1991) (recognizing Orleans Parish as a majority-Black jurisdiction and holding that at-large judicial elections diluted minority voting strength under Section 2 of the Voting Rights Act).

[86] *Hearing on S.B. 256 Before the S. Comm. on Judiciary A*, at 01:51:00–01:56:24, 52nd Reg. Sess. (La. Apr. 8, 2026) ("Apr. 8 Senate Hearing"), https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2026/04/0408

143. Moments before the Senate passed the First Landry Amendment, Senator Duplessis represented how many New Orleans voters felt witnessing their votes cast aside, referencing PBS Pinchback, who had succeeded to the office of governor in 1872. "For the few days he served as the first Black governor of Louisiana. But we often don't hear the story about when he ran and was elected to serve in the U.S. Senate and was not allowed to serve for whatever reasons were given, just like whatever reasons were given today, why Calvin Duncan will not be allowed to serve."[87]

144. On April 16, 2026, the NAACP Legal Defense Fund ("LDF") wrote to the Louisiana House Committee on Judiciary underscoring the Governor's retaliatory motive, describing SB 256 as "retaliation against Clerk-Elect Duncan, a formerly incarcerated person whose conviction was vacated, and who has been critical of the current administration's handling of court records." LDF added that the bill "is an attack on the rights of voters in Orleans Parish—a racially-diverse electorate comprised of a significant number of Black voters" that "threatens to defy the will of Orleans Parish voters and deny them their right to have their recently elected candidate of choice, Calvin Duncan, serve them as Clerk of Orleans Parish Criminal District Court." *See* Ex. E.

145. The Landry Act fits this documented pattern. It stripped an elected office from a Black exoneree chosen by a majority-Black electorate in the one Louisiana parish that elects a distinct Criminal District Court Clerk, while the voters of every majority-white parish remained free to elect their own clerks. The historical parallels drawn on the Senate floor—to John Willis Menard and P.B.S. Pinchback, Black men elected in Louisiana and then denied the offices the

_26_26RS_Day14; *see also* Tammy C. Barney, *First Black person elected to Congress not allowed to take seat*, Verite News (Nov. 14, 2025), https://veritenews.org/2025/11/14/bitd-john-menard-first-black-person-elected-congress/.

[87] Apr. 8 Senate Hearing, *supra* note 86, at 01:54:06–01:54:31.

voters had chosen them to hold—were not rhetorical flourishes. Rather, they underscore how the Landry Act's timing and structure continue a recurring practice of nullifying the electoral choices of Black Louisianians and depriving Black elected officials of their rightful terms on the basis of discriminatory animus.

### E. Defendants' Efforts Have Caused Mr. Duncan Significant Harm

146. Defendants' conduct has also caused Mr. Duncan, specifically, concrete and ongoing harm.

147. Though elected, certified, commissioned, and sworn to a four-year term, he has been denied the office the voters chose him to hold and the elected platform from which he sought to reform the Criminal District Court Clerk's Office, along with the salary and emoluments of that office.

148. He has been forced to curtail the very advocacy for which he was targeted, under the shadow of Defendants' threatened "usurper" enforcement—criminal penalties, civil suit, and forfeiture of office—directed at anyone who recognizes an officeholder other than Ms. Napoleon. And he previously relinquished his claim for state compensation for his wrongful conviction in the face of Defendant Murrill's threats to prosecute him and to contest his application to the Louisiana Bar.

149. Mr. Duncan is deeply reluctant to seek office again—afraid that Defendants will once against target him and (if they do not succeed in preventing him from winning) nullify his election all over again. Indeed, Mr. Duncan fears he will face further retaliation for litigating this very case.

150. Mr. Duncan has also refrained from applying to sit for the Louisiana bar examination, out of a well-founded concern that doing so would invite further retaliation from Defendants.

151. Mr. Duncan brings this suit because there is no doubt in his mind—particularly following the enactment of the Landry Act—that he was targeted as a Black exoneree championing criminal justice reform. This view is shared by thousands of other Orleans Parish voters who stand to have their vote erased if Mr. Duncan does not take his rightful place as Criminal District Court Clerk.[88]

## CAUSES OF ACTION

### COUNT I
### (42 U.S.C. § 1983)
### Denial of Electoral Due Process (U.S. Const. amend. XIV)
### (Against All Defendants in Their Official Capacities)

152. Mr. Duncan realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

153. At all relevant times, Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983. Mr. Duncan, together with the other voters of Orleans Parish, possessed a constitutionally protected interest in a fairly and honestly conducted election and in the effect of the votes lawfully cast, as secured by the Due Process Clause of the Fourteenth Amendment. Mr. Duncan is himself one of those voters: he cast ballots for himself in both the October 11, 2025 open primary and the November 15, 2025 runoff election for Clerk of Criminal District Court, and both of those votes were stripped of legal effect along with those of every other Orleans Parish elector who participated. Mr. Duncan was also duly elected, certified, commissioned, and sworn to the office of Clerk of Criminal District Court for Orleans Parish.

154. The interest protected here is not any personal entitlement to public office, but the electorate's liberty interest in the fundamental fairness and integrity of the electoral process the State itself established. The Fourteenth Amendment protects the right of all qualified citizens to

[88] LaRose, *supra* note 33.

vote in state and local elections, and that right may be denied by the debasement or dilution of the weight of a citizen's vote as effectively as by wholly prohibiting its free exercise. It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters and to fill the seats of government other than through the electoral process the State's own law commands.

155. Defendants deprived Mr. Duncan of that interest without constitutionally adequate process by enacting and enforcing the Landry Act to abolish Mr. Duncan's office after he had been elected to it, nullifying the completed November 2025 election, and installing an unelected officeholder in his place—without any established, uniform, and nonarbitrary procedure and without a meaningful opportunity to be heard. The challenged conduct went far beyond garden-variety election irregularities; it retrospectively nullified a completed election, worked a patent and fundamental unfairness in the electoral process, and was intended to change its outcome. Defendants' conduct was deliberate and purposeful: they enacted and enforced the Landry Act with the specific intent of preventing Mr. Duncan from serving the term the electorate chose him to hold.

156. The voters of Orleans Parish cast their ballots, and Mr. Duncan campaigned for and won office, in reliance on the rules the State had announced and long followed: that the November 2025 election would determine who would hold and exercise the office of Clerk of Criminal District Court. The State confirmed that commitment at every step—by calling the election, tabulating and certifying the results, issuing Mr. Duncan a commission, and administering his oath of office. Having induced the electorate to participate on those terms, Defendants may not retroactively strip the votes already cast of all legal effect.

157. A post-election change that alters the meaning and effect of votes already cast—as distinct from a garden-variety election irregularity—works a patent and fundamental unfairness that offends the Due Process Clause. *Poythress*, 657 F.2d 691. The Landry Act did not merely dilute the votes cast for Mr. Duncan or subject them to a recount under new rules; it nullified the election's entire legal effect after the outcome was known, extinguishing the office the electorate had just filled before its chosen candidate could serve the term, and vesting that office's authority in an official the voters never elected to it. That retroactive nullification of a completed election is the paradigmatic patent and fundamental unfairness that federal due process forbids, and it is independent of any property interest in the office itself.

158. A State may of course restructure, consolidate, or even abolish a local office *prospectively*, by setting the terms of the office *before* an election so that voters and candidates know what the election will decide. But once the State has committed the office to popular election and the election has been held, it may not retroactively nullify that result—by stripping the office of its authority or abolishing it outright—to prevent the winning candidate from exercising the authority the voters conferred. The timing is dispositive: the Landry Act redefined and abolished the office not before the November 2025 election, but after their disfavored candidate, Mr. Duncan, had won it, was signed days before his term began, and was made effective the day before his inauguration, for the express purpose of ensuring he could not serve his elected term.

159. Mr. Duncan's injuries include both the loss of the office to which he was elected and the nullification of the votes to serve in that office. Those injuries are the direct and proximate result of Defendants' enactment and ongoing enforcement of the Landry Act, and they will continue unless enjoined. Because these harms are ongoing and irreparable and have no adequate remedy at law, they would be redressed by the relief Mr. Duncan seeks: a declaration that the Act

is unconstitutional as applied to him; an injunction restraining Defendants from enforcing the Act against him, from installing any other person as clerk of court for the Parish of Orleans, and from taking "usurper" or other enforcement action against him or those who recognize him as clerk; compensatory and punitive damages against Defendants Governor Landry and Attorney General Murrill in their personal capacities; nominal damages; and reasonable attorneys' fees under 42 U.S.C. § 1988.

**COUNT II**
**(42 U.S.C. § 1983)**
**Deprivation of Property Without Due Process (U.S. Const. amend. XIV)**
**(Against Defendants Governor Landry and Attorney General Murrill in Their Official and Personal Capacities, and Defendant Secretary of State Landry in Her Official Capacity)**

160. Mr. Duncan realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

161. Although an elected official has no constitutionally protected property interest in a public office itself, Mr. Duncan held a constitutionally protected property interest in the salary, compensation, and emoluments attached to the four-year term to which he was duly elected on November 15, 2025, certified by the Secretary of State, commissioned by the Governor, and sworn into office on April 21, 2026. Mr. Duncan's position is that he began that term at midnight on May 4, 2026, and, in any event, that his entitlement to the term's compensation and emoluments had vested before Defendants' enforcement of the Landry Act excluded him from continuing to serve. That interest arises not from the office as such but from Mr. Duncan's legitimate, statutorily grounded entitlement to the fixed compensation and emoluments of the term he had already begun, or at minimum was entitled, to serve. That interest is reinforced by the Louisiana Constitution, which provides that the compensation of an elected public official shall not be reduced during the term for which he is elected. La. Const. art. X, § 23.

162. Under Louisiana law, the constitutional protections attached to an elected term vest at the time of election, not the date of assumption of office. *Hoag v. State ex rel. Kennedy*, 836 So. 2d 207, 231 (La. Ct. App. 2002); *Avoyelles Par. Just. of Peace v. Avoyelles Par. Police Jury*, 758 So. 2d 161, 166–69 (La. Ct. App. 1999); *Calogero v. State ex rel. Treen*, 445 So. 2d 736, 739 (La. 1984). Mr. Duncan was elected on November 15, 2025; certified and commissioned by Defendants themselves; and sworn into office on April 21, 2026. His property interest in the compensation and emoluments of his elected term therefore attached no later than his election and could not be extinguished by post-election legislation.

163. Defendants deprived Mr. Duncan of that property interest without constitutionally adequate process by enforcing the Landry Act to exclude him from continuing to serve his elected term and receive the compensation and emoluments attached to that term—without any established, uniform, and nonarbitrary procedure and without a meaningful opportunity to be heard.

164. The deprivation of Mr. Duncan's compensation and emoluments is the direct and proximate result of Defendants' enactment and continued enforcement of the Landry Act. One of the Louisiana Supreme Court justices—joined by another—recognized that any claim by Mr. Duncan for foregone compensation under Article X, Section 23 of the Louisiana Constitution remains available for resolution in future litigation. That injury would be redressed by the relief Mr. Duncan seeks: a declaration that the Act is unconstitutional as applied to him; an injunction restraining Defendants from enforcing the Act against him, from installing any other person as clerk of court for the Parish of Orleans, and from taking "usurper" or other enforcement action against him or those who recognize him as clerk; compensatory and punitive damages against

Defendants Governor Landry and Attorney General Murrill in their personal capacities; nominal damages; and reasonable attorneys' fees under 42 U.S.C. § 1988.

**COUNT III**
**(42 U.S.C. § 1983)**
**Retaliation (U.S. Const. amend. I)**
**(Against Defendants Governor Landry and Attorney General Murrill in Their Official and Personal Capacities, and Defendant Secretary of State Landry in Her Official Capacity)**

165. Mr. Duncan realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

166. Mr. Duncan engaged in activity protected by the First Amendment; Defendants took adverse action that would chill a person of ordinary firmness from continuing to engage in that activity; and Mr. Duncan's protected activity was a substantial or motivating factor in that adverse action. Because Mr. Duncan is an elected official, Defendants' action is materially adverse in that it prevents him from performing the office's duties and deprives him of the authority he enjoyed by virtue of his popular election. *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022).

167. Mr. Duncan engaged in activity protected by the First Amendment, namely his sustained public criticism of the Orleans Parish criminal legal system, his advocacy for criminal-justice and racial-justice reform, his public identification as an exoneree, his campaign for office, and his filing of this and prior litigation. This activity addressed matters of public concern and constituted core political speech.

168. Defendants took adverse actions against Mr. Duncan, including Attorney General Murrill's public threats of "further action" if he continued to describe himself as exonerated, and the Governor's direction, signature, implementation, and continued enforcement of the Landry Act to abolish Mr. Duncan's office and prevent him from serving in it—actions that would chill or deter a person of ordinary firmness from continuing to engage in the protected activity. The abolition of Mr. Duncan's office is not mere criticism or censure; it is the exclusion of a duly

elected official from the office the voters chose. *Bond v. Floyd*, 385 U.S. 116 (1966); *see Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 481–82 (2022) (distinguishing permissible censure from an actionable exclusion from office). Mr. Duncan's protected activity was a substantial or motivating factor in Defendants' decision to take those adverse actions. Defendants would not have taken the same actions absent the retaliatory motive, and there was no legitimate, non-retaliatory basis for the conduct.

169. Defendants' retaliation—Attorney General Murrill's threats of "further action" and the Governor's direction, signature, implementation, and continued enforcement of the Landry Act—is the direct and proximate cause of Mr. Duncan's loss of the elected office and platform the voters conferred and of the chilling of his protected speech. These injuries are ongoing and irreparable, have no adequate remedy at law, and will persist so long as Defendants enforce the Act. They would be redressed by the relief Mr. Duncan seeks: a declaration that the Act is unconstitutional as applied to him; an injunction restraining Defendants from enforcing the Act against him, from installing any other person as clerk of court for the Parish of Orleans, and from taking "usurper" or other enforcement action against him or those who recognize him as clerk; compensatory and punitive damages against Defendants Governor Landry and Attorney General Murrill in their personal capacities; nominal damages; and reasonable attorneys' fees under 42 U.S.C. § 1988.

**COUNT IV**
**(42 U.S.C. § 1983)**
**Burden on Future Protected Speech (U.S. Const. amend. I)**
**(Against Defendants Governor Landry and Attorney General Murrill in Their Official and Personal Capacities, and Defendant Secretary of State Landry in Her Official Capacity)**

170. Mr. Duncan realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

171. The First Amendment protects Mr. Duncan's right to engage in future political speech, association, candidacy, and petitioning free from unwarranted governmental burden or restraint. Defendants' course of conduct described above—including the enactment and threatened enforcement of the Landry Act and Attorney General Murrill's threats of prosecution and "usurper" enforcement—imposes a direct and continuing burden on Mr. Duncan's ability to engage in such protected expression by threatening further sanction and by removing the elected platform from which he exercised it.

172. The burden Defendants have imposed is objectively chilling: it would deter a person of ordinary firmness from continuing to engage in protected political speech, and it has had that exact effect on Mr. Duncan. Indeed, Defendants' prior and ongoing actions have left Mr. Duncan deeply reluctant to seek office again. Defendants may not condition Mr. Duncan's ability to hold the elected office the voters conferred, or his freedom from "usurper" enforcement, on the surrender of his First Amendment rights.

173. Defendants' course of conduct was substantially motivated by Mr. Duncan's protected speech and was undertaken because of, not merely in spite of, that speech. Mr. Duncan faces a credible and continuing threat of enforcement that presents an ongoing and concrete injury, including Defendant Murrill's threats of "further action" against Mr. Duncan, her threats of criminal prosecution and "usurper" enforcement, and her demonstrated willingness to invoke the usurper statutes against public officials who recognize any officeholder other than Ms. Napoleon—as shown by her threats to remove the Mayor, the District Attorney, five City Council members, and interim Clerk Johnson.

174. Unless enjoined, Defendants' enactment and threatened enforcement of the Landry Act will continue to burden Mr. Duncan's future protected speech by stripping him of the elected

platform from which he intended to speak and subjecting him to a credible, ongoing threat of "usurper" enforcement. That burden is a direct and proximate result of Defendants' conduct, is irreparable, and has no adequate remedy at law. It would be redressed by the relief Mr. Duncan seeks: a declaration that the Act is unconstitutional as applied to him; an injunction restraining Defendants from enforcing the Act against him, from installing any other person as clerk of court for the Parish of Orleans, and from taking "usurper" or other enforcement action against him or those who recognize him as clerk; compensatory and punitive damages against Defendants Governor Landry and Attorney General Murrill in their personal capacities; nominal damages; and reasonable attorneys' fees under 42 U.S.C. § 1988.

**COUNT V**
**(42 U.S.C. § 1983)**
**Denial of Equal Protection: Post-Election Vote Nullification (U.S. Const. amend. XIV)**
**(Against All Defendants in Their Official Capacities)**

175. Mr. Duncan realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

176. The Equal Protection Clause of the Fourteenth Amendment protects the voters of Orleans Parish, together with Mr. Duncan, from the arbitrary and disparate treatment of votes already cast. Having committed the office of Clerk of Criminal District Court to popular election and having called, tabulated, and certified that election, the State may not, by later arbitrary and disparate treatment, value one parish's completed vote less than another's or strip the votes cast for Mr. Duncan of all legal effect. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). The Landry Act singled out one parish's electorate for post-election nullification of its vote, while the voters of every other parish retained the right to elect their clerk, and thereby denied the voters of Orleans Parish the equal protection of the laws.

177. Orleans Parish voters were also treated differently from voters in the State's other 63 parishes, each of whom retained the right to elect its clerk of court. The Landry Act imposes a severe burden on the right to vote—not by denying access to the ballot, but by retroactively stripping the ballot of all legal consequence—that cannot be justified by the State's asserted efficiency interest, which this Court has already found likely pretextual and which is supported by no study, data, or fiscal justification.

178. Where, as here, state action burdens a constitutionally protected right by regulating the mechanics of the electoral process, its validity is assessed by weighing the character and magnitude of the asserted injury against the precise interests the State puts forward as justification. The injury here—the wholesale nullification of a completed, certified election—is of the highest magnitude, while the State's asserted efficiency interest is supported by no study, data, or fiscal justification and has already been found likely pretextual by this Court.

179. The Landry Act also denies the voters of Orleans Parish the equal protection of the laws by substituting appointment for election as to the criminal clerk's functions. By transferring the office's entire authority, records, and chief-elections-officer duties to an official whom no voter ever selected to perform them, the Act substitutes an appointed officer for one the electorate chose—extinguishing an office whose occupant had just been chosen and vesting its role in someone the electorate never selected for it.[89] Even the *Crockett* majority acknowledged that the federal district court in this action found that Act 15 established a new office when it enjoined the

[89] While Mr. Duncan acknowledges that the *Crockett* court found that no new office was created by the Landry Act, in the alternative, to the extent this Court construes the Landry Act to have created a new consolidated office, the Louisiana Constitution requires that office to be filled by election, and Defendants' installation of an unelected appointee denied Plaintiff and every other Orleans Parish voter the right to vote for the officer who would exercise the criminal clerk's functions. La. Const. art. V, § 28(A).

Governor and Secretary of State from issuing a commission to Ms. Napoleon, and that the Fifth Circuit stayed but did not reverse that finding.[90]

180. Defendants' post-election nullification of the Orleans Parish electorate's completed vote is the direct and proximate cause of Mr. Duncan's injury, as well as the injury of those who voted for him. That injury is ongoing and irreparable, has no adequate remedy at law, and would be redressed by the relief Mr. Duncan seeks: a declaration that the Act is unconstitutional as applied to him; an injunction restraining Defendants from enforcing the Act against him, from installing any other person as clerk of court for the Parish of Orleans, and from taking "usurper" or other enforcement action against him or those who recognize him as clerk; compensatory and punitive damages against Defendants Governor Landry and Attorney General Murrill in their personal capacities; nominal damages; and reasonable attorneys' fees under 42 U.S.C. § 1988.

**COUNT VI**
**(42 U.S.C. § 1983)**
**Equal Protection: Class of One (U.S. Const. amend. XIV)**
**(Against Defendants Governor Landry and Attorney General Murrill in Their Official and Personal Capacities, and Defendant Secretary of State Landry in Her Official Capacity)**

181. Mr. Duncan realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

182. In the alternative to the voter-based theory in Count V, and independent of the race-discrimination theory pleaded in Count VII below, Mr. Duncan was intentionally treated differently as a "class of one" from others similarly situated in all material respects. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Specifically, Mr. Duncan was treated differently from every other official elected in Orleans Parish and from the judicial officers affected by the other 2026 reform bills—SB 217, SB 197, and HB 911—each of which used multi-year

[90] *See* Opinion at 11 n.9, *Crockett*, No. 2026-CV-594, *supra* note 80 (Hughes, J., concurring).

implementation windows that allowed duly elected officials to serve the terms to which they were elected. Defendants intentionally singled out Mr. Duncan for uniquely unfavorable treatment—an immediate, no-implementation-window abolition of his office effective before his term could begin—while treating each identified comparator more favorably.

183. There was no rational basis for the difference in treatment. The disparate treatment was wholly arbitrary and irrational and was motivated by illegitimate personal animus toward Mr. Duncan—targeting him because of who he is as an exoneree and critic of the criminal legal system, and because of his political positions—and bore no reasonable relationship to any legitimate governmental purpose. As alleged above, the Act's sponsor admitted there were no studies supporting it, the Legislative Fiscal Office's fiscal note was indeterminate as to any cost savings, and the Landry Act alone dispensed with the multi-year implementation window used in every comparable reorganization of Orleans Parish offices. Even under rational-basis review, the Landry Act cannot stand, because a law born of a bare desire to harm a politically unpopular or disfavored individual does not serve any legitimate governmental interest. The Act's singular focus on one office, in one parish, taking effect only after the electorate had chosen and only in time to prevent Mr. Duncan from taking his seat, reflects impermissible animus rather than any legitimate interest in governmental efficiency—an efficiency rationale this Court has already found likely pretextual, and which was supported by no study, data, or fiscal justification.

184. Defendants' intentional singling out of Mr. Duncan for an immediate, no-implementation-window abolition of his office is the direct and proximate cause of his injury—the loss of the office and term the voters conferred, while every comparable officeholder was allowed to serve. That injury is ongoing and irreparable, has no adequate remedy at law, and would be redressed by the relief Mr. Duncan seeks: a declaration that the Act is unconstitutional

as applied to him; an injunction restraining Defendants from enforcing the Act against him, from installing any other person as clerk of court for the Parish of Orleans, and from taking "usurper" or other enforcement action against him or those who recognize him as clerk; compensatory and punitive damages against Defendants Governor Landry and Attorney General Murrill in their personal capacities; nominal damages; and reasonable attorneys' fees under 42 U.S.C. § 1988.

**COUNT VII**
**(42 U.S.C. § 1983)**
**Equal Protection: Intentional Race Discrimination (U.S. Const. amend. XIV)**
**(Against Defendants Governor Landry and Attorney General Murrill in Their Official and Personal Capacities, and Defendant Secretary of State Landry in Her Official Capacity)**

185. Mr. Duncan realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

186. Independent of the class-of-one theory in Count VI, Defendants intentionally discriminated against Mr. Duncan on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment. The Landry Act was enacted because of, and not merely in spite of, its impact on a Black officeholder elected by a majority-Black electorate, against a documented backdrop of racial discrimination and voter suppression in Louisiana and Orleans Parish. Race was a substantial or motivating factor in Defendants' conduct. Because race was a motivating factor, Defendants' proffered non-racial justifications must be subjected to strict scrutiny, which they cannot survive.

187. The discriminatory purpose behind the Landry Act is established by the totality of the circumstances surrounding its enactment, including: (a) the historical background of racial discrimination and voter suppression in Louisiana and Orleans Parish; (b) the specific sequence of events leading to the Act, including that it was introduced and accelerated only after Mr. Duncan—a Black exoneree—won election by a majority-Black electorate, was signed days before his term began, and was made effective the day before his inauguration; (c) the Act's departures from the

normal legislative sequence, including the Legislature's abandonment of the multi-year implementation windows it used in every prior and contemporaneous reorganization of Orleans Parish offices; (d) legislators' contemporaneous statements, including Senator Morris's admission that the bill was "in the Governor's package" and that the immediate-effect amendment was designed "[t]o go ahead and get [SB 256 passed into law] before Mr. Duncan takes office"; (e) the Attorney General's pre-election campaign of threats against Mr. Duncan for speaking about his exoneree status; and (f) the Governor's immediate pledge to pardon the Attorney General after she was indicted on sixteen felony counts arising from her threats to remove elected New Orleans officials who resisted the Act's enforcement.

188. Because a discriminatory purpose was a motivating factor, the burden shifts to Defendants to demonstrate that the same legislative action would have resulted even absent the impermissible purpose. Defendants cannot make that showing: no prior or contemporaneous reorganization of Orleans Parish courts was made effective immediately, and the Act's own sponsor admitted it had no supporting studies, data, or fiscal justification. The Landry Act is subject to strict scrutiny, which it cannot survive.

189. Defendants' intentional race discrimination is the direct and proximate cause of Mr. Duncan's injury—the loss of the office and term to which a majority-Black electorate elected him. That injury is ongoing and irreparable, has no adequate remedy at law, and would be redressed by the relief Mr. Duncan seeks: a declaration that the Act is unconstitutional as applied to him; an injunction restraining Defendants from enforcing the Act against him, from installing any other person as clerk of court for the Parish of Orleans, and from taking "usurper" or other enforcement action against him or those who recognize him as clerk; compensatory and punitive damages

against Defendants Governor Landry and Attorney General Murrill in their personal capacities; nominal damages; and reasonable attorneys' fees under 42 U.S.C. § 1988.

**COUNT VIII**
**(42 U.S.C. § 1983)**
**Bill of Attainder (U.S. Const. art. I, § 10, cl. 1)**
**(Against All Defendants in their official capacities)**

190. Mr. Duncan realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

191. The Constitution prohibits the States from enacting any bill of attainder—a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without the protections of a judicial trial. U.S. Const. art. I, § 10, cl. 1. Although framed as a consolidation, the Landry Act applies to Mr. Duncan with specificity: it was drafted and timed to target a single, easily ascertainable individual—Calvin Duncan, the only person elected to the Orleans Parish Clerk of Criminal District Court whose term had not yet begun—and identifies him by reference to his past conduct, including his electoral success and protected campaign speech.

192. The Landry Act inflicts punishment on Mr. Duncan within the meaning of the Bill of Attainder Clause. Disqualification from a position of public trust is a form of punishment, and the Act's punitive character is confirmed by its lack of any non-punitive purpose: it cannot reasonably be said to further a legitimate governmental objective, and its timing, structure, and legislative history evince an obvious legislative intent to punish Mr. Duncan for his protected speech and electoral success. Indeed, that the Act expressly prohibits the consolidated Clerk of Court from terminating any employee of the former Criminal Clerk's Office (absent extenuating circumstances) until January 2027 underscores that the Act was not about "consolidation," but about removing one specific person: Mr. Duncan. The Landry Act imposes this punishment without a judicial trial or any of the safeguards of the ordinary criminal process.

193. The burden the Landry Act inflicts falls within the historical meaning of legislative punishment. Enactments that bar designated persons from a chosen office, profession, or vocation—or that strip them of civil or political rights previously enjoyed—have long been recognized as punishment forbidden by the Bill of Attainder Clause. The Act imposes precisely that kind of deprivation: it ousts Mr. Duncan from, and disqualifies him from holding, the elected public office the voters chose him to fill, extinguishing the authority, salary, and emoluments of that office. Disqualification from and forced forfeiture of public office is a classic historical form of legislative punishment. Because Mr. Duncan's constitutionally protected interest in his elected term vested at the time of his election, *see supra* ¶¶ 161–62, the Act's post-election reduction of that term to zero inflicts punishment on a right that had already vested.

194. Viewed in terms of the type and severity of the burden it imposes, the Landry Act cannot reasonably be said to further any legitimate nonpunitive purpose, and the functional indicia of punishment are present. Its asserted consolidation and efficiency rationale is supported by no study, data, or fiscal justification and has already been found likely pretextual by this Court. The Legislature had readily available, less burdensome alternatives by which it could have achieved any legitimate consolidation objective—including the multi-year implementation windows used in every prior reorganization of Orleans Parish offices, and the rejected amendment that would have delayed the Act's effect until after Mr. Duncan had served the term to which he was elected. The grave disproportion between the burden imposed on Mr. Duncan—the loss of an elected office on the eve of his term—and any purported nonpunitive purpose confirms the Act's punitive character.

195. The legislative record independently evinces an intent to punish Mr. Duncan. The Act was introduced and accelerated through the Legislature only after Mr. Duncan won election,

was signed days before his term, and was made effective the day before his inauguration. On the Senate floor, the Act's sponsor admitted the immediate-effect amendment was brought at the Governor's behest "[t]o go ahead and get [SB 256 passed into law] before Mr. Duncan takes office," and that the alternative would be to "pay [Mr. Duncan] for the next four years in a job that is gonna be eliminated," making "him an immediate lame duck." Those contemporaneous statements, together with the Act's singular focus on the one office Mr. Duncan had just won, reflect a legislative determination to single out and punish Mr. Duncan for his protected speech and electoral success rather than any generally applicable rule of conduct.

196. The legislative punishment the Landry Act inflicts—Mr. Duncan's disqualification, without trial, from the office to which he was elected—is the direct and proximate result of Defendants' enactment and continued enforcement of the Act and persists as an ongoing, irreparable injury with no adequate remedy at law. It would be redressed by the relief Mr. Duncan seeks: a declaration that the Act is unconstitutional as applied to him; an injunction restraining Defendants from enforcing the Act against him, from installing any other person as clerk of court for the Parish of Orleans, and from taking "usurper" or other enforcement action against him or those who recognize him as clerk; compensatory and punitive damages against Defendants Governor Landry and Attorney General Murrill in their personal capacities; nominal damages; and reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT IX
## (42 U.S.C. §§ 1983 and 1985(3))
## Conspiracy
## (Against Defendants Governor Landry and Attorney General Murrill in Their Official and Personal Capacities, and Defendant Secretary of State Landry in Her Official Capacity)

197. Mr. Duncan realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

198. Defendants plotted, planned, coordinated, and conspired to target Mr. Duncan—a Black exoneree and advocate for criminal justice reform—and to prevent him from serving the term to which he was duly elected.

199. Defendants, together with one or more other persons who are not officers or employees of any single State entity—including Ms. Napoleon, an Orleans Parish official who prepared to and did assume the consolidated office before any election for that role; former Clerk Darren Lombard, who coordinated with the Attorney General to attack Mr. Duncan's exoneree status, declare Mr. Duncan a murderer, and silence Mr. Duncan's speech (including his ability to defend against their lies); and others—reached an agreement to deprive Mr. Duncan of the constitutional rights described in the preceding Counts and to accomplish the unlawful objectives described above. The non-state-entity co-conspirators did not merely share a common goal with the Defendant state officials; they willfully participated in joint action with state officials to that end, acting in concert with state actors and under color of state law. In furtherance of the conspiracy, the conspirators committed one or more overt acts, including, but not limited to: (a) directing and enacting the Landry Act and its amendments; (b) refusing alternatives that would have allowed a special election; (c) publicly attacking Mr. Duncan's exoneree status; (d) preparing for and assuming the consolidated office before any election for that role; and (e) threatening "usurper" enforcement—including criminal prosecution and forfeiture of office—against the Mayor, the District Attorney, five City Council members, and interim Clerk Johnson for recognizing any officeholder other than Ms. Napoleon.

200. The object and effect of the conspiracy was to deprive Mr. Duncan of rights secured by the Constitution and laws of the United States, and each act was undertaken under color of state law. The conspiracy was motivated by invidiously discriminatory animus against Mr. Duncan

because of his race, his membership in the class of Black exonerees, and his advocacy on behalf of Black people subjected to Louisiana's criminal legal system—a class-based animus, and not merely disagreement with his conduct. Because the conspiracy included state actors and was aimed at depriving Mr. Duncan of the equal protection of the laws secured by the Fourteenth Amendment, it falls within the conspiracies that Section 1985(3) reaches. The conspiracy actually deprived Mr. Duncan of the protected rights and caused the injuries alleged herein.

201. Because the conspiracy included actors outside any single State entity, including an independently elected parish official and a former local clerk, it is not limited to an alleged agreement among members of one governmental office. Those actors' alleged joint participation with state officials also supports Mr. Duncan's claim that their conduct was taken under color of state law.

202. The conspiracy's object and overt acts—directing and enacting the Landry Act and its amendments, refusing alternatives that would have permitted that Mr. Duncan serve the term he won or, at minimum, that a special election be held to fill the consolidated position, and threatening "usurper" enforcement against those who recognize anyone other than Ms. Napoleon—are the direct and proximate cause of his continuing exclusion from the office to which he was elected. That injury is ongoing and irreparable, has no adequate remedy at law, and would be redressed by the relief Mr. Duncan seeks: a declaration that the Act is unconstitutional as applied to him; an injunction restraining Defendants from enforcing the Act against him, from installing any other person as clerk of court for the Parish of Orleans, and from taking "usurper" or other enforcement action against him or those who recognize him as clerk; compensatory and punitive damages against Defendants Governor Landry and Attorney General Murrill in their personal capacities; nominal damages; and reasonable attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Calvin Duncan respectfully requests that this Court:

a) assume jurisdiction over the claims in this matter;

b) declare that the Landry Act, as applied to Mr. Duncan, violates the First and Fourteenth Amendments and the Bill of Attainder Clause of the United States Constitution;

c) permanently enjoin Defendants from enforcing the Landry Act against Mr. Duncan, and from taking any "usurper" or other enforcement action against Mr. Duncan or those who recognize him as clerk;

d) award compensatory damages against Defendants Governor Landry and Attorney General Murrill in their personal capacities for the injuries caused by their individual conduct;

e) award punitive damages against Defendants Governor Landry and Attorney General Murrill in their personal capacities where their conduct was motivated by evil motive or intent or involved reckless or callous indifference to Mr. Duncan's federally protected rights;

f) award nominal damages;

g) award Mr. Duncan his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

h) enjoin Defendants from taking any further retaliatory action against Mr. Duncan for filing and litigating this suit; and

i) grant such other and further relief as the Court deems just and proper.

Dated: August 14, 2026

Respectfully submitted,


/s/ *Charles Andrew Perry*
Nora Ahmed, *admitted pro hac vice*
Malcolm Lloyd, La. Bar No. 41573
Charles Andrew Perry, La. Bar No. 40906
Ashley Fox, La. Bar No. 41748
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St., Ste. 2160
New Orleans, LA 70112
(504) 522-0628
nahmed@laaclu.org
mlloyd@laaclu.org
aperry@laaclu.org
afox@laaclu.org

Kayla Vinson, *admitted pro hac vice*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
kvinson@ccrjustice.org

William P. Quigley, La. Bar No. 07769
Professor Emeritus of Law
LOYOLA UNIVERSITY COLLEGE OF LAW
7214 St. Charles Avenue
New Orleans, LA 70118
(504) 710-3074
quigley77@gmail.com

Ronald L. Wilson, La. Bar No. 13575
Attorney at Law
701 Poydras Street, Suite 4100
New Orleans, LA 70139
(504) 525-4361
cabral2@aol.com

Joseph L. Sorkin, *pro hac vice forthcoming*
Jillian R. Kulikowski, *pro hac vice forthcoming*
Dara R. Mouhot, *pro hac vice forthcoming*
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park, Bank of America Tower
New York, NY 10036
(212) 872-1000
jsorkin@akingump.com
jkulikowski@akingump.com
dmouhot@akingump.com

Laura P. Warrick, *pro hac vice forthcoming*
AKIN GUMP STRAUSS HAUER & FELD LLP
2300 N. Field Street, Suite 1800
Dallas, TX 75201
(214) 969-2800
lwarrick@akingump.com

Margaret O. Rusconi, *pro hac vice forthcoming*
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
(202) 887-4000
mrusconi@akingump.com


*Counsel for Plaintiff Calvin Duncan*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2026, I electronically filed the foregoing Amended Complaint with the Clerk of the Court by using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Charles Andrew Perry*
Charles Andrew Perry

*Counsel for Plaintiff Calvin Duncan*

# VERIFICATION STATEMENT

I, Calvin Duncan, declare as follows:

1. I am the Plaintiff in the present case, a citizen of the United States of America, and a resident and registered voter of Orleans Parish and the State of Louisiana.

2. I have personal knowledge of myself, my activities, my intent, and the actions undertaken by myself and Defendants, as set out in the foregoing Verified Amended Complaint for Declaratory and Injunctive Relief and Damages.

3. If called to testify, I would competently testify as to the matters discussed in the foregoing Verified Amended Complaint for Declaratory and Injunctive Relief and Damages.

4. Under the laws of the United States of America, I verify under penalty of perjury that the factual statements in the foregoing Verified Amended Complaint for Declaratory and Injunctive Relief and Damages are, to the best of my knowledge, true and correct. *See* 28 U.S.C. § 1746.

Executed on Aug. 13, 2026

Calvin Duncan

Calvin Duncan